## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| **KEVIN FOLTA, Ph.D.** | : | |
| Professor and Chair | : | |
| Horticultural Sciences Department | : | |
| University of Florida | : | |
| Gainesville, FL 32611 | : | |
| | : | |
| | : | |
| **Plaintiff** | : | **CASE NO:** |
| **v.** | : | |
| | : | |
| | : | |
| **THE NEW YORK TIMES** | : | |
| **COMPANY** | : | |
| 620 Eighth Avenue | : | |
| New York, NY 10018 | : | |
| | : | |
| **AND** | : | |
| | : | |
| **ERIC LIPTON** | : | |
| Washington, DC 20016 | : | |
| **Defendants.** | : | |
| | : | |

## CIVIL COMPLAINT
## JURY TRIAL DEMANDED

### I.   INTRODUCTION

1.   This lawsuit against the New York Times and Eric Lipton (defendants), filed pursuant to, *inter alia*, Section 770 (2017) of the Florida Statutes, is required because these defendants intentionally misrepresented the actions of a pure academic scientist to push their own agenda.

2.   Kevin Folta, Ph.D., is a professor and chairman of the horticultural sciences department at the University of Florida, and has dedicated his life to being a scientist.

3. Dr. Folta has made remarkable discoveries related to plant genetics and their application to food products; as part of his mission, has tirelessly worked to educate the public on the facts regarding science.

4. Dr. Folta is also an expert in molecular biology, the basis of genetic engineering, what is colloquially known as "GMOs" or "genetically modified organisms."

5. These defendants – to further their own "anti GMO" agenda and in disregard of the truth – manipulated an interview with Dr. Folta and then misrepresented him as a covertly paid operative of one of the largest and controversial companies in America, Monsanto, a company that produces GMO products.

6. In order to ensure maximum effect and to best propagate their subjective agenda, these defendants placed this lengthy article above the fold on Sunday, 6 September 2015, the day after posting this scandalous article on the New York Times' website, with false and misleading headlines and bylines, to draw readers into the manifestly false and misleading content.

7. These defendants furthered their mischief by using a large photo of Dr. Folta, juxtaposed with more misleading and inflammatory text.

8. As a result of the defendants' knowingly false and misleading article, Dr. Folta, his laboratory, and his family have been the subject of verbal attacks and death threats; his credibility and reputation have been damaged.

9. The defendants' article is attached as Exhibit "A" to this Complaint.

10. In spite of being given multiple opportunities to do so, these defendants refused to retract, correct or otherwise fix the misleading and false article.

## II.   THE PARTIES

11.    Plaintiff Kevin Folta, Ph.D. is an individual who resides in Gainesville, FL. Dr. Folta brings this action in his own right.

12.    Defendant, The New York Times Company, ("NYT") is a New York company with a principal place of business at 620 Eighth Avenue, New York, NY 10018.  At all times material hereto, Defendant NYT owned and published The New York Times, a nationally circulated newspaper with approximately nine million readers – daily – in 2015.

13.    Defendant, Eric Lipton, ("Lipton") is an adult individual who resides in Washington, DC.   At all times material hereto, Lipton was an employee or agent of Defendant NYT.

14.    Defendant NYT and Defendant Lipton may be referred to individually, or collectively as "Defendants."

15.    Each and every defendant is liable for the acts of its agents, servants, and/or employees identified in this complaint.

## II.    JURISDICTION AND VENUE

16.    This Honorable Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 1332.   The amount in controversy substantially exceeds the requirement for Federal Diversity Jurisdiction and to guarantee a jury trial, exclusive of interest and costs. The Defendants are citizens of states other than the state in which the Plaintiff resides.

17.    This Court has jurisdiction over the parties because the Defendants have a substantial presence in Florida, and engage in continuous and systematic business activity in  Florida.    Furthermore,  the  Defendants'  malicious,  false,  and  defamatory  article described herein targeted a Florida citizen.

18.   Venue is proper pursuant to 28 U.S.C § 1391 because all Defendants are subject to the Court's personal jurisdiction with respect to the civil action in question.

## III.   FACTS

19.   Plaintiff, Kevin Folta, Ph.D. ("Dr. Folta"), is a Professor at the University of Florida in Gainesville and Chairman of its Horticultural Sciences Department. He has been employed as a university scientist for 30 years.

20.   When the defendants contacted Dr. Folta for an interview, they failed to inform him that he was going to be the subject of their own "anti-GMO" agenda, and was to be used as a pawn in their story.

21.   During this misleading interview, when it became plain that the defendants were not going to publish the truth, but were, instead, promoting their own agenda, Dr. Folta made it clear to Lipton that his research was funded by a combination of federal and state grants, but has not taken any money from any biotechnology company for his research or his salary.  Even in spite of this, Lipton and the NYT published that and other falsehoods anyway.

22.   These defendants took advantage of and misstated Dr. Folta's involvement in teaching other scientists to effectively communicate his scientific findings to others in a way that transcended the field of horticulture.

23.   These defendants intentionally and maliciously misrepresented Dr. Folta's honest and benign desire to ensure proper education and communication, and misrepresented the basis, nature and purpose of Dr. Folta's lectures.

24.   These defendants also mislead the public via its article by falsely claiming that Dr. Folta was, in effect, a paid operative of Monsanto, and as a covert operative of

Monsanto, misrepresented the safety, purpose and efficacy of GMOs to advance Monsanto's corporate goals instead of presenting legitimate, objective scientific results.

25.    The defendants ignored the anti-G.M.O. platform, subjectively advanced by these defendants in this article, in spite of being well aware that the organic food industry was actively funding particular research and paying academic scientists' salaries to further their own marketing goals.

26.    These anti-G.M.O. activists began submitting FOIA requests for emails from over forty scientists working in biotechnology at public universities, whose research did not support the organic industry's goal – fear of G.M.O.s – in hopes of finding some semblance of the same organic industry funded research.  Defendants latched onto this group, and obtained the materials from these FOIA requests, as part of the article at issue in this lawsuit.

27.    Defendant Lipton, who frequently wrote articles related to lobbying, to help spread the organics industries' false narrative.

28.    On Saturday, September 5, 2015, Defendant NYT published an online article written by Defendant Lipton titled "*Food Industry Enlisted Academics in G.M.O. Lobbying War, Emails Show.*"

29.    The following day, September 6, 2015, Defendant NYT published the article with a new title **on the front page of the Sunday New York Times**: "*Emails Reveal Academic Ties in a Food War. Industry Swaps Grants for Lobbying Clout.*"

30.    As written above, Dr. Folta spoke in depth with Defendant Lipton prior to the publication of his article and explained the facts that are set forth further herein, which

demonstrates that the Defendants knew their defamatory assertions were false and still consciously disregarded the truth.

### A.    *Headlines, Bylines, and Photographs*

31.    Not only are the purported facts of the Defendants' article, which will be described further herein,  knowingly false, but the manner in which the Defendants chose to present this misguided story through the headlines, bylines, and photographs amplified the damage to Dr. Folta.

32.    The front page of the Sunday 6 September 2015 New York Times reads, *"Emails Reveal Academic Ties in a Food War. Industry Swaps Grants for Lobbying Clout:"*



33.    The front page article continued to page 18, with a full page spread with additional headlines, bylines, and photographs.

34.    The Defendants placed Dr. Folta's photo in the middle of the full page spread, above the fold:



"Nobody tells me what to say, and nobody tells me what to think."
**KEVIN FOLTA**
An aggressive biotech proponent with financial ties to Monsanto

"If you spend enough time with skunks, you start to smell like one."
**CHARLES M. BENBROOK**
A proponent of labels on G.M.O. foods, backed by the organic industry

35.    Placing it above the fold on the Sunday New York Times gives an inappropriate and unwarranted amount of emphasis on this story.   Adding insult to that is the clear "quid pro quo" statement in the byline stating "[I]ndustry swaps grants for lobbying clout."

36.    When one even summarily peruses this story, with that byline placed in context with the photographs and word choice surrounding the particular juxtaposition of Dr. Folta's photo with Charles Benbrook ("Benbrook"), it amplifies the damage.   The Defendants knew this would be the result.

37.    The Defendants described Dr. Folta in the caption beneath his photograph as "[a]n aggressive biotech proponent with financial ties to Monsanto" while describing Benbrook as "a proponent (*contra* "aggressive") of labels on G.M.O. foods backed (*contra* "financial ties") by the organic industry."

38.    The Defendants tactically chose to place Dr. Folta next to Benbrook, knowing the nature of Benbrook's relationship with the organics industry.

39.    Claiming that Dr. Folta is an "aggressive biotech proponent with financial ties to Monsanto" was specifically planned to misrepresent Dr. Folta's work and affiliations.

40.    The Defendants knew Dr. Folta has no financial ties to Monsanto – personal or research.   The Defendants deliberately chose the caption "if you spend enough time with skunks, you start to smell like one" to insinuate that Dr. Folta is a "skunk."   This was offensive, malicious, and reckless.

41.    The photographs, bylines, and captioning in the online version of the Defendants article is equally as glaring.

42.    The Defendants use a photo of Dr. Folta – seen in a laboratory with petri dishes, metal racks, and indoor plants under florescent lamps. Benbrook's photo, on the other hand, shows him outside in the great outdoors, with a winding river, trees, and mountains:

 

43.    The captions that the Defendants selected to accompany the photographs are telling as well.   While Dr. Folta is "among the scientists *who have been recruited* in the

debate over **bioengineered foods**," Benbrook is merely "*supported* by organic food companies."

44.   As part of the defendants' scheme and plot to damage Dr. Folta, **directly across from Dr. Folta's photograph** appears:

> "But even some of the academics who have accepted special "**unrestricted grants**" or taken industry-funded trips to **help push corporate agendas on Capitol Hill** say they regret being caught up in this nasty food fight."
>
> "If you spend enough time with skunks, you start to smell like one [.]"

45.   As described further herein, the Defendants knew that Dr. Folta never received a "grant" from Monsanto or any company.

46.   The Defendants knew that Dr. Folta never "lobbied" for Monsanto or any company. They knew he was not registered as a lobbyist and that it would be illegal for him to engage in lobbying activity.

47.   Despite the Defendants' knowledge that Dr. Folta never received a grant from Monsanto and never lobbied for Monsanto, Defendants chose to put these titles, bylines, and photos, above the fold of the Sunday New York Times newspaper and adjacent to Dr. Folta's photograph online.

### B.    The Defamatory Setup to the Article

48.   Lipton starts with Monsanto, introducing the villain in his story and setting it up for a false narrative around purported academic stooges.

49.   Next, Lipton puts his villain on one side of the "billion-dollar industry war." He creates the "war" to support his title of "enlist[ing]" scientists – the soldiers doing the work for their industry.

50.   To further his backdrop, he purports to suggest that it was only through recently obtained emails that this "recruit[ment] of academic researchers" was finally revealed.

51.   To complete his fictional backdrop, Lipton then reveals who is winning this purported "war" – his villains:

> The push has intensified as the Senate prepares to take up ***industry-backed legislation*** this fall, already passed by the House, that would ban states from adopting laws that require the disclosure of food produced with genetically modified ingredients.

> The efforts have helped produce ***important payoffs***, including the approval by federal regulators of new genetically modified ***seeds after academic experts intervened*** with the United States Department of Agriculture on the industry's behalf, the emails show.

### C.   *The Malicious and Defamatory Falsehoods*

#### I.   UNDISCLOSED AND UNRESTRICTED GRANTS – FALSE

52.   The Defendants' article directly, and falsely, reports that Dr. Folta has received an "undisclosed amount in special grants."

53.   Lipton knew that Dr. Folta *never* received a penny from Monsanto or other companies in the industry, never received any form of grant, and never received support for him to "travel around the country and defend genetically modified foods."

54.   Given that there is no support for this claim and Lipton was specifically told these facts, it can only be concluded that this damaging activist narrative was spun to further harm Dr. Folta.

55.   The Defendants wrote:

> "This is a great 3rd party approach to developing the advocacy that we've been looking to develop." Michael Lohius, the director of crop biometrics at Monsanto, wrote last year in an email as the company considered giving Dr. Folta an ***unrestricted grant***."

56. This was false.  Dr. Folta has never received an "unrestricted grant," and these defendants misrepresented what an "unrestricted grant" is.

57. These defendants knew that the supposed "unrestricted grant" to Dr. Folta was in fact an unrestricted *gift* to *the university*, which means that the funds provided to the university go into a fund to support the training scientists and students in science.

58. These defendants knew that Dr. Folta is incapable of receiving an "unrestricted grant."  In fact, there is no such thing as an "unrestricted grant."

59. Lipton knows that Dr. Folta is incapable of receiving any such funds as this article implies.

60. The only way that grants can be made is with specific guidelines and deliverables being stated up front.  No guidelines or deliverables were made and no deliverables were expected.

61. Defendant Lipton spun an "unrestricted gift" – which means that it goes to *the University foundation* and has no expected deliverables – and changed the wording to "unrestricted grant" to Dr. Folta to maliciously imply that there was a bottomless pit of funds with which to bribe Dr. Folta to do Monsanto's bidding.

62. This malicious implication is – as intended – catastrophic to the reputation and emotions of an honest, independent public scientist. The damage is so catastrophic that it serves to silence the other honest scientists for fear of the same fate. Again, the goal.

63. Defendant Lipton not only smeared Dr. Folta, but has almost single handedly silenced the scientific community from teaching scientists how to communicate.

64. Defendant Lipton was made aware of the defamatory difference between an "unrestricted gift" to a university and the fictional "unrestricted grant" to Dr. Folta.  Lipton

did more than willfully disregard the factual difference – he spun it to promote his own activist viewpoint at Dr. Folta's expense.

65.   The article continues to falsely claim that Monsanto gave Dr. Folta an unrestricted grant:

> In August 2014, Monsanto decided to approve ***Dr. Folta's grant for $25,000*** to allow him to travel more extensively to **give talks** on the genetically modified food ***industry's products***.

66.   As written above, Dr. Folta did not "give talks on the genetically modified food industry's products." He teaches scientists and students about how the technology works: its strengths, limitations, risks, benefits, and the published evidence.    Dr. Folta's discussions are spent talking about the way scientists communicate and how scientists are not connecting to people correctly.

67.   Dr. Folta does not discuss industry products of any sort, he teaches broadly about technology.

68.   Lipton's clear and false implication that Dr. Folta is nothing more than a paid industry salesman is an incredibly damaging claim, and is the 'kiss of death' to a public scientist's reputation. An implication these defendants knew or recklessly disregarded.

## II.    DEFENDANTS FALSELY CLAIM THAT DR. FOLTA WORKED DIRECTLY WITH A MONSANTO OPERATIVE TO MISLEAD THE PUBLIC

69.   The Defendants misrepresented Dr. Folta's communications with Bill Mashek (who does not work for Monsanto) to further the agenda of this article.

70.   The   Defendants   knew   Mashek's   company   sponsored   the   website gmoanswers.com, an evidence based website where curious or concerned citizens can have

64L3267.DOCX

scientists (like Dr. Folta) provide science-based responses to their inquiries related to genetic engineering of crop plants (familiarly,"GMOs").

71.    The reference to "keep it up" in the story takes a positive, important action in public education by these highly qualified scientists and portrays it as some nefarious scheme and plot on behalf of Dr. Folta to mislead the public at the direction and benefit of Monsanto and related companies.

72.    The Defendants' implication that Dr. Folta has been "recruited" by the biotech industry is also false, malicious and reckless. The Defendants reported that "companies like Monsanto are squaring off against major organic firms like Stonyfield Farms, the yogurt company, and both sides have aggressively recruited academic researchers, emails obtained through open records laws show." Yet, the Defendants knew that Dr. Folta has never been "recruited" by any company, and to present that is malicious and reckless.

73.    In this regard, the Defendants knew that there may be nothing more offensive to a life-long scientist than to report that he was "recruited" by the biotech industry in order to further their agenda, and not pure science, or to portray him as an industry lackey and lobbyist.

74.     Beyond the above, the Defendants also clearly imply that Dr. Folta's research is slanted, inaccurate, and otherwise suspect:

> The emails provide a rare view into the strategy and tactics of a ***lobbying campaign*** that has ***transformed ivory tower elites into powerful players***.    The use by both sides of third-party scientists and their ***supposedly unbiased*** research, helps explain why the American public is often confused as it processes the conflicting information.

75.    Comments such as "ivory tower elites," "powerful player," and "supposedly unbiased research" is offensive and undermines everything that Dr. Folta has worked his

life to create – pure science and a stellar reputation for advancing evidence based findings to advance his passion for science and to aid humanity.

76.    Calling Dr. Folta an "[i]vory tower elite" is particularly offensive because Dr. Folta works constantly, and has always performed substantial amounts of public service – from third grade classrooms to retirement homes without getting a nickel for his time.

77.    The whole paragraph is meant to build Lipton's story of corporate villains and their academic puppets in this "war."

### III.    TRAVEL PAID BY MONSANTO TO SUPPORT ITS AGENDA – FALSE

78.    The Defendants wrote:

> "By the middle of 2014, Dr. Folta and Monsanto had taken steps to ***formalize their relationship***, with Dr. Folta planning a trip, at the company's expense, to its headquarters and the company considering a ***grant to Dr. Folta*** for helping promote G.M.O. technologies."

79.    This is also false.   This travel was not at the company's expense.  Dr. Folta was at the University of Missouri to teach a summer course.   On his way home he stopped at Monsanto to give a seminar about how to teach other scientists to speak with the public. Dr. Folta did not "formalize [a] relationship" with Monsanto.

80.    The goal of "relationship" to imply there was a "client relationship" or "employee relationship", i.e. Dr. Folta does what's in the best interest for the entity who pays him.

### IV.    DEFENDANTS FALSELY CLAIMED THAT DR. FOLTA HAS MOTIVATIONS TO DEFEND MONSANTO

81.    Defendant Lipton sought to falsely define Dr. Folta's motivations and imply they are less than pure.

82.    Contrary to the defendants' misrepresentations, Dr. Folta is not part of a "campaign to publically defend genetically modified technologies."

64L3267.DOCX

83.   Defendant Lipton's malicious premise and pre-judgment of the facts is exemplified by his loaded question to Dr. Folta: "how does it feel to be a tool of the industry?"

84.   This unprofessional, disgraceful comment by Lipton reveals his activist approach to this, his slant, and so does the manner in which he couched Dr. Folta's response.

85.   Dr. Folta summarily and swiftly rejected Lipton's premise.  Yet, Defendant Lipton did not include Dr. Folta's rejection of Lipton's misleading and ignorant premise in the article, because it did not support the defendants' false, activist narrative.

86.   Neither Defendant Lipton nor Defendant NYT has a shred of evidence that Dr. Folta is subject to any influence from Monsanto or any company or that companies influence his teaching or messaging. His scientific presentations and communications workshops are based on the peer-reviewed literature and are consistent with the scientific consensus.

87.   Similarly, the Defendants have no evidence to support their false claims that Dr. Folta was ever involved in lobbying or corporate public relations campaigns – because there is none.

88.   Lipton also cherry picked quotations from emails to further his false and defamatory narrative that Dr. Folta was motivated to defend Monsanto:

> "Misinformation campaign in ag biotech area is more than overwhelming," Yong Gao, then Monsanto's global regulatory policy director, explained in an April 2013 email to Dr. Folta as the company ***started to work closely with him***. "It is really hurting the progress in translating science and knowledge into ag productivity."

89.   Lipton knew that Dr. Folta did not even know who "Yong Gao" was when Dr. Folta received that email.

90.   Lipton's misrepresentation of the facts sought to imply that there was some relationship between Yong Gao and Dr. Folta; the false and defamatory implication is clear – that Monsanto's "global regulatory policy director" has direct access to Dr. Folta, and, in accord with the twisted theme of the article, can sway Dr. Folta's beliefs, research, results, and motivations. In other words, Dr. Folta will lie for money.

91.   Contrary to the goal of Lipton's activist narrative, Gao's comments are true.  In addition to speaking with Dr. Folta, Lipton purports to have read all of the email exchanges. He knew that Gao wrote to Dr. Folta out of the blue after reading one of Dr. Folta's articles, which was based on good scientific evidence. Dr. Folta does not know Gao and has never met him.  Lipton knew this.

92.   Dr. Folta did nothing nefarious but Lipton spun and presented it as such to support his own activist narrative.

93.   Lipton did not stop there, and instead amplified the damages by implying Dr. Folta took steps to hide his purported "relationship" with Monsanto and that only upon receipt of the emails was the depth and breadth of Dr. Folta's purported mischief revealed:

> "Dr. Folta is among the most aggressive and prolific biotech proponents, although until his emails were released last month, ***he had not publicly acknowledged the extent of his ties*** to Monsanto."

94.   The truth – known to the defendants - is that any time there was a communications workshop, the sponsors were identified – including Monsanto – on the program's public website, along with others.

64L3267.DOCX

95.   However – Monstano was never acknowledged on Dr. Folta's research, because *it never sponsored, paid for, contributed, or had any influence or involvement in his research*.   Yet, Lipton implies the reverse – that Dr. Folta concealed purported research funding by Monsanto – which is another dagger to not only the reputation of an objective scientist but to the merits of his research overall – his life's work.

96.   Lipton used this language to suggest that Dr. Folta's scientific discussion of biotechnology is somehow motivated by "ties" to Monsanto (the "undisclosed grant"), and that the donation to the University of Florida was not public information.   Lipton knew that that was not the case.

97.   Lipton has also misrepresented the manner in which Monsanto executives first approached Dr. Folta. He wrote:

> "[Dr. Folta] has a doctorate in molecular biology and has been doing research on the genomics of small fruit crops for more than a decade. Monsanto executives approached Dr. Folta in the spring of 2013 after they read a blog post *he had written defending industry technology*."

98.   The Defendants knew this was misleading.   Lipton knew that Dr. Folta's blog post was not "defending industry technology," but was instead identifying falsified information that was put on a website by, ironically, anti GMO activists.

99.   Dr. Folta published truthful scientific facts and evidence based research, with risks and benefits.   He was not "defending industry technology" as though he was somehow promoting a misleading or false narrative.   He was correcting a false narrative put out by the same camp as the Defendants.

---

64L3267.DOCX

100. The article furthers the false narrative by stating that Dr. Folta defends and promotes industry products, which, again, makes the clear implication that he is some paid advocate rather than a pure academic scientist:

> "Dr. Folta is one of many academics the biotech industry has approached to help [Monsanto] ***defend or promote its products***, the emails show."

101. Dr. Folta ***never*** promoted or defended Monsanto's products. Lipton is well aware that he teaches about technology and how to communicate it, and that all the information is based on the scientific literature; far from the agenda that the NYT wants to promote.

## V. Lobbying for the Industry – False

102. Lipton also defamed Dr. Folta with this excerpt:

> "Dr. Folta, the emails show, soon became part of an ***inner circle*** of industry *consultants*, *lobbyists* and *executives **who devised strategy*** on how to ***block state efforts*** to mandate G.M.O. labeling and, most recently, on ***how to get Congress to pass legislation*** that would pre-empt any state from taking such a step."

103. Dr. Folta is not part of an "inner circle of industry consultants, lobbyists and executives."

104. Dr. Folta has never "devised strategy to block state efforts."

105. To create a false premise for this outrageous claim, Lipton made this false and misleading conclusion by misrepresenting the clear import of an email, which Lipton took out of context to advance his activist agenda.

106. In that email, Dr. Folta discussed how *science* should drive the process and that others, who discuss this as a process and not a product, are correct. That is not "inner circle" strategy. That's textbook science.

64L3267.DOCX

107. Lipton progresses the article to frame a factual statement as nefarious, when it is the opposite:

> What the situation requires is a suite of TV spots featuring attractive young women, preferably mommy farmers, explaining why biotech derived foods are the safest & greenest in the history of ag and worthy of support," wrote L. Val Giddings, a senior fellow at Information Technology & Innovation Foundation, a nonprofit food policy research group in Washington, in an October 2014 email to a Monsanto lobbyist. The company was debating how to defeat labeling campaigns last year in Colorado and Oregon. Dr. Folta, included in the email chain, agreed. "We can't fight emotion with lists of scientists," Dr. Folta wrote to Lisa Drake, the Monsanto lobbyist. "It needs a connection to farming mothers."

108. The facts, known to Lipton and NYT, are that this statement is based on data collected by many organizations. It is information that sociologists, advertisers, and many others know, and scientists don't think about – classic *pathos* versus *logos*.

109. Importantly, ***Dr. Folta highly criticized Monsanto's approach***, which was fear-based – no better than the activists. Dr. Folta simply pointed out why their plan was flawed. Yet, Lipton spins this to make it appear that he is agreeing with a misleading industry message to the public.

110. Ironically, as much as Lipton attempted to portray Dr. Folta as some "quid pro quo" industry lackey, he all but ignores the massive conflicts of interest in the anti-G.M.O. lobby.

111. Lipton willfully ignored the massive financial conflicts of interest of Benbrook (juxtaposed to Dr. Folta's photo above), which shows this article was nothing more than an asymmetrical attack on Dr. Folta to further the anti-G.M.O. agenda. Lipton wrote:

> "At least twice, Mr. Hirshberg's group also paid for Dr. Benbrook to go to Washington so he could help lobby against a federal ban on G.M.O. labels. And his research suggesting that herbicide use in G.M.O. crops has surged

has been a central part of the organic industry's argument for mandatory labels."

112.   Lipton and NYT knew that Benbrook had a **_salary and 100% of his research paid_** by industry; some estimates have said **_over $1 million_**.

113.   Unlike Dr. Folta, Benbrook publishes work that is highly criticized and includes *"estimated" statistics* that influence the outcomes of the trends, leading to his anti-biotech conclusions.

114.   Benbrook has also authored work saying there is no health consensus on food products from genetically engineered crops, in direct opposition with the National Academies of Science's (the most esteemed scientific body in the USA) synthesis.

115.   Unlike Dr. Folta, Benbrook does not disclose this funding in his research papers that the anti-G.M.O. industry sponsored.

116.   If Lipton actually sought to write an article on the "industry swap[ing] grants for lobbying clout" he would have included these known, egregious, facts about Benbrook in his article.  Instead, Lipton ignored them to further his own agenda at Dr. Folta's expense.

### D.   *The Aftermath of the Defendants' Article*

117.   As further evidence of the laden falsehoods contained in the Defendants article, Forbes published an article to describe the manifest errors and harmful spin in the Defendants' article only four days after it was published titled, *"What The New York Times Missed On Kevin Folta and Monsanto's Cultivation of Academic Scientists."*

118.   Dr. Folta himself wrote to the NYT public editor, Liz Spayd, on two occasions and requested corrections to the falsehoods, improper inferences and innuendoes, and knowingly wrong false-light presentations of Dr. Folta.  He enclosed a litany of information and evidence, which demonstrated the above.

64L3267.DOCX

119. In response, he received a boilerplate note from an autoresponder, only to acknowledged receipt of his. NYT never even sent a substantive response to his extensive letters.

120. The Defendants' article, laden with falsehoods, improper inferences and innuendoes, and knowingly wrong false-light presentations of Dr. Folta, caused tremendous damage to him and his family.

121. Hundreds of false, career-damaging articles began to issue, citing the NYT as a piggyback, all of which are a permanent part of the internet's archive.

122. Universities cancelled Folta's invited seminars and presentations, which had been continuously scheduled and organized throughout his long career.

123. Dr. Folta's university had to remove his name from his laboratory and change his office phone number after receiving credible threats to him, and those that work with him.

124. Dr. Folta's direct supervisor was even asked to meet with the FBI Domestic Terrorism Task Force in response to the credible threats against him.

125. Dr. Folta had standing media opportunities that were cancelled, with at least one source saying, "because the New York Times says you work for Monsanto."

126. Dr. Folta's university had individuals follow him to local meetings, farm events, and public seminars, or, alternatively, made him cancel off-campus events because of the fallout from the Defendants' article.

127. Dr. Folta has been excluded from academic events and discussions, with organizers citing the Defendants' article.

128. Dr. Folta has also received numerous death threats, to the point that his employer had to meet with the FBI Domestic Terrorism Task Force to ensure the safety of Dr. Folta and his laboratory. Dr. Folta has been forced to ensure protection for himself, his family, and his colleagues and all times.

129. To this day, approximately 50% of the first page of a Google web search or Google Images search are negative, defamatory, false, and tied to the Defendants' article.

130. At the young age of only fifty, Dr. Folta is extremely young for a university administrator at a major US university.  The reputational and collateral damage from the Defendants' article capped his career ascension and destroyed the opportunities he earned with over 30 years of public service in university science.

131. The Defendants' article trashes all of the reputational and emotional benefits that Dr. Folta has created as a result of his dedication to science.

### E.    *Lipton Doubles Down on His Malice*

132. In the April, 2016, the Council for Agricultural Science and Technology ("CAST") announced that Dr. Folta was the recipient of the prestigious 2016 CAST Communication Award. CAST's press release read, in part:

> "A teacher, mentor, researcher, and organizer, Folta focuses on clear, credible information. He knows how to communicate science to non-scientific audiences—and how to train scientists, farmers, physicians, and students to perform public outreach in scientific or controversial topics.
> ...
> Although he is an accomplished scientist, Folta is respected by his peers and many others for his ability to communicate in a polite, thoughtful, and provocative manner. As one colleague stated, 'He treats everyone with tremendous respect. He often transforms conflict-riddled situations into true learning moments.' With his passion for science, knowledge, and understanding, Dr. Folta is a worthy recipient of the Borlaug CAST Communication Award.

133. Within hours after the announcement, Defendant Lipton took to twitter to continue his malicious campaign:



**Eric Lipton** ✓
@EricLiptonNYT

Biotech industry comes-strongly-to
defense of Kevin Folta--U of Florida
prof featured in NYT piece on
Monsanto/GMOs
agri-pulse.com/Florida-biotec…

9:39pm · 21 Apr 2016 · Twitter Web Client

134. Defendant Lipton categorizes the prestigious award as just the "industry com[ing] strongly to [the] defense" of Dr. Folta (furthering his 'war' theme) and then describes his own article *as being about "Monsanto/GMOs."*

135. There were other tweets as well, equally as malicious, that Defendant Lipton has since deleted.

136. In order to cause even more mental harm to Dr. Folta, Defendant Lipton then blocked Dr. Folta from viewing Lipton's malicious tweets, so that Dr. Folta was not even able to see what defamatory and harmful words Lipton was publishing next, even though it was, in fact, Lipton who was targeting Dr. Folta, and never vice versa.

## V.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**DEFAMATION AND FALSE LIGHT**
**(Kevin Folta, Ph.D.  v. All Defendants)**

137. Plaintiff incorporates all preceding paragraphs by reference.

138. As written above, these defendants knew their false and misleading article, with its implications, innuendos and malicious misrepresentations, would place Dr. Folta in a false light and harm him and his reputation.

139. These defendants used their position of alleged trust and reliability to mislead Dr. Folta as to the premise of the article, and to misrepresent him and his work in a false and defamatory manner.   They knew this would be highly offensive to Dr. Folta, yet did it anyway.

140. These defendants understood all of the innuendos and implications made to the nation, scientific community, and the State of Florida to refer to and to defame Dr. Folta.

141. This story also has a substantial amount of words taken out of context, again defaming Dr. Folta by clear implication.

142. These defendants understood that all of the false statements, innuendos, and implications made in their article would be – and were – offensive to a reasonable person.

143. Despite this knowledge, the Defendants wrote this article to make the clear implication, and present the false conclusions, that there was some form of conspiracy between Dr. Folta and Monsanto.

144. These defendants damaged Dr. Folta's respect and effectiveness as a leader in the scientific community, and knowingly interfered with his professional and personal life. These defendants left a permanent and enduring scar on Dr. Folta's online identity and in online searches – the first thing that people do in order to learn about a scientist.

145. The defendants' behavior warrants the imposition of substantial punitive damages.

64L3267.DOCX

WHEREFORE, Plaintiff, Kevin Folta, Ph.D., demands judgment against all Defendants, jointly and severally, in an amount of compensation for damages substantially in excess of the jurisdictional limit to guarantee a jury trial, together with interest, costs, and punitive damages in an amount which will effectively punish the Defendants for their conduct and deter them and others similarly situated from similar acts in the future.

## SECOND CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Kevin Folta, Ph.D. v. All Defendants)

146.  Plaintiff incorporates by reference all preceding paragraphs.

147.  As set forth above, the Defendants' conduct at issue in this lawsuit involves a pattern and practice of intentionally and recklessly misrepresenting Dr. Folta; this has created a national uproar which has caused the Dr. Folta, his family, and his laboratory personnel plaintiff to receive multiple threats, including death threats.

148.  The defendants' extreme, outrageous, and indefensible misconduct has caused the Plaintiff to fear for his and his family's safety, and has otherwise made him extremely upset, anxious, scared and frightened for his life.

149.  These defendants were well aware of the potential for Dr. Folta to suffer severe and extreme emotional distress once their scheme and plot was finalized in the publication at issue in this lawsuit; nevertheless, in abject disregard for Dr. Folta and journalistic ethics, they proceeded with their plan, to Dr. Folta's great and permanent detriment.

150.  Dr. Folta has also experienced various severe physical manifestations of his fear, anxiety and concern, including but not limited to, insomnia, nausea, weight loss, cardiac events, and extreme anxiety.

64L3267.DOCX

151. At all times relevant hereto, the Defendants' conduct has been intentional, willful, and reasonably calculated to create extreme emotional distress and fear in Dr. Folta, who had absolutely no control over the defendants' reckless editing and knowingly false reporting.

152. As a result of the foregoing, Dr. Folta has suffered the damages set forth herein.

WHEREFORE, Plaintiff, Kevin Folta, Ph.D., demands judgment against all Defendants, jointly and severally, in an amount of compensation for damages substantially in excess of the jurisdictional limit to guarantee a jury trial, together with interest, costs, and punitive damages in an amount which will effectively punish the Defendants for their conduct and deter them and others similarly situated from similar acts in the future.

## NOTICE OF PRESERVATION OF EVIDENCE

PLAINTIFF HEREBY DEMANDS AND REQUESTS THAT DEFENDANTS TAKE NECESSARY ACTION TO ENSURE THE PRESERVATION OF ALL DOCUMENTS, COMMUNICATIONS, WHETHER ELECTRONIC OR OTHERWISE, ITEMS AND THINGS IN THE POSSESSION OR CONTROL OF ANY PARTY TO THIS ACTION, OR ANY ENTITY OVER WHICH ANY PARTY TO THIS ACTION HAS CONTROL, OR FROM WHOM ANY PARTY TO THIS ACTION HAS ACCESS TO, ANY DOCUMENTS, ITEMS, OR THINGS WHICH MAY IN ANY MANNER BE RELEVANT TO OR RELATE TO THE SUBJECT MATTER OF THE CAUSES OF ACTION AND/OR THE ALLEGATIONS OF THIS COMPLAINT.

64L3267.DOCX

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial.

James J. Evangelista
Florida Bar No: 600725
Bush Ross, P.A.
1801 North Highland Avenue
Tampa, FL  33602
P.O. Box 3913
Tampa, FL  33601-3913
(813) 224-9255
Fax No: (813) 223-9620
Primary E-mail:  jevangelista@bushross.com
Secondary E-mail:  osmith@bushross.com
Attorney for Plaintiff

Date: September 1, 2017



**Eric Lipton** ✓
@EricLiptonNYT

Biotech industry comes-strongly-to
defense of Kevin Folta--U of Florida
prof featured in NYT piece on
Monsanto/GMOs
agri-pulse.com/Florida-biotec…

9:39pm · 21 Apr 2016 · Twitter Web Client

He had to let some air out of the balloon.

This is what he posted when it was announced that I won a prestigious award in
agricultural communication.  CAST is not "industry" and the award goes to recognize
outstanding achievement by a scientist, engineer, technologist, or other professional working in the agricultural,
environmental, or food sectors for contributing to the advancement of science in the public policy arena. Primary
consideration will be given to candidates who are actively engaged in promoting agriculture through research,
teaching, extension, or mass communication; who have made significant contributions to their discipline or field; and
who demonstrate a passionate interest in communicating the importance of agriculture to policymakers, the news
media, and the public.

The tweet was later deleted.

64L3267.DOCX

"All the News
That's Fit to Print"

# The New York Times

**Late Edition**

Today, sunny, warm, high 85. To-
night, patchy clouds, low 68. To-
morrow, plenty of sunshine, ver-
warm for early September, hig
89. Weather map is on Page 28

VOL. CLXIV ... No. 56,981     © 2015 The New York Times     NEW YORK, SUNDAY, SEPTEMBER 6, 2015     $6 beyond the greater New York metropolitan area.     $5.00

---

## CLINTON RELYING ON TAKING SOUTH TO THWART RIVALS

### FOCUS ON SUPER TUESDAY

### After Lessons of 2008, a Push to Wrap Up Nomination Early

**By PATRICK HEALY and AMY CHOZICK**

Hillary Rodham Clinton's pres-
idential campaign is methodical-
ly building a political firewall
across the South in hopes of ef-
fectively locking up the Demo-
cratic nomination in March re-
gardless of any early setbacks in
the Iowa caucuses and the New
Hampshire primary.

Mrs. Clinton's advisers, struck
by the strength of Senator Bernie
Sanders in those two states, have
been assuring worried support-
ers that victories and superdele-
gate support in Southern states
will help make her the inevitable
nominee faster than many Demo-
crats expect. They point to her
popularity with black and His-
panic voters, as well as her policy
stances and the relationships
that she and her husband, former
President Bill Clinton, have culti-
vated. Mrs. Clinton was similarly
confident at this point eight years
ago, before Barack Obama and
his superior organizers began pil-
ing up delegates, including in
many Southern states.

In interviews, advisers said the
campaign was increasingly de-
voting staff members and money
to win the South Carolina prima-
ry on Feb. 27 while laying the
groundwork to sweep Alabama,
Arkansas, Georgia, Oklahoma,
Tennessee, Texas and Virginia on
March 1. These Super Tuesday
states are highlighted in red on
maps in the offices of Mrs. Clin-
ton's senior aides in Brooklyn.

The eight primaries will de-
liver several hundred delegates
for Mrs. Clinton, advisers believe,
toward the goal of more than
2,200 needed to clinch the Demo-
cratic nomination. The campaign
is barraging superdelegates in

Continued on Page 20

---

## Emails Reveal Academic Ties In a Food War

### Industry Swaps Grants for Lobbying Clout

**By ERIC LIPTON**

WASHINGTON — At Monsan-
to, sales of genetically modified
seeds were steadily rising. But
executives at the company's St.
Louis headquarters were private-
ly worried about attacks on the
safety of their products.

So Monsanto, the world's larg-
est seed company, and its in-
dustry partners retooled their
lobbying and public relations
strategy to spotlight a rarefied
group of advocates: academics,
brought in the gloss of impar-
tiality and weight of authority
that come with a professor's ped-
igree.

"Professors/researchers/sci-
entists have a big white hat in
this debate and support in their
states, from politicians to pro-
ducers," Bill Mashek, a vice pres-
ident at Ketchum, a public rela-
tions firm hired by the biotech-
nology industry, said in an email
to a University of Florida profes-
sor. "Keep it up!"

And the industry has.

Corporations have poured
money into universities to fund
research for decades, but now
the debate over bioengineered
foods has escalated into a billion-
dollar food industry war. Compa-
nies like Monsanto are squaring
off against major organic firms
like Stonyfield Farm, the yogurt
company, and both sides have
aggressively recruited academic
researchers, emails obtained
through open records show.

The emails provide a rare view
into the strategy and tactics of a
lobbying campaign that has
transformed ivory tower elites
into powerful players. The use by
both sides of third-party scien-
tists, and their supposedly unbi-
ased research, helps explain why
the American public is often con-
fused as it processes the conflict-
ing information.

The push has intensified as the
Senate prepares to take up in-
dustry-backed legislation this
fall, already passed by the House,

Continued on Page 18

---



Migrants arriving to cheers in Munich on Saturday at the city's main railway station after an arduous journey through Europe.

SEAN GALLUP/GETTY IMAGES

## Germany Welcomes Thousands of Weary Migrants

*This article is by Katrin Benn-
hold, Steven Erlanger and Alison
Smale.*

MUNICH — Germans waving
welcome signs in German, Eng-
lish and Arabic came to the train
station here Saturday to greet the
first group of what is expected to
be about 8,000 migrants to arrive
in Germany by early Sunday, af-
ter an arduous and emotional
journey through Hungary and
Austria.

Germans applauded and vol-
unteers offered hot tea, food and
toys as about 450 migrants ar-
rived on a special train service
from Austria, finally reaching
Germany, which had held out an
open hand to them.

"Thank you, Germany," said
one woman from the Kurdish
part of northern Iraq who said
she had been on the road for a
month and a half with her two



children. A German volunteer,
Silvia Reinschmiedt, who runs a
local school, could not stay at
home. "I said to myself, I have to
do something," she said as she
handed out warm drinks.

By Saturday evening, about
8,000 migrants had arrived here,
and another 1,800 were expected
to arrive in trains overnight, ac-
cording to the German police.

### A Desperate Flight

Some are fleeing brutal wars. Oth-
ers, economic misery. For eyewit-
ness dispatches of their perilous
journeys, follow Anemona Harto-
collis as she travels across Europe
with the migrants (Page 6). Also,
in The New York Times Magazine,
Paolo Pellegrin and Scott Ander-
son document an encounter with
two boats carrying 733 people
adrift in the Mediterranean.

It was the desired destination
for an extraordinary march of mi-
grants, who broke through Hun-
garian obstacles and reached
Austria on Saturday morning af-
ter a night of frantic negotiations
among German, Austrian and
Hungarian officials cleared the
way.

Overnight, some 4,500 exhaust-
ed migrants were bused to the

Austrian border by a Hungarian
government that gave up trying
to stop them and instead decided
to help them travel in safety. That
help was temporary, however, as
Hungary found itself struggling
to cope with a new influx of mi-
grants.

The arrival in Germany of the
migrants was the culmination of
10 days of tragedy and emotion
that at last caught the world's at-
tention, as war and chaos in Syria
and elsewhere in the Middle East
set off one of the largest emigra-
tions since World War II.

The standoff in Hungary
seemed to encapsulate the long
and often deadly journeys that
hundreds of thousands of people
have made to try to reach some
semblance of peace, security and
prosperity in a Europe that, for
the most part, did not much want
them.

Even as the thousands made it

Continued on Page 15

TOM GANNAM/REUTERS

# Emails Reveal Financial Ties Between Food Industry and Academics

*From Page 1*

that would ban states from adopting laws that require the disclosure of food produced with genetically modified ingredients.

The efforts have helped produce important payoffs, including the approval by federal regulators of new genetically modified seeds after academic experts intervened with the United States Department of Agriculture on the industry's behalf, the emails show.

Charla Lord, a Monsanto spokeswoman, said the company's longstanding partnership with academics helped demystify the science. "It is in the public interest for academics to weigh in credibly, not only to consumers but to stakeholders like lawmakers and regulators as well," she said.

But even some of the academics who have accepted special "unrestricted grants" or taken industry-funded trips to help push corporate agendas on Capitol Hill say they regret being caught up in this nasty food fight.

"If you spend enough time with skunks, you start to smell like one," said Charles M. Benbrook, who until recently held a post at Washington State University. The organic foods industry funded his research there and paid for his trips to Washington, where he helped lobby for labels on foods with genetically modified ingredients.

On the other side, the biotech industry has published dozens of articles, under the names of prominent academics, that in some cases were drafted by industry consultants.

Monsanto and its industry partners have also passed out an undisclosed amount in special grants to scientists like Kevin Folta, the chairman of the horticultural sciences department at the University of Florida, to help with "biotechnology outreach" and to travel around the country to defend genetically modified foods.

"This is a great 3rd-party approach to developing the advocacy that we're looking to develop," Michael Lohuis, the director of crop biometrics at Monsanto, wrote last year in an email as the company considered giving Dr. Folta an unrestricted grant.

Dr. Folta said that he had joined the campaign to publicly defend genetically modified technologies because he believes they are safe, and that it is his job to share his expertise. "Nobody tells me what to say, and nobody tells me what to think," he said, adding, "Every point I make is based on evidence."

But he also conceded in an interview that he could unfairly be seen as a tool of industry, and his university now intends to donate the Monsanto grant money to a food pantry. "I can understand that perception 100 percent," he said, "and it bothers me a lot."

TOM GANNAM/REUTERS

Monsanto soybeans, top, and a soybean chipper that allows Monsanto to analyze seed genetics. Monsanto and its industry partners have relied on academics to push their case for genetically modified crops.

TYLER JONES/UNIVERSITY OF FLORIDA

*"Nobody tells me what to say, and nobody tells me what to think."*

**KEVIN FOLTA**

An aggressive biotech proponent with financial ties to Monsanto

GEORGE ROBINSON

*"If you spend enough time with skunks, you start to smell like one."*

**CHARLES M. BENBROOK**

A proponent of labels on G.M.O. foods, backed by the organic industry

## Players in a Safety Debate

The moves by Monsanto, in an alliance with the Biotechnology Industry Organization and the Grocery Manufacturers Association, are detailed in thousands of pages of emails that were at first requested by the nonprofit group U.S. Right to Know, which receives funding from the organic foods industry.

The New York Times separately requested some of these documents, then made additional requests in several states for email records of academics with ties to the organics industry.

There is no evidence that academic work was compromised, but the emails show how academics have shifted from researchers to actors in lobbying and corporate public relations campaigns.

The fight between the competing academics is not focused on questions about the safety of genetically engineered seeds themselves. The sides are fighting mainly over the safety of herbicides used in so-called genetically modified organism, or G.M.O., crops. The organic food proponents argue that herbicide use has surged, and that some of these herbicides may be unsafe. The biotech companies say that data relating to herbicide use on genetically engineered crops is being misinterpreted — and that these new crops, more resistant to pests and disease, are helping to feed the world.

So far, the anti-G.M.O. community has been winning the public relations war. Major brands like Chipotle and original Cheerios have moved to reduce or eliminate their use of genetically engineered ingredients, based in part on a marketing judgment that this is what the American public wants. That poses a threat to companies like Monsanto, which had $15.9 billion in global sales last year.

"Misinformation campaign in ag biotech area is more than overwhelming," Yong Gao, then Monsanto's global regulatory policy director, explained in an April 2013 email to Dr. Folta as the company started to work closely with him. "It is really hurting the progress in translating science and knowledge into ag productivity."

Dr. Folta is among the most aggressive and prolific biotech proponents, although until his emails were released last month, he had not publicly acknowledged the extent of his ties to Monsanto.

He has a doctorate in molecular biology and has been doing research on the genomics of small fruit crops for more than a decade. Monsanto executives approached Dr. Folta in the spring of 2013 after they read a blog post he had written defending industry technology.

"We really appreciate independent scientists working to educate the public," Keith Reding, a microbiologist who helps Monsanto manage its relations with regulatory agencies, wrote in an April 2013 email to Dr. Folta.

A few weeks later, the Council for Biotechnology Information — controlled by BASF, Bayer, Dow Chemical, DuPont and Monsanto — asked Dr. Folta and other prominent academics if they would participate in a new website, GMO Answers, which was established to combat perceived misinformation about their products. The plan was to provide the academics with questions from the public, such as, "Do GMOs cause cancer?"

"This is a new way to build trust, dialogue and support for biotech in agriculture that will help explain in an independent voice what GMOs are," an executive at Ketchum wrote to Dr. Folta.

But Ketchum did more than provide questions. On several occasions, it also gave Dr. Folta draft answers, which he then used nearly verbatim, a step that he now says was a mistake.

"It was absolutely not the right thing," he said, adding that he now insists that he write his own responses.

Kate Hall, a spokeswoman for the biotechnology council, said that the scholars were free to revise the scripted responses, and that the group offered these draft answers in only a few dozen cases, compared with the nearly 1,000 responses on GMO Answers to date.

Dr. Folta, the emails show, soon became part of an inner circle of industry consultants, lobbyists and executives who devised strategy on how to block state efforts to mandate G.M.O. labeling and, most recently, on how to get Congress to pass legislation that would preempt any state from taking such a step.

While Dr. Folta was not personally compensated, biotech companies paid for his trips to testify in Pennsylvania and Hawaii. "I should state upfront that I have not been compensated for any testimony," he said at a public hearing in Hawaii, before adding, "The technology is safe and is used because it helps farmers compete."

Dr. Folta routinely gave updates on his travels — and his face-to-face encounters with opponents of genetically modified crops — to the industry executives who were funding his efforts.

"Your email made my day!" wrote Cathleen Enright, an executive vice president of the Biotechnology Industry Organization, after Dr. Folta gave her a written update on the October 2014 legislative hearing in Pennsylvania. "Please send all receipts to us whenever you get around to it. No rush."

In August 2014, Monsanto decided to approve Dr. Folta's grant for $25,000 to allow him to travel more extensively to give talks on the genetically modified food industry's products.

"I am grateful for this opportunity and promise a solid return on the investment," Dr. Folta wrote in an email to one Monsanto executive.

Dr. Folta is one of many academics the biotech industry has approached to help it defend or promote its products, the emails show.

The company, in late 2011, gave a grant for an undisclosed amount to Bruce M. Chassy, a professor emeritus at the University of Illinois, to support "biotechnology outreach and education activities," his emails show.

In the same email in which Dr. Chassy negotiated the release of the grant funds, he discussed with a Monsanto executive a monthslong effort to persuade the Environmental Protection Agency to abandon its proposal to tighten the regulation of pesticides used on insect-resistant seeds.

"Is there a coordinated plan to maintain pressure and emphasis on EPA's evolving regulations?" Eric Sachs, the chief of Monsanto's global scientific affairs group, wrote in a related email to Dr. Chassy. "Have you considered having a small group of scientists request a meeting with Lisa Jackson," referring to the E.P.A. administrator at the time.

In an interview, Dr. Chassy said he had initiated the fight against the E.P.A. plan before Monsanto pressed him. But he conceded that the money he had received from the company had helped to elevate his voice through travel, a website he created and other means.

"What industry does is when they find people saying things they like, they make it possible for your voice to be heard in more places and more loudly," he said.

Dr. Chassy eventually set up a meeting at the E.P.A., with the help of an industry lobbyist, and the agency ultimately dropped the proposal.

In 2013, Monsanto also asked David R. Shaw, the vice president for research and economic development at Mississippi State University, to intervene with the Department of Agriculture to help persuade the agency to approve a new type of genetically modified soybean and cottonseed designed by Monsanto.

Organic farmers argued against this move, convinced that approval of the new seeds would lead to an increase in potentially harmful herbicide use. Monsanto wanted Dr. Shaw, whom the company has supported over the last decade with at least $880,000 in research grants for projects he helped oversee, to refute these arguments, the emails show.

"Our Regulatory Affairs and Government Affairs groups feel it is important that USDA hear from folks like you on the key issues since there is a high probability that many negative voices will be heard during these calls," said a June 2013 email from John K. Soteres, then Monsanto's head of weed resistance programs. "Your voice not only counts from the standpoint of presenting scientifically based viewpoints but also to a degree from a numbers standpoint."

Dow Chemical made a similar pitch this year, with one company executive first reminding Dr. Shaw in an email about the industry's financial support for the university. Then the executive asked Dr. Shaw to intervene with the Agriculture Department to urge it to approve Dow's new genetically modified cottonseed, which was designed to be treated with a Dow-produced herbicide.

Dow's and Monsanto's requests to the Agriculture Department have since been approved. Dr. Shaw declined to comment. But a university spokesman, Sid Salter, described Dr. Shaw as "a highly ethical researcher."

## Why Not 'Mommy Farmers'?

At times, the scientists themselves questioned whether they were the best advocates for the companies.

"What the situation requires is a suite of TV spots featuring attractive young women, preferably mommy farmers, explaining why biotech derived foods are the safest & greenest in the history of ag and worthy of support," wrote L. Val Giddings, a senior fellow at Information Technology & Innovation Foundation, a nonprofit food policy research group in Washington, in an October 2014 email to a Monsanto lobbyist. The company was debating how to defeat labeling campaigns last year in Colorado and Oregon.

Dr. Folta, included in the email chain, agreed.

"We can't fight emotion with lists of scientists," Dr. Folta wrote to Lisa Drake, the Monsanto lobbyist. "It needs a connection to farming mothers."

But Ms. Drake flatly rejected their arguments. Monsanto had already run television ads with mothers who were farmers. They fell flat.

"Doesn't poll as well as credible third party scientist," she said. "I know hard to believe, but I have seen the poll results myself, and that is why the campaigns work the way they do."

Emails and other documents obtained by The Times from Washington State, where Dr. Benbrook served until earlier this year, show how the opponents of genetically modified foods have used their own creative tactics, although their spending on lobbying and public relations amounts to a tiny fraction of that of biosciences companies.

The organic foods industry has a direct financial interest to raise consumer concerns, because federal law requires that any product labeled organic in the United States be free of ingredients produced from genetically modified seeds. So if consumers move away from G.M.O.-based sources, they sometimes switch to organic alternatives.

Like the biotech companies, organic industry executives believed they could have more influence if they pushed their message through academics.

"I am a business guy, not a scientist," said Gary Hirshberg, the chairman and former president of Stonyfield Farm, which produces organic yogurt, who leads an industry lobbying effort called Just Label It. "So of course it helps to have an academic scientist explain it."

That is why Dr. Benbrook, who had served as chief scientist at the Organic Center, a group funded by the organic foods industry, resigned his job and sought a university appointment, he said.

"I was working for an organization affiliated and funded by the industry, and people were just not listening," he said.

At Washington State, Dr. Benbrook was supported by many of the same financial backers, including Organic Valley, Whole Foods, Stonyfield and United Natural Foods Inc. The companies stayed closely involved in his research and advocacy, helping him push reporters to write about his studies, including one concluding that organic milk, produced without any G.M.O.-produced feed for the cows, had greater nutritional value.

At least twice, Mr. Hirshberg's group also paid for Dr. Benbrook to go to Washington so he could help lobby against a federal ban on G.M.O. labels. And his research suggesting that herbicide use in G.M.O. crops has surged has been a central part of the organic industry's argument for mandatory labels.

Dr. Benbrook, whose research post at Washington State was not renewed this year, said the organic companies had turned to him for the same reasons Monsanto and others support the University of Florida or Dr. Folta directly.

"They want to influence the public," he said. "They could conduct those studies on their own and put this information on their website. But nobody would believe them. There is a friggin' war going on around this stuff. And everyone is looking to gain as much leverage as they can."