## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

KEVIN FOLTA, Ph.D.,

    Plaintiff,                          Case No.: 1:17-cv-00246-MW-GRJ

v.

THE NEW YORK TIMES COMPANY
and ERIC LIPTON,

    Defendants.

_____/

## DEFENDANTS' MOTION TO DISMISS AMENDED
## COMPLAINT AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 7.1,

Defendants The New York Times Company ("NYT"), publisher of *The New York
Times,* and Eric Lipton (collectively, the "Defendants") hereby move this Court for

an order dismissing with prejudice both the defamation/false light and intentional

infliction counts of Plaintiff's October 5, 2017, Amended Complaint (ECF No. 19,

the "Complaint").

In September 2015, NYT published a news story written by Mr. Lipton that

revealed the close relationship between academics and major agribusiness

companies regarding the public debate swirling around genetically modified

organism ("GMO") food (both the online and print versions of that story will be

referred to as the "News Story").  In writing about Plaintiff—a University of

Florida ("UF") professor and department chair—and his involvement in that debate, Mr. Lipton wrote his account from Plaintiff's own e-mail communications as disclosed through public records requests to UF.  Undoubtedly, Mr. Lipton's truthful and meticulously researched account of Plaintiff's interactions with agribusiness—as told in Plaintiff's own words—placed him in the middle of an uncomfortable public controversy.  But any resultant discomfort from this truthful reporting is not a basis for a defamation lawsuit, especially from a public employee whose actions are rightly open to public oversight.

When the Court reviews the News Story—and the embedded, supporting public records—it will be evident that the reporting is, as a matter of law, protected by Florida's fair report privilege, and not capable of the defamatory reading Plaintiff suggests.  Reporting on government records lies at the core of a journalist's mission, and it is proper for the Court to examine the News Story in light of these records at the motion to dismiss stage.

Specifically, the Complaint must be dismissed wholesale, and with prejudice, because: (1) the News Story is, as a matter of law, a privileged fair and substantially accurate report of the contents of government records; (2) the News Story cannot, as a matter of law, reasonably be read to imply the strained implications alleged; (3) Florida law does not recognize the tort of false light; and (4) the intentional infliction of emotional distress claim is wholly derivative and

duplicative of the defamation claim, thus violating Florida's "single cause of action rule."  Specific grounds for this motion are contained in the accompanying Memorandum of Law.

## MEMORANDUM OF LAW

## I.     BACKGROUND

Plaintiff is a UF professor who chairs the Horticultural Sciences Department. (Complaint, ¶¶ 2, 19.)  He is an expert in molecular biology and genetic engineering/GMO science who has been employed as a university scientist for thirty years.  (Id. ¶¶ 4, 19.)

NYT owns and publishes *The New York Times*.  (Id. ¶ 12.)  On September 5, 2015, it published a news article titled, "*Food Industry Enlisted Academics in G.M.O. Lobbying War, Emails Show*" (the online version of the News Story) (Id. ¶ 28.)  On the following day, September 6, 2015, it published the News Story in its print edition under the headline, "*Emails Reveal Academic Ties In a Food War. Industry Swaps Grants for Lobbying Clout.*"  (Id. ¶¶ 29, 32.)  A copy of the print version of the News Story is attached as Exhibit A to the Complaint.  (ECF No. 19-1.)  A copy of the online version, also cited in the Complaint, is not.[1]  The News

---

[1] A copy of the online version of the News Story is located at: https://www.nytimes.com/2015/09/06/us/food-industry-enlisted-academics-in-gmo-lobbying-war-emails-show.html.  A true and correct copy of the same is also attached as **Exhibit A**.  Notwithstanding Plaintiff's failure to include a copy of the *…footnote continued on next page*

Story was based upon a review of e-mails produced by Plaintiff (and others) in response to public records requests.  (Complaint, ¶ 26.)

Based in Washington, D.C., Mr. Lipton is a two-time Pulitzer Prize-winning journalist who has worked at NYT since 1999.  As alleged, Mr. Lipton was at all relevant times an NYT employee.  (Id. ¶ 13.)  Mr. Lipton interviewed Plaintiff for and authored the News Story.  (Id. ¶¶ 20-21, 28-29.)[2]

The Complaint attempts to state claims for defamation/false light, and intentional infliction of emotional distress.  However, Plaintiff presents a labored interpretation of the actual reported details of his interactions with the food industry as revealed by his own public record e-mail communications.  What the News Story on its face describes are nearly two years of communications and activity among Plaintiff and various members of the agribusiness/biotechnology industry, including representatives of Monsanto, a company he describes as "one of the largest and [most] controversial companies in America."  (Id. ¶ 5.)  For

online version of the News Story with the Complaint, he refers to and challenges certain elements specific to that version and the supporting public records that were integrated with that story for readers to access.  (Complaint, ¶¶ 28, 43-44, 78.)  True and correct copies of the public records as published within the online version of the News Story, followed by the related online annotations are attached as **Exhibit B**.  The annotated public records can also be found at: https://www.nytimes.com/interactive/2015/09/06/us/document-folta.html.

[2] Defendants agree that Plaintiff was interviewed but would dispute his characterization of that interview.

example, they document: (1) how Monsanto provided travel funding for Plaintiff to give talks on GMO science; (2) Plaintiff's interactions with Ketchum, a major public relations firm working with agribusiness/biotechnology interests, in writing for GMOAnswers.com, a pro-GMO, industry-backed website; and (3) Plaintiff's trips to testify or speak in places such as Hawaii, Pennsylvania, and Washington, D.C., at the invitation of industry interest groups with ties to Monsanto such as The Biotechnology Industry Organization and the Hawaii Crop Improvement Association ("HCIA").

Unable to deny the story told by his own public record communications, Plaintiff instead seeks to recover under a theory that reads unreasonable and tortured implications into factual, public records-based reporting.  Those claims are essentially that the News Story allegedly implied Plaintiff was a shill for the agribusiness industry whose scientific ethics bent accordingly (such claims are specifically addressed in Section II.C., below).

But the News Story does not address Plaintiff's motivations, integrity, or scientific bona fides.  Instead, it simply highlights how both GMO and organic industry advocates have turned to academia to help advance their respective messaging, a newsworthy reality that the public has a right to know about and independently assess, particularly when the department chair of a major land grant public university is involved.

## II.   **ARGUMENT**

Plaintiff cannot silence a factual accounting of his own e-mail communications by making strained legal claims.  The overarching point of the News Story was to shed light on an issue of immense public debate—the messaging behind pro-GMO and organic food products—and the fair report privilege is specifically designed to promote government transparency by protecting the type of public records-based reporting at issue in this case.

### A.   **Procedural Standards Applicable to a Motion to Dismiss.**

On a Rule 12(b)(6) motion to dismiss a court "must accept the allegations of the complaint as true and must construe the facts alleged in the light most favorable to the plaintiff."  Hunnings v. Texaco, Inc., 29 F.3d 1480, 1484 (11th Cir. 1994) (citation omitted).  "However, conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."  Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1185 (11th Cir. 2003) (citation omitted).  Plaintiffs cannot simply regurgitate labels, conclusions, and "a formulaic recitation of the elements of a cause of action."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "[N]aked assertions devoid of further factual enhancement are also insufficient to survive a motion to dismiss."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations omitted).  Here, the Complaint does not plead facts giving rise to any plausible claim for relief.

Although the Court's review of a motion to dismiss is limited to the "four corners" of the pleading, the four corners include the complaint's attachments. Where the attachments contradict the pleadings, the attachments are controlling. Degirmenci v. Sapphire–Fort Lauderdale, LLLP, 693 F. Supp. 2d 1325, 1341 (S.D. Fla. 2010).  On a motion to dismiss a court may also take judicial notice of authentic documents integral to the allegations without the motion being converted into a summary judgment motion.  See Universal Express, Inc. v. U.S. Secs. and Exch. Comm'n, 177 Fed. Appx. 52, 53 (11th Cir. 2006) (court may take judicial notice of public records and consider them on motion to dismiss without converting the same to motion for summary judgment); Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir. 2005) ("Our prior decisions also make clear that a document need not be physically attached to a pleading to be incorporated by reference into it…."); Horsley v. Feldt, 304 F.3d 1125, 1134-35 (11th Cir. 2002) (news article forming basis of defamation claim could be considered on motion to dismiss without converting the same to motion for summary judgment); Brooks v. Blue Cross & Blue Shield of Fla., 116 F.3d 1364, 1369 (11th Cir. 1997) ("where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion

into a motion for summary judgment.").  As explained by the First Circuit, materials allegedly containing defamatory statements are "not merely referred to in plaintiffs' complaint but [are] absolutely central to it" and thus can be considered on a motion to dismiss even if not attached to the complaint.  Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012, 1015 (1st Cir. 1988).

Here, the Court should consider the online version of the News Story, and the public records that were imbedded and made part of that story for readers to peruse.  The Complaint attacks statements exclusive to the online article as defamatory (*i.e.*, Mr. Lipton's editorial notes accompanying the supporting public record e-mails) and, at its core, ignores a plain reading of those records which were published in the online version.  (Complaint, ¶ 78.)  Because a reasonable reading of the full story in context is required, these documents are particularly appropriate for review at the motion to dismiss stage.  See Byrd v. Hustler Magazine, Inc., 433 So. 2d 593, 595 (Fla. 4th DCA 1983) (requiring reading in full context); Brown v. Tallahassee Democrat, Inc., 440 So. 2d 588, 589 (Fla. 1st DCA 1983) (same) (discussed *infra*).  Reading the News Story alongside the companion public records demonstrates the claims are ripe for disposition as a matter of law.

Florida law recognizes that cases involving First Amendment rights are particularly suited for early-stage disposition.  In defamation cases, a court has a "prominent function" in determining whether the case should be submitted to the

jury.  Byrd, 433 So. 2d at 595.  To protect public debate and safeguard freedom of the press, courts have long favored dismissal of legally untenable claims at the earliest possible juncture.  See Stewart v. Sun Sentinel Co., 695 So. 2d 360, 363 (Fla. 4th DCA 1997) ("pretrial dispositions are 'especially appropriate' because of the chilling effect these cases have on freedom of speech") (quoting Karp v. Miami Herald Publ'g Co., 359 So. 2d 580, 581 (Fla. 3d DCA 1978)); see also Meyer v. City of Gainesville, No. 1:15cv185-MW/GRJ, 2016 WL 660907, at *1 (N.D. Fla. Feb. 18, 2016) (dismissing claims against the City of Gainesville, including slander claims on absolute privilege and immunity grounds).  Such dispositions are routinely granted in favor of publishers in fair report privilege cases such as this one.  See, e.g., Stewart, 695 So. 2d at 363; Alan v. Palm Beach Newspapers, Inc., 973 So. 2d 1177, 1180 (Fla. 4th DCA 2008) (affirming summary judgment in favor of publisher on fair report grounds); Carson v. News-Journal Corp., 790 So.2d 1120, 1122 (Fla. 5th DCA 2001) (same); Jamason v. Palm Beach Newspapers, Inc., 450 So. 2d 1130, 1132-33 (Fla. 4th DCA 1984) (same).  See also § 768.295, Fla. Stat. (2017) (Florida's Anti-SLAPP law, which provides for accelerated dismissal of lawsuits designed to suppress free speech rights).

**B.     The Defamation Count Fails as a Matter of Law Because Defendants Have a Privilege to Report on Government Records.**

**1.     Florida's Fair Report Privilege.**

Count I of the Complaint is a combined defamation/false light claim.[3] (Complaint, ¶ 137-45.)  To state a claim for defamation, Plaintiff must plead and prove the following elements: (1) a false and defamatory statement of and concerning him; (2) an unprivileged publication to a third party; (3) fault on the part of the publisher; and (4) damages.  Mile Marker, Inc. v. Petersen Publ'g, L.L.C., 811 So. 2d 841, 845 (Fla. 4th DCA 2002) (citing Thomas v. Jacksonville Television, Inc., 699 So. 2d 800, 803-04 (Fla. 1st DCA 1997)).  Plaintiff's defamation claim fails the second prong as a matter of law because Defendants' journalism is substantially true and protected by Florida's fair report privilege.  In short, the statements cited in the Complaint are fair and accurate accounts of the contents of government records, namely Plaintiff's public record e-mail correspondence.

This privilege permits the news media "to report accurately on the information received from government officials."  Rasmussen v. Collier Cty. Publ'g Co., 946 So. 2d 567, 570 (Fla. 2d DCA 2006); Stewart, 695 So. 2d at 362; Woodard v. Sunbeam Television Corp., 616 So. 2d 501, 502 (Fla. 3d DCA 1993).

---

[3] Plaintiff's failed false light claim is discussed in Section II.D.

Its application is a question of law to be decided by the Court.  See Huszar v. Gross, 468 So. 2d 512, 515-16 (Fla. 1st DCA 1985).

The privilege encompasses a wide range of government activity including reporting on oral statements and records, government press releases, employment records, and complaint letters.[4]  See, e.g., Steven H. v. Duval Cty. Sch. Bd., No. 99-500-CIV-J-20C, 1999 WL 1427666, at *1 (M.D. Fla. Sept. 3, 1999) (statements provided by public school teacher/football coach); Carson, 790 So. 2d 1120 (employment records); Stewart, 695 So. 2d at 362 (government press releases); Ortega v. Post-Newsweek Stations, Fla., Inc., 510 So. 2d 972, 976 (Fla. 3d DCA 1987) (oral statements describing testimony of another); Angelastro v. Novotny, No. 2012-CA-000998-NC, 2013 WL 12144969 (Fla. Cir. Ct. July 2, 2013), per curiam aff'd, 145 So. 3d 838 (Fla. 2d DCA 2014) (complaint letters and government reports); Dickey v. Gannett Co., Inc., No. 09-28344, 2010 WL 3581644 (Fla. Cir. Ct. Sept. 8, 2010) (video surveillance footage).

---

[4] Under Florida law, a public record is defined as "all documents . . . made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency."  § 119.011(12), Fla. Stat. (2017).  The right to inspect public records is of constitutional magnitude.  See Art. I, §24, Fla. Const. Public employee e-mails related to official business qualify as public records.  See Rhea v. Dist. Bd. of Trs. of Santa Fe Coll., 109 So. 3d 851, 855 (Fla. 1st DCA 2013) (finding professor e-mails public records and noting that "[t]he physical format of the record is irrelevant" with "electronic communications, such as e-mail…covered just like communications on paper") (citations omitted).

This "fair report" or "official action" privilege exists to foster the free flow of information about government records and activities, thereby "enabl[ing] the public to receive information from government sources through the media in a timely, efficient manner." Vaillancourt v. Media Gen. Operations, Inc., 36 Media L. Rep. 1543, 1544 (Fla. Cir. Ct. May 3, 2007) (attached hereto as **Exhibit C**); Clark v. Clark, No. 93-47-CA, 1993 WL 528464, at *3 (Fla. Cir. Ct. June 22, 1993) ("the privilege encourages the republication of information disseminated by government sources on the theory that the public should be informed about such statements and that the press is the logical vehicle to accomplish the task").

The privilege is broad and simply requires the publication be a substantially correct account of information contained in public records. See, e.g., Rasmussen, 946 So. 2d at 570 (privilege applied because the publications were "substantially truthful" accounts); Alan, 973 So. 2d at 1180 (privilege applied because reporting of official proceeding was correct). "It is not necessary that [the publication] be exact in every immaterial detail or that it conform to the precision demanded in technical or scientific reporting. It is enough that it conveys to the persons who read it a substantially correct account of the proceedings." Woodard, 616 So. 2d at 502-03 (quoting Restatement (Second) of Torts § 611, cmt. f (1977)).

Additionally, the privilege does not dictate that news organizations report on the contents of official files in sterile language.  Rather, news reporting may be "phrased to catch the . . . readership's attention" without losing the protection afforded by the privilege.  <u>Alan</u>, 973 So. 2d at 1180.  In other words, the legal test does not turn on editorial style, but an evaluation of the publication's substantial accuracy in its reporting on public records.  <u>Id.</u>; <u>see also</u> <u>Jamason</u>, 450 So. 2d at 1132.  Even allegations that a journalist published with actual or constitutional malice cannot overcome this privilege.  <u>See</u> <u>Jamason</u>, 450 So. 2d at 1133 ("we fail to see how actual malice is pertinent to an accurate report of a judicial proceeding"); <u>Fancher v. Lee Cty. Humane Soc'y, Inc.</u>, 25 Media L. Rep. 2565, 2566 (Fla. Cir. Ct. July 14, 1997) ("Dr. Fancher's allegations of actual malice . . . will not save this action from dismissal under the fair report privilege . . . [because] allegations of actual malice are irrelevant in actions concerning substantially accurate press reports on the government."), <u>rev. den.</u>, 717 So.2d 1011 (Fla. 2d DCA 1998) (attached hereto as **Exhibit D**).[5]

---

[5]  The terms "actual malice" or "constitutional malice" are derived from the U.S. Supreme Court's landmark decision in <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254 (1964).  The terms are shorthand for a high media fault standard that involves the publishing of known falsehoods or publication with reckless disregard for the truth.  <u>Id.</u> at 280.

A plaintiff's claim that the information contained in the government records is false is also irrelevant.  It is the publisher's *summary* of the contents of the record that must be accurate.  <u>Woodard</u>, 616 So. 2d at 502 (privilege applies "even if the official documents contain erroneous information"); <u>Ortega</u>, 510 So. 2d at 976 (press has no duty to independently determine accuracy of statements in government records); <u>see also</u> <u>El Amin v. Miami Herald</u>, 9 Media L. Rep. 1079, 1081 (Fla. 11th Jud. Cir. 1983) ("The test of accuracy for purposes of the privilege requires that the publications be compared not with the events that actually transpired, but with the information that was reported from official sources.") (citations omitted) (attached hereto as **Exhibit E**); <u>accord</u> <u>Miller v. Twentieth Century Fox Int'l Corp.</u>, 29 Media L. Rep. 1087, 1092 (M.D. Fla. Oct. 16, 2000) ("The Defendants' only obligation was to ensure that it reported the contents [of public records] accurately.") (attached hereto as **Exhibit F**).

Once the fair report privilege attaches, it can be defeated *only* where the challenged report is not "reasonably accurate and fair" in describing the contents of the records.  <u>Woodard</u>, 616 So. 2d at 502 (citations omitted); <u>see also</u> <u>Stewart</u>, 695 So. 2d at 362 (news reports of beatings by corrections officers privileged because there were "no material differences" between reports and information contained in official files); <u>Ortega</u>, 510 So. 2d at 977 (privilege applied to "substantially accurate" report of official proceeding).  To assess the privilege, the Court need

only compare the complained of statements to the corresponding public records.

### 2. Comparing the Statements Complained of to the Public Records Shows the Statements are Privileged.

Despite the fair report privilege, Plaintiff seeks to impose liability on the Defendants for numerous statements—all of which are non-actionable.[6]  To demonstrate the privileged nature of these statements Defendants set forth the statements at issue and then compare the statements to the corresponding public record source information.

### Statements A-B

- **Statement A**: *"This is a great 3rd party approach to developing the advocacy that we've been looking to develop.' Michael Lohius, the director of crop biometrics at Monsanto, wrote last year in an email as the company considered giving Dr. Folta an unrestricted grant."*  (Complaint, ¶ 55.)

- **Statement B**:  *"In August 2014, Monsanto decided to approve Dr. Folta's grant for $25,000 to allow him to travel more extensively to give talks on the genetically modified food industry's products.  (*Id.* ¶ 65.)

In discussing the academic community's ties to the food industry, the News Story discussed the fact that Plaintiff submitted a grant proposal to Monsanto that ultimately resulted in $25,000 being given to him; money that was designated to

---

[6] Plaintiff repeatedly takes issue with the News Story and its alleged implications in introductory sections of the Complaint (see, e.g., Complaint, ¶¶ 22-24, 36-44, 49-51) that are repetitive and derivative of the statements focused on here, that is, those contained in Section C of the Complaint (¶¶ 52-116), "The Malicious and Defamatory Falsehoods."  Those latter statements are the crux of the Complaint and fully encapsulate the claims made within this lawsuit.

fund speaking engagements discussing how to effectively communicate GMO science.

Plaintiff, however, focuses on semantics, insisting he never received an "unrestricted grant" from Monsanto and alleging that the monies received took the form of an "unrestricted gift" to UF.  (Id. ¶¶ 52, 56-58.)  He further claims that Defendants knew he had never "received a penny from Monsanto or other" entities to support his travel.  (Id. ¶ 53.)  Finally, Plaintiff alleges that he does not give presentations about GMO food industry products and instead teaches about GMO technology and how to communicate that science to the public.  (Id. ¶ 66.)  All of these allegations are contradicted by his own records.

**Public Records Supporting Statements A-B**: On July 15, 2014, Plaintiff e-mailed Keith Reding at Monsanto a proposal requesting $25,000 to travel and teach university "faculty, staff, and students how to most effectively communicate topics in biotechnology." (Ex. B, pp. 95, 97, 103-04.)[7]  That same proposal suggests the $25,000 project be funded "as a SHARE contribution (essentially unrestricted funds) [because] it is not subject to IDC and is not in a 'conflict-of-interest' account.  In other words, SHARE contributions are not publicly noted." (Id. p. 104.)  Two days later, in a July 16 e-mail from Monsanto representative

---

[7] Page references to **Exhibit B** correspond to the inserted, paginated page numbers in the lower right-hand corner of each page of the exhibit.

Carolyn Daly to Plaintiff, Ms. Daly states that she "will work with [Plaintiff] to create an unrestricted grant payment in the amount of $25,000." (Id. p. 105.)  The funding was also referred to as an "unrestricted grant" in another Monsanto e-mail dated July 16, 2014 from Michael Lohuis.  (Id.)  Finally, in an August 8, 2014, letter to Plaintiff, Monsanto provides the funds, and explicitly states, "Please accept this unrestricted grant in the amount of $25,000.00 which may be used at your discretion in support of your research and outreach projects."  (Id. p. 110.)

Plaintiff's related claim that the Defendants knew he had never taken "a penny" from Monsanto or other industry players is belied by additional communications that: (1) document The Biotech Industry Organization's funding of Plaintiff's October 2014 trip to Pennsylvania to testify before a state legislative committee in opposition to proposed GMO labeling legislation  (Id. pp. 121-138.); (2) suggest the HCIA—a non-profit that includes Monsanto and other major biotechnology companies as "members"—supported Plaintiff's July 2013 travel costs to Kaua'i to testify in opposition to proposed anti-GMO legislation (Id. pp. 23-35.);[8] (3) reveal that Ketchum—which was hired by The Biotechnology Industry Organization—paid for Plaintiff's December 2013 trip to Washington,

_____

[8] Plaintiff admits that HCIA paid for this trip as evidenced in his own "transparency report" that he now publishes on his blog.  The first entry on that report notes that HCIA paid $4,322.08 in travel costs for this trip.  See https://drive.google.com/file/d/0B-80pGeLdmnpSHlPU1h5Q01uZGM/view.

D.C., where he participated in various "Q&A" sessions about GMO technology

(Id. pp. 56, 59, 70.); and (4) reveal that in August 2014 Plaintiff gave a lecture at

Monsanto headquarters titled "Reframing Biotechnology Communication," for

which his hotel room was "prepaid by Monsanto."  (Id. pp. 107, 111.)

### Statements C-D

•       **Statement C**: Quoting the phrase "*Keep it up!*" in reference to Plaintiff
speaking in support of GMO science.  (Complaint, ¶ 71.)

•       **Statement D**: Use of the term "*recruited*" to refer to industry seeking out
Plaintiff.  (Id. ¶¶ 72-73.)

The News Story factually reported on various correspondence between

Plaintiff and industry representatives, many of which highlight industry desires to

have Plaintiff defend GMO science, and Plaintiff's willingness to do so.  Again,

each is supported by the source records.

**Public Records Supporting Statements C-D**: Statement C speaks for itself

and is used by Bill Mashek of Ketchum in a May 12, 2014, e-mail to Plaintiff

where he is praised for continuing to speak out in support of GMO technology, in

this case taking the form of an *Orlando Sentinel* editorial.  (Ex. B, pp. 84-86.)

Moreover, other e-mails from Mr. Mashek acknowledge that Ketchum "work[s]

with a few experts at the University of Florida" including Plaintiff.  (Id. p. 71.)

This association, however apparently distressing for Plaintiff, cannot be denied.

Plaintiff also actively participated in signing his name to answers on GMO-related

questions for the industry-funded (including Monsanto) and Ketchum-sponsored website GMOAnswers, at times only lightly editing supplied, pre-drafted responses.  (<u>Id.</u> pp. 10-20, 45-47, 79.)

Furthermore, use of the term "*recruited*" (Statement D) is a fair and accurate characterization of Plaintiff's continued willingness to answer the call of industry to speak out in favor of GMO science.  E-mails indeed show that on multiple occasions industry approached Plaintiff and sought his help in this regard—for example, his providing content for GMOAnswers or offering strategies on how to counter GMO-labeling legislative initiatives.  (<u>Id.</u> pp. 7-9, 10-22, 36-47, 77-79, 90-91, 109, 139-144, 162-69. The specifics of these communications are discussed below in support of Statement E.)

## <u>Statement E</u>

•   **Statement E**: "*By the middle of 2014, Dr. Folta and Monsanto had taken steps to formalize their relationship, with Dr. Folta planning a trip, at the company's expense, to its headquarters and the company considering a grant to Dr. Folta for helping promote G.M.O. technologies.*"[9]  (Complaint, ¶ 78.)

The News Story also discussed the fact that around the time Monsanto was considering Plaintiff's $25,000 grant proposal, Plaintiff spoke at company

---

[9] This quotation is not actually found in the text of the News Story but is found in Mr. Lipton's online, embedded annotations to the public record e-mail communications.  <u>See</u> the annotations to the relevant supporting e-mails, Ex. B, p. 176.

headquarters, at Monsanto's invitation and with Monsanto paying for related travel costs.  Plaintiff disputes the fact that travel expenses were paid for by Monsanto. (Id. ¶ 79.)  He also takes issue with the fact that the News Story describes his relationship with Monsanto as just that, a "relationship." (Id. ¶¶ 78-80.)  Once again, the public record details related to this trip including comped hotel expenses, the grant, and Plaintiff's ongoing association with Monsanto contradict his allegations.

**Public Records Supporting Statement E**: E-mails again tell the story of Plaintiff's multi-faceted relationship with Monsanto.  First, it is clear that Monsanto paid for Plaintiff's hotel costs related to this trip.  (Ex. B, p. 111.)   As for Plaintiff's "relationship" with Monsanto, in addition to the wealth of e-mails previously discussed that catalogue Monsanto's $25,000 grant and the funding of various trips by Monsanto and other industry interests, e-mails also reveal that Plaintiff consistently offered to be a voice to which Monsanto could turn to in times of need.

As early as April 2013 Plaintiff tells Monsanto's Keith Reding to, "[k]eep me in mind if you ever need a good public interface, with no corporate ties, that knows the subject inside and out and can think on his feet."  Plaintiff then explains that he has "changed quite a few minds" regarding GMOs and is "always here and glad to help."  (Id. pp. 7, 9.)  This blossoming relationship—ultimately solidified

by the $25,000 grant in 2014 and for which Plaintiff "promise[d] a solid return on the investment" (Id. p. 109.)—was documented in numerous other e-mails wherein Monsanto representatives request assistance speaking in favor of GMO science including: (1) a 2013 request to respond to negative comments about GMO food in *Elle* magazine to which Plaintiff indicated a "strong response" was needed, ultimately posting one (Id. pp. 21-22.); (2) a 2013 request to author a policy brief on GMO activism that was eventually published under the title "*Anti-GMO Activism and Its Impact on Food Security*" (Id. pp. 36-44.); and (3) a 2015 request to provide pro-GMO content to WebMD, to which Plaintiff agreed (Id. pp. 162-69.).

As noted above, Plaintiff was also heavily involved in providing content to be posted on the GMOAnswers website.  (Id. pp. 10-20, 45-47, 79.)  His "willingness to get into the fray, both in and out of GMO Answers" was praised by Cathleen Enright of The Biotechnology Industry Organization, with Plaintiff writing in response that "companies need to stand up to pressure, not to bend" so "[c]all me whenever you need some extra assistance.  I'm here."  (Id. p. 77.) Plaintiff's eagerness to engage on GMOAnswers was also evident in his offer to Ketchum to confer "even on nights/weekends."  (Id. p. 12.)

Finally, throughout 2014, Plaintiff actively engaged with Monsanto representatives to discuss strategies to combat anti-GMO legislation.  This

included not only his previously mentioned testimony and "Q&A" sessions but also a willingness to sign onto a letter ("I'm glad to sign on to whatever you like, or write whatever you like") proposed by Monsanto opposing Colorado and Oregon GMO food labeling campaigns and his offering suggestions on how best to sway public opinion through television advertisements. (Id. pp. 139-44.) Plaintiff also provided thoughts on promoting pro-GMO federal legislation through public relations campaigns. (Id. pp. 90-91.)

## Statements F-J

- **Statement F**: "*campaign to publicly defend genetically modified technologies.*" (Complaint, ¶ 82.)

- **Statement G**: "*Misinformation campaign in ag biotech is more than overwhelming,' Yong Gao, then Monsanto's global regulatory policy director explained in an April 2013 email to Dr. Folta as the company started to work closely with him. 'It is really hurting the progress in translating science and knowledge into ag productivity.'*" (Id. ¶ 88.)

- **Statement H**: "*Dr. Folta is among the most aggressive and prolific biotech proponents, although until his emails were released last month, he had not publicly acknowledged the extent of his ties to Monsanto.*" (Id. ¶ 93.)

- **Statement I**: "*[Dr. Folta] has a doctorate in molecular biology and has been doing research on the genomics of small fruit crops for more than a decade. Monsanto executives approached Dr. Folta in the spring of 2013 after they read a blog post he had written defending industry technology.*" (Id. ¶ 97.)

- **Statement J**: "*Dr. Folta is one of many academics the biotech industry has approached to help [Monsanto] defend or promote its products, the emails show.*" (Id. ¶ 100.)

The News Story also laid out certain background facts about how industry and academia found their way to one another and ultimately worked together to promote GMO science.  Once again, Plaintiff alleges the e-mails documenting this relationship were reported in a manner that attacked his scientific integrity.  But, once again, the statements are supported by the records relied upon to write the News Story.

**Public Records Supporting Statement F**:  As noted above, a wealth of public records support the assertion that Plaintiff was more than willing to (1) advocate for GMO technology (e.g., "Call me whenever you need some extra assistance.  I'm here.")  (Ex. B, p. 77.); (2) publish supportive articles and other pieces (e.g., his *Orlando Sentinel* editorial in support of GMO science)  (Id. pp. 84-86); and (3) discuss with industry representatives ways to influence the public debate and counter legislative attempts to regulate GMO food products (e.g., his willingness to sign on to letters opposing anti-GMO legislation and offering suggestions on how best to craft television spots aimed at influencing GMO skeptics) (Id. pp. 139-44.)  This statement is a fair characterization of those activities and all of the communications discussed above in support of Statement E apply with equal force here.

**Public Records Supporting Statement G** :  Plaintiff takes issue with this statement because of its characterization that Plaintiff began to "work closely" with

Monsanto.  Once again, the public records reveal direct communications between

Plaintiff and Monsanto around this timeframe, with Plaintiff willingly advocating

for GMO science at Monsanto's request (e.g., at Monsanto's request, posting a

"strong response" to anti-GMO comments in *Elle* magazine) and accepting

Monsanto-backed travel funding.  (Ex. B, pp. 6, 10-12, 21-22, 36-44, 110.)

Defendants are free to characterize that relationship as "close" based on the

revealed records.

**Public Records Supporting Statement H**:  The records reveal that Plaintiff

sought to shield the $25,000 from public scrutiny when he proposed the grant be

funded as a "SHARE contribution" which would not be in a "conflict-of-interest

account," meaning it would not be "publicly noted."  (Id. p. 104.)  Furthermore,

Plaintiff's frequent and enthusiastic willingness to support industry calls to defend

GMO science, including the 24/7 availability for GMOAnswers and his *Orlando*

*Sentinel* editorial that he described as not being written in a "soft voice," was fairly

described as "aggressive" and "prolific."  (Id. pp. 12, 85.)  Finally, the

communications discussed above in support of Statement E provide additional

support for this claim.

**Public Records Supporting Statements I-J**: Public records show

Monsanto's early correspondence with Plaintiff came in April 2013 when Keith

Reding reached out to Plaintiff after reading Plaintiff's comment posted to an

online GMO article.  Plaintiff then corresponds with Reding, essentially

commenting that the GMO debate needs scientists' input to dispel misinformation.

(Id. pp. 6-7.)  This, of course, marked the beginning of Plaintiff's relationship with

Monsanto and its related industry/PR partners, a relationship that, among other

things, led to him writing multiple articles and testifying in support of the same

GMO science advocated by industry.

## Statements K-M

- **Statement K**: "*The emails provide a rare view into the strategy and tactics of a lobbying campaign that has transformed ivory tower elites into powerful players.  The use by both sides of third-party scientists and their supposedly unbiased research, helps explain why the American public is often confused as it processes the conflicting information.*"  (Complaint, ¶ 74-76.)

- **Statement L**: "*Dr. Folta, the emails show, soon became part of an inner circle of industry consultants, lobbyists, and executives who devised strategy on how to block state efforts to mandate G.M.O. labeling and, most recently, on how to get Congress to pass legislation that would preempt any state from taking such a step.*"  (Id. ¶ 102.)

- **Statement M**: "*…The company was debating how to defeat labeling campaigns last year in Colorado and Oregon.  Dr. Folta, included in the email chain, agreed.  'We can't fight emotion with lists of scientists,' Dr. Folta wrote to Lisa Drake, the Monsanto lobbyist.  'It needs a connection to farming mothers.*" (Id. ¶ 107.)

The News Story also detailed Plaintiff's numerous cross-country

trips where he testified before governmental bodies against Anti-GMO legislation

and discussed ways to influence public opinion on GMO science.

**Public Records Supporting Statements K-M**: As discussed previously, multiple records show Plaintiff directly strategized with industry insiders regarding how to combat anti-GMO legislation.  Moreover, at industry urging, he testified in favor of GMO science before public bodies considering such legislation. As to Statement K, it is nothing more than a fair and accurate, aggregate view of what Plaintiff's e-mails reveal regarding how industry utilized academics to devise and implement public relations and legislative strategy.  For Plaintiff to now claim his role was unfairly portrayed is disingenuous when industry representatives like the HCIA noted he was "part of our overall public education strategy" whose goal was to get the Kaua'i "Council to oppose the bill," with DuPont personnel providing Plaintiff and others strategy notes.  (Ex. B, pp. 23-26)  Statement M lifts verbatim quotes from Plaintiff's own emails.  (Id. p. 142.)  Once again, Plaintiff cannot divorce himself from the story his own records tell.

*      *      *

The law is clear that inherent negative inferences from public records cannot support a defamation claim.  See Alan, 973 So. 2d at 1180.  Plaintiffs cannot avoid the fair report privilege by asserting, as Plaintiff does here, that the accurate reporting of potentially unflattering facts created a negative implication. See Alan, 973 So. 2d at 1180 (finding statements in newspaper report privileged and that "[w]hile some of the statements . . . may be viewed as painting [Plaintiff]

26

in a negative light, this alone does not rise to actionable defamation"). In <u>Alan</u>, the plaintiff was an attorney who was charged with accessory after the fact to murder, threats or extortion, tampering with a witness, and solicitation to commit perjury. <u>Id.</u> at 1178. The newspaper reported on the charges, relying on the arrest warrant, the probable cause affidavit and testimony at trial. <u>Id.</u> at 1178-79. Once Alan was acquitted, he sued the newspaper for defamation. <u>Id.</u> at 1178. The court found the paper's reporting—based on the public documents and testimony—was privileged even though it painted Alan in a negative light and may have been phrased in a way to catch its readership's attention. <u>Id.</u> at 1179-80. <u>See also</u> <u>Jeter v. McKeithen</u>, No. 5:14-cv-00189-RS-EMT, 2014 WL 4996247, at *2 (N.D. Fla. Oct. 7, 2014) (dismissing case on Florida fair report privilege grounds and noting such that the privilege applies with full force in cases of claimed defamation by implication). Simply put, Plaintiff cannot avoid the factual trail of his e-mails by complaining those carefully and accurately reported facts show Plaintiff in a negative light.

As demonstrated above, a review of the supporting records establishes that the News Story is a truthful recounting of Plaintiff's own words and communications and is, therefore, protected by the fair report privilege.

**C.    The Statements Complained of in the News Story are Incapable of Having the Defamatory Meanings Alleged.**

Unable to refute the immutable plain meaning of his own e-mail exchanges, Plaintiff is left to conjure up claims that the News Story somehow implied defamatory untruths about him.[10]  Those assertions are baseless.

It is for the Court in the first instance to decide whether a publication is capable of a defamatory meaning.  See Rubin v. U.S. News & World Rep., Inc., 271 F.3d 1305, 1306-08 (11th Cir. 2001) (affirming dismissal of defamation by implication claim because no reasonable reader would have concluded that plaintiff, who owned a gold refining business, was involved in the illegal gold trade simply because he was interviewed for a story discussing the small fraction of the trade that was illegitimate).  Additionally, the law also counsels that plaintiffs cannot simply cherry pick; the alleged defamatory statement(s) must be read in the context of the entire article.  See Carroll v. TheStreet.com, Inc., No. 11-CV-81173, 2014 WL 5474061, at *11 (S.D. Fla. July 10, 2014) ("However, the

---

[10] Plaintiff alleges a libel *per quod* claim based on alleged implications derived from the News Story.  This is in contrast to a *per se* claim where the defamatory nature of the statement is evident on its face.  In libel *per quod* claims, special damages must be plead with particularity.  Plaintiff has failed to do so, thus necessitating dismissal of the defamation claim on this ground too.  See Frieder v. Prince, 308 So. 2d 132, 134 (Fla. 3d DCA 1975) ("[i]n addition, the amended complaint does not state with specificity the appellant's claim of special damages, a clear prerequisite in an action based upon libel per quod") (citations omitted).

Court cannot view the defamatory remarks in a vacuum. It must view the Article as a whole."); Brown v. Tallahassee Democrat, Inc., 440 So. 2d 588, 589 (Fla. 1st DCA 1983) (stating the "allegedly defamatory publication must be considered in its entirety rather than with an eye constrained to the objectionable feature alone."). Where a plaintiff's reading is strained, a "court has a 'prominent function' in determining whether a statement is defamatory, and if a statement is not capable of a defamatory meaning, it should not be submitted to a jury." Ranbaxy Labs, Inc. v. First Databank, Inc., No. 3:13-cv-859-J-32MCR, 2015 WL 3618429, at *3 (M.D. Fla. June 9, 2015) (quoting Smith v. Cuban Am. Nat'l Found., 731 So. 2d 702, 704 (Fla. 3d DCA 1999)).

Further, to decide whether a statement is capable of a defamatory meaning, courts must take an objective approach and "evaluate the publication, not by 'extremes, but as the common mind would naturally understand it.'" Byrd, 433 So. 2d at 595 (finding that re-touched photograph resulting in subject giving obscene gesture could not, in light of caption making clear photograph was altered, be viewed as implying subject posed making the gesture) (citation omitted). See also Valentine v. C.B.S., Inc., 698 F.2d 430, 431-32 (11th Cir. 1983) (finding plaintiff's claim that Bob Dylan song lyrics implied she was part of conspiracy to convict Rubin "Hurricane" Carter was not reasonable because none of the lyrics mentioning her related to the conspiracy and noting "[a] review of the entire song

makes it clear this interpretation is not reasonably possible…plaintiff's interpretation does not construe the words as the common mind would understand them but is tortured and extreme.").

The supposed defamatory implications in this case,[11] which are interrelated and peppered throughout the Complaint, distill to the following themes: (1) that Plaintiff was "nothing more than a paid industry salesman" (Complaint, ¶ 68); (2) that Plaintiff was a "puppet" of industry who coordinated to mislead the public and compromised his own scientific integrity (Id. ¶¶ 69-74); (3) that he was a "client" or "employee" of Monsanto (Id. ¶¶ 78-80); and (4) that he stood ready to defend Monsanto and was a lobbyist who would "lie for money" (Id. ¶¶ 86-87, 90, 93, 95, 99-100).  The News Story does not say or imply any of those things.

When the News Story is considered as a whole and the statements complained of put in proper context, it becomes clear that it was not an attack on Plaintiff but, rather, a balanced look at the overall food industry practice—both pro and anti-GMO—of soliciting academics to further their messages.  Like the

---

[11] Incredibly, to further the false narrative that Defendants were targeting Plaintiff, the Complaint contains purported quotations from the News Story that simply are not there.  For example, the "quotations" found in paragraphs 49 and 83 of the Complaint, "enlist[ing] scientists – the soldiers doing the work for their industry" and "how does it feel to be a tool of the industry?" do not appear in the News Story.  He also claims that Defendants stated that he had taken industry money to fund his research and salary.  (Complaint ¶ 21.)  It simply does not say that and in fact states that he was not personally compensated.

plaintiffs in <u>Rubin</u>, <u>Byrd</u>, and <u>Valentine</u>, Plaintiff seeks to stack and twist sourced facts set forth within the story to contrive a litany of implications, all the while ignoring statements that flatly refute his reading.  For example, quoting an industry representative as saying "*Keep it Up!*" is simply does not imply anything defamatory.  Likewise, truthfully describing Plaintiff as having a "*relationship*" with Monsanto or that he was an "*aggressive*" proponent of GMO science cannot be reasonably read to imply that the Monsanto relationship was unethical or otherwise compromised.  These examples typify Plaintiff's entire approach to the News Story and the litany of allegedly offensive statements catalogued in the Complaint.

The same is true about Plaintiff's claims that the photographs and headlines accompanying the News Story, along with layout elements of the same result in similar implications.  (<u>Id.</u> ¶¶ 31-47).  The similar online and print headlines for the News Story: "*Food Industry Enlisted Academics in G.M.O. Lobbying War, Emails Show*" and "*Emails Reveal Academic Ties In a Food War.  Industry Swaps Grants for Lobbying Clout*" cannot reasonably be read to imply Plaintiff himself had nefarious relationship with industry.  The News Story, which must be considered in full, explicitly makes clear that no evidence suggested Plaintiff was compromised in any way and includes his supporting quotations.  The picture Plaintiff complains about is another notable example of his hypersensitivity.  He

claims the picture purposefully portrayed him as some kind of evil, corporate scientist, "seen in a laboratory with petri dishes, metal racks, and indoor plants under fluorescent lamps." (Id. at ¶¶ 41-42.) But that public record photograph is by a UF-credited photographer, and is virtually identical to one UF has used in press releases about Plaintiff.[12] Finally, Plaintiff's claim that the News Story's layout (Id. ¶¶ 36-39, 44) implies negative implications is equally overreaching and unreasonable. No reasonable reader would draw implications simply from where photographs appear in the News Story in relation to each other, or story text.

All told, Plaintiff's true grievance is the one he admits was regrettable and one he understands "*100 percent*": that after reading a factual account of his activities some members of the public may independently form the opinion that he became too close to industry. Plaintiff cannot ignore the statements in the News Story that contradict his allegations, mainly: (1) that the organic food industry and its academic partners are equally profiled, "*Like the biotech companies, organic industry executives believed they could have more influence if they pushed their message through academics*;" (2) the News Story explicitly states that "*[t]here is no evidence that [Plaintiff's] academic work was compromised*" and that "*Dr. Folta was not personally compensated*" by Monsanto or any other industry party,

---

[12] See, e.g., *Kevin Folta receives 2016 Borlaug CAST Communication Award*, http://ufgi.ufl.edu/kevin-folta-receives-2016-borlaug-cast-communication-award/.

also including a quote from Plaintiff's testimony in Hawaii reiterating that fact; and (3) the News Story quotes Plaintiff as saying "[n]*obody tells me what to say, and nobody tells me what to think*" and that "[e]*very point I make is based on evidence.*"

The alleged implications that Plaintiff aligned with industry to do its bidding and was willing to sacrifice his integrity in the process are objectively unreasonable, extreme, and contradicted by those portions of the News Story Plaintiff would have this Court ignore.  They should, therefore, not be credited.

Finally, to the extent elements of the News Story are read to in any way editorialize about certain facts those would be protected opinion incapable of a defamatory meaning.  See Beck v. Lipkind, 681 So. 2d 794, 795 (Fla. 3d DCA 1996) ("'[O]pinions cannot be defamatory'…'Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public.'") (citations omitted).  Words such as "*recruited*," "*aggressive*," and "*prolific*" (Complaint ¶¶ 72-73, 93) are reasonable opinions based on the facts disclosed in the News Story.

For these additional reasons, dismissal is appropriate.

### D.     Florida Does Not Recognize False Light.

Count I of the Complaint bears a combined title of Defamation/False Light predicated on the alleged "implications," "innuendos," and "misrepresentations" in the News Story.  (Complaint, ¶ 138).  However, to the extent Count I is read to plead an independent claim for false light it must be dismissed because the Florida Supreme Court ruled almost a decade ago that the tort does not exist in Florida. See Jews for Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1108 (Fla. 2008) ("Because defamation by implication applies in circumstances where literally true statements are conveyed in such a way as to create a false impression, we conclude that there is no meaningful distinction on that basis to justify recognition of false light as a separate tort."); Dowbenko v. Google Inc., 582 Fed. Appx 801, 804 (11th Cir. 2014) (applying Jews for Jesus, Inc. and affirming dismissal of false light claim).

### E.     Plaintiff's Intentional Infliction of Emotional Distress Claim is Barred.

Count II of the Complaint is for intentional infliction of emotional distress allegedly caused by Defendants' publication of the News Story.  (Complaint, ¶¶ 146-49).  Such derivative and duplicative claims are barred by Florida's "single cause of action rule," which provides that the publication of allegedly defamatory material gives rise to one cause of action: defamation.  Fridovich v. Fridovich, 598 So. 2d 65, 70 (Fla. 1992).  Florida courts "look for the reality, and the essence of

the action and not its mere name." Orlando Sports Stadium, Inc. v. Sentinel Star Co., 316 So. 2d 607, 609 (Fla. 4th DCA 1975) (internal quotation omitted).

As the Florida Supreme Court has explained, a plaintiff cannot make an end-run around a valid defense to defamation "by simply renaming the cause of action and pleading the same facts" as those that would be alleged in support of a defamation claim. Fridovich, 598 So. 2d at 69 (rejecting duplicative cause of action for intentional infliction of emotional distress in defamation case). The purpose of the rule is to ensure that a plaintiff does not use alternative tort claims to evade the strict requirements of defamation law. Id. at 69-70; Orlando Sports Stadium, Inc. v. Sentinel Star Co., 316 So. 2d 607, 609 (Fla. 4th DCA 1975) (explaining that a plaintiff cannot skirt the strict requirements of defamation "by the simple expedient of redescribing the libel action to fit a different category of intentional wrong"). The rule also prevents litigants from making an end run around the privileges, protections, and defenses available in defamation actions by simply renaming their defamation claims as some other tort. Id.; see also Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp., 831 So. 2d 204, 208 (Fla. 4th DCA 2002).

"[R]egardless of privilege, a plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the alleged defamatory statements as 'outrageous.'" Fridovich, 598 So. 2d at 70

(citing <u>Boyles v. Mid-Florida Television Corp.</u>, 431 So. 2d 627, 636 (Fla. 5th DCA 1983), <u>approved on other grounds</u>, 467 So. 2d 282 (Fla. 1985)).  Because Plaintiff's intentional infliction of emotional distress claim is based entirely on the same allegations which give rise to his defamation claim, it must be dismissed.

### III.   <u>CONCLUSION</u>

For these reasons, Defendants The News York Times Company and Eric Lipton respectfully request the Court grant this Motion and dismiss with prejudice Plaintiff's Amended Complaint as a matter of law.

<u>**REQUEST FOR ORAL ARGUMENT**</u>

Defendants request oral argument on this motion and estimate that sixty (60) minutes will be required.

Respectfully submitted,

THOMAS & LOCICERO PL

/s/ *Gregg D. Thomas*
Gregg D. Thomas
  Florida Bar No. 223913
Carol Jean LoCicero
  Florida Bar No. 603030
Mark R. Caramanica
  Florida Bar No. 110581
601 South Boulevard
Tampa, FL 33606
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
gthomas@tlolawfirm.com
clocicero@tlolawfirm.com
mcaramanica@tlolawfirm.com

secondary e-mail addresses:
abeene@tlolawfirm.com
tgilley@tlolawfirm.com

*Attorneys for The New York Times
Company and Eric Lipton*

## <u>LOCAL RULE 7.1(F) CERTIFICATION</u>

I HEREBY CERTIFY that the foregoing memorandum of law contains 7,963 words, with such word count incorporating all portions of this document subject to the limitations imposed under Local Rule 7.1(F).

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing

document is being electronically filed and will be furnished via CM/ECF and via

electronic mail on October 19, 2017, to:

James J. Evangelista
Bryan D. Hull
Bush Ross, P.A.
1801 North Highland Avenue
Tampa, FL 33602
P.O. Box 3913
Tampa, FL 33601-3913
jevangelista@bushross.com
bhull@bushross.com
osmith@bushross.com
jlantz@bushross.com

James E. Beasley, Jr.
Lane R. Jubb, Jr.
The Beasley Law Firm, LLC
1125 Walnut Street
Philadelphia, PA 19107
Jim.Beasley@BeasleyFirm.com
Lane.Jubb@BeasleyFirm.com
Roseann.Diorka@BeasleyFirm.com
Janet.Volpe@BeasleyFirm.com


/s/ *Gregg D. Thomas*
Attorney