## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

KEVIN FOLTA, Ph.D.,

    Plaintiff,                                                     Case No.: 1:17-cv-00246-MW-GRJ

v.

THE NEW YORK TIMES COMPANY
and ERIC LIPTON,

    Defendants.

_____/

## DEFENDANTS' MOTION FOR FINAL SUMMARY JUDGMENT
## WITH SUPPORTING MEMORANDUM OF LAW

# **TABLE OF CONTENTS**

**Table of Authorities** ............................................................ ii

**Memorandum of Law** ..........................................................3

**I.**    **Statement of Undisputed, Material Facts**...............................3

    The Parties ................................................................3

    The UF Records ...........................................................5

    Plaintiff's Monsanto Grant & the Pre-Article Controversy ............8

    The Article ..............................................................10

    Plaintiff's Public Statements About Industry Ties & Industry Products ......12

**II.**   **Argument**................................................................14

    A.    Standards Applicable to Cases Involving First Amendment
        Rights...................................................................15

    B.    Applicable Substantive Defamation Law/Defenses...........................16

        1.    Elements of Defamation ...........................................16

        2.    Florida's Fair Report Privilege .................................17

        3.    Truth/Substantial Truth...........................................25

        4.    Lack of Defamatory Meaning ....................................28

        5.    Statements of Opinion are Non-Actionable..........................30

        6.    Statements Must Be "Of And Concerning" Plaintiff...............34

        7.    Certain Statements are Time-Barred................................35

        8.    Florida Rejects False Light ......................................36

    C.    The Complaint and Joint Report Statements.....................37

    D.    Strained Implications........................................69

**III.**  **Conclusion** ................................................73

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

Abram v. Oldham,
  89 So. 2d 334 (Fla. 1956) ................................................................... 17

Air Wis. Airlines Corp., v. Hoeper,
  134 S.Ct. 852 (2014)............................................................. 26, 28, 70

Alan v. Palm Beach Newspapers, Inc.,
  973 So. 2d 1177 (Fla. 4th DCA 2008)............................................ 17, 19

Angelastro v. Novotny,
  2013 WL 12144969 (Fla. Cir. Ct. July 2, 2013) ................................. 19

Angelastro v. Novotny,
  145 So. 3d 838 (Fla. 2d DCA 2014)................................................. 19

Baker v. McDonald's Corp.,
  686 F. Supp. 1474 (S.D. Fla. 1987) ................................................ 34

Beck v. Lipkind,
  681 So. 2d 794 (Fla. 3d DCA 1996)................................................ 30

Bigelow v. Brumley,
  37 N.E.2d 584 (Ohio 1941) ........................................................... 48

Byrd v. Hustler Magazine, Inc.,
  433 So. 2d 593 (Fla. 4th DCA 1983)..................................... 16, 29, 70

Canonico v. Callaway,
  26 So. 3d 53 (Fla. 2d DCA 2010)........................................ 35, 38, 46

Carson v. News-Journal Corp.,
  790 So. 2d 1120 (Fla. 5th DCA 2001)........................................ 19, 24

Chapin v. Knight-Ridder, Inc.,
  993 F.2d 1087 (4th Cir. 1993) ................................................... 40, 42

Clark v. Clark,
  1993 WL 528464 (Fla. Cir. Ct. June 22, 1993)................................. 18

Coghlan v. Beck,
  984 N.E.2d 132 (Ill. App. Ct. 2013) ............................................... 52

Coles v. Dearborn Midwest Co.,
  2014 WL 7530433 (E.D. Mich. Sept. 17, 2014) ............................... 31

Coogler v. Rhodes,
  21 So. 109 (Fla. 1896) .................................................................. 17

Croixland Props. Ltd. P'ship v. Corcoran,
  174 F.3d 213 (D.C. Cir. 1999)........................................................ 34

Davies v. Bossert,
  449 So. 2d 418 (Fla. 3d DCA 1984)................................................ 36

Dickey v. Gannett Co., Inc.,
  2010 WL 3581644 (Fla. Cir. Ct. Sept. 8, 2010) ............................................. 19, 20
Dowbenko v. Google Inc.,
  582 Fed. App'x 801 (11th Cir. 2014) ...................................................... 37
Fancher v. Lee Cty. Humane Soc'y, Inc.
  25 Media L. Rep. 2565, 2566 (Fla. Cir. Ct. July 14, 1997) ................................ 20
Fancher v. Lee Cty. Humane Soc'y, Inc.,
  717 So. 2d 1011 (Fla. 2d DCA 1998) ........................................................ 20
Ferguson v. Dayton Newspapers, Inc.,
  1981 WL 5379 (Ohio Ct. App. Dec. 17, 1981) .................................................. 57
Forston v. Colangelo,
  434 F. Supp. 2d 1369 (S.D. Fla. 2006) ...................................................... 33
From v. Tallahassee Democrat, Inc.,
  400 So. 2d 52 (Fla. 1st DCA 1981) .......................................................... 30
Garrison v. Louisiana,
  379 U.S. 64 (1964) ......................................................................... 25
Gifford v. Bruckner,
  565 So. 2d 887 (Fla. 2d DCA 1990) .......................................................... 36
Hadlock v. Tex. Christian Univ.,
  2009 WL 485669 (Tex. Ct. App. Feb. 26, 2009) .............................................. 31
Honolulu Data Entry Project, Ltd. v. D. Bello Assocs.,
  2014 WL 4536266 (D. Hawaii Sept. 10, 2014) ................................................ 31
Huszar v. Gross,
  468 So. 2d 512 (Fla. 1st DCA 1985) ......................................................... 17
Ingenere v. Am. Broad. Cos., Inc.,
  1984 WL 14108 (D. Mass. Sept. 18, 1984) ................................................... 23
Jamason v. Palm Beach Newspapers, Inc.,
  450 So. 2d 1130 (Fla. 4th DCA 1984) ..................................................... 20, 21
James v. San Jose Mercury News, Inc.,
  17 Cal. App. 4th 1 (Cal. App. Ct. 1993) ................................................... 33
Jeter v. McKeithen,
  5:14-CV-00189-RS-EMT, 2014 WL 4996247 (N.D. Fla. Oct. 7, 2014) ............ 21
Jews for Jesus, Inc. v. Rapp,
  997 So. 2d 1098 (Fla. 2008) ....................................................... 17, 21, 36, 37
McCormick v. Miami Herald Publ'g Co.,
  139 So. 2d 197 (Fla. 2d DCA 1962) ......................................................... 26
Medico v. Time, Inc.,
  643 F.2d 134 (3d Cir. 1981) ........................................................... 18, 23
Miami Herald Publ'g Co. v. Tornillo,
  418 U.S. 241 (1974) ........................................................................ 34

iii

Mile Marker, Inc. v. Petersen Publ'g, L.L.C.,
 811 So. 2d 841 (Fla. 4th DCA 2002) .................................................. 34
Molenda v. Hoechst Celanese Corp.,
 60 F. Supp. 2d 1294 (S.D. Fla. 1999) ................................................. 34
Nelson v. Associated Press, Inc.,
 667 F. Supp. 1468 (S.D. Fla. 1987) ............................................... 26, 35
New York Times Co. v. Sullivan,
 376 U.S. 254 (1964) ............................................................. 20, 34, 70
Orlando Sports Stadium, Inc. v. Sentinel Star Co.,
 316 So. 2d 607 (Fla. 4th DCA 1975) .................................................. 36
Ortega v. Post-Newsweek Stations, Fla., Inc.,
 510 So. 2d 972 (Fla. 3d DCA 1987) ............................................... 19, 22
Palermo v. Underground Solutions, Inc.,
 2012 WL 3134255 (S.D. Cal. Aug. 1, 2012) ......................................... 32
Palermo v. Underground Solutions, Inc.,
 2013 WL 310556 (S.D. Cal. Jan. 25, 2013) ......................................... 33
Parks v. Steinbrenner,
 131 A.D.2d 60 (N.Y. App. Div. 1987) ................................................ 32
Price v. Viking Penguin, Inc.,
 881 F.2d 1426 (8th Cir. 1989) ........................................... 31, 49, 56, 61
Pullum v. Johnson,
 647 So. 2d 254 (Fla. 1st DCA 1994) .................................................. 33
Rappaport v. VV Publ'g Corp.,
 618 N.Y.S.2d 746 (N.Y. Sup. Ct. 1994) .............................................. 32
Rappaport v. VV Publ'g Corp.,
 223 A.D.2d 515 (N.Y. App. Div. 1996) ............................................... 32
Rasmussen v. Collier Cty. Publ'g Co.,
 946 So. 2d 567 (Fla. 2d DCA 2006) ............................................... 17, 19
Reuber v. Food Chemical News, Inc.,
 925 F.2d 703 (4th Cir. 1991) ......................................................... 18
Rosenblatt v. Baer,
 383 U.S. 75 (1966) .................................................................... 34
Ross v. Gore,
 48 So. 2d 412 (Fla. 1950) ............................................................. 35
Rubin v. U.S. News & World Rep., Inc.,
 271 F.3d 1305 (11th Cir. 2001) .................................................... 28, 70
Sall v. Barber,
 782 P.2d 1216 (Colo. App. 1989) ..................................................... 57
Sands v. Living Word Fellowship,
 34 P.3d 955 (Alaska 2001) ............................................................ 33

iv

Santilli v. Van Erp,
 No. 8:17-cv-1797-T-33MAP, 2014 WL 2172554 (M.D. Fla. Apr. 20, 2018) ...... 33

Savage v. Pac. Gas & Elec. Co.,
 21 Cal. App. 4th 434 (Cal. App. Ct. 1993) ............................................................ 53

Schmidt, Long & Assocs. v. Aetna U.S. Healthcare, Inc.,
 2001 WL 856946 (E.D. Pa. July 26, 2001) ........................................................... 52

Simmons v. Ware,
 920 S.W.2d 438 (Tex. Ct. App. 1996) .................................................................. 32

Smith v. Cuban Am. Nat'l Found.,
 731 So. 2d 702 (Fla. 3d DCA 1999) .............................................................. 26, 29

Steven H. v. Duval Cty. Sch. Bd.,
 1999 WL 1427666 (M.D. Fla. Sept. 3, 1999) .................................................. 16, 19

Stewart v. Sun Sentinel Co.,
 695 So. 2d 360 (Fla. 4th DCA 1997) ............................................................. Passim

Taylor v. Town of Freetown,
 479 F. Supp. 2d 227 (D. Mass. 2007) ................................................................... 31

Treppel v. Biovail Corp., No. 03-Civ-,
 2004 WL 2339759 (S.D.N.Y. Oct. 15, 2004) ....................................................... 32

Turner v. Wells,
 198 F. Supp. 3d 1355 (S.D. Fla. 2016) ................................................................. 16

Turner v. Wells,
 879 F.3d 1254 (11th Cir. 2018) ..................................................................... Passim

Vaillancourt v. Media Gen. Operations, Inc.,
 36 Media L. Rep. 1543, 1544 (Fla. Cir. Ct. May 3, 2007) .................................... 18

Valentine v. C.B.S., Inc.,
 698 F.2d 430 (11th Cir. 1983) ....................................................................... 29, 70

Wilson v. Grant,
 687 A.2d 1009 (N.J. App. Div. 1996) ................................................................... 57

Wolfson v. Kirk,
 273 So. 2d 774 (Fla. 4th DCA 1973) .................................................................... 16

Woodard v. Sunbeam Television Corp.,
 616 So. 2d 501 (Fla. 3d DCA 1993) ............................................... 17, 19, 21, 26

## Florida Constitution

Art. IX, § 7(b), Fla. Const ...................................................................................... 22

## Statutes

7 U.S.C. § 342 (2018) .............................................................................................. 4

7 U.S.C. §§ 301-309 (2018)..................................................................... 3
§ 119.011(12), Fla. Stat. (2018)............................................................ 23
§ 95.11(4)(g), Fla. Stat. (2018)...................................................... 35, 38
§ 768.295, Fla. Stat. (2018)....................................................................16
§ 770.01, Fla. Stat. (2018)............................................................. 35, 36

**Other Authorities**

Restatement (Second) of Torts § 611, cmt. f (1977) ...............................19
Rodney A. Smolla, <u>Law of Defamation</u>, § 5.2, at 5-3 (2d ed.) ............................. 25

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendants The New York Times Company ("NYT"), publisher of *The New York Times,* and Eric Lipton (collectively, "Defendants") move for final summary judgment on the remaining defamation/false light claim in the Amended Complaint (ECF 19, "Complaint").[1]

This case concerns a September 2015 NYT news report documenting relationships major agribusiness/biotechnology companies cultivated with public university academics amid the debate swirling around the safety and regulation of genetically modified organism ("GMO") food products.[2]  It also highlighted how the organics food industry developed similar relationships.  Plaintiff—a University of Florida ("UF") professor and then department chair who is an outspoken advocate for GMO science and products—is a central voice in that controversial space.

Mr. Lipton relied on Plaintiff's own email communications, which were provided to him by UF in response to a public records request.  While it may be that Plaintiff, a self-described "public" scientist, would rather not have his associations with industry giants like Monsanto examined, accurate reporting on

---

[1]  On November 16, 2017, this Court dismissed with prejudice Plaintiff's Intentional Infliction of Emotional Distress claim.  See ECF 34,p.5-6.

[2] Both the online and print versions of the story are referred to as the "Article."

the records documenting those associations cannot form the basis for a defamation lawsuit.

When ruling on Defendants' motion to dismiss, this Court observed that it "ha[d] reservations about allowing Plaintiff's defamation claim to proceed" and "a thorough reading of the entire article leads this Court to conclude that no reasonable juror could find a number of these statements to be defamatory." ECF 34,p.3. Because "the amended complaint [wa]s somewhat unclear as to where Plaintiff's hyperbole and editorializing of the facts ends and the factual allegations begin," this Court separately ordered Plaintiff to focus his claims by specifically identifying what statements he alleged were defamatory, and to include them in a Joint Report, wherein Defendants were ordered to provide supportive sources. ECF 35,p.1. However, rather than streamlining this lawsuit through the Joint Report, Plaintiff attempted to enlarge its scope and place new statements at issue. See ECF 44. For comprehensiveness, the memorandum that follows addresses statements alleged in Plaintiff's scattered pleading and the Joint Report.

Plaintiff's defamation (and false light) claim cannot survive summary judgment because the statements complained of: (1) are protected by the "fair report" privilege; (2) are true or substantially true; (3) do not contain any statements capable of a defamatory meaning; (4) constitute protected opinion; (5)

are not "of and concerning" Plaintiff; and/or (6) are barred by the applicable statute of limitations.  Further, Florida flatly rejects the false light tort.

## MEMORANDUM OF LAW

## I.      STATEMENT OF UNDISPUTED, MATERIAL FACTS

### The Parties

1.      Plaintiff is a UF professor who has chaired the Horticultural Sciences Department since 2012.[3]  See ECF 19, ¶¶ 2,19; ECF 41 ¶¶ 2,19; ECF 64-1,p.1.  UF is a "land-grant" university.  See ECF 64-2; ECF 64-51.[4]

2.      Plaintiff has been a professor within the department since 2002, and describes himself as an expert in molecular biology and genetic engineering/GMO science.  See ECF 19, ¶¶ 4,19; ECF 64-1,p.1.

3.      Land-grant universities like UF were established by the The Morrill Land-Grant Act of 1862 and the second Morrill Act of 1890 (codified at 7 U.S.C. §§ 301-309 (2018)).  The Smith-Lever Act of 1914 provided that land-grant universities have a duty to engage in "[c]ooperative agricultural extension work [which] shall consist of the development of practical applications of research

---

[3] On or about May 25, 2018, Plaintiff resigned from his chair position.  See ECF 64-3,p.1.

[4] ECF 64-51 is the Declaration of Cherie L. Pacheco verifying the accuracy of exhibits retrieved from Internet sources.

knowledge and giving of instruction and practical demonstrations of existing or improved practices or technologies in agriculture…to persons not attending or resident in said colleges in the several communities, and imparting information on said subjects through demonstrations, publications, and otherwise.…"  7 U.S.C. § 342 (2018).

4.      Consistent with this federal mandate, Plaintiff identified "science communication," which involves "promoting public understanding of biotechnology," as one of his main professional responsibilities.  <u>See</u> ECF 64-4. His "central job is to educate the public, perform cutting-edge research, and communicate that research to citizens in our state." <u>See</u> ECF 64-5,p.2.

5.      Plaintiff has also stated that "[a]s a faculty member at a land-grant university, part of my job is to integrate with industry."  <u>See</u> ECF 64-6,p.2.

6.      In previous filings, Plaintiff affirmed that educating the public about GMOs, including testifying before governmental bodies and participating in industry-sponsored communication campaigns like the GMOAnswers website forum, furthers his land-grant duties.  <u>See</u> ECF 29-2,pp.9-11.

7.      Mr. Lipton is a three-time Pulitzer Prize-winning journalist employed by NYT since 1999.  <u>See</u> ECF 64-7,pp.1-2,4,9.  He interviewed Plaintiff for and authored the Article.  <u>See</u> ECF 64-8.

8.      On September 5, 2015, NYT published an online news article written by Mr. Lipton: "*Food Industry Enlisted Academics in G.M.O. Lobbying War, Emails Show*." See ECF 19, ¶ 28; ECF 41, ¶ 28.

9.      On September 6, 2015, NYT published the print version: "*Emails Reveal Academic Ties In a Food War*." See ECF 19, ¶¶ 29, 32; ECF 41, ¶ 29, 32. The print version of the Article is Exhibit A to the Complaint (ECF 19-1) and found at ECF 64-8.[5]

The UF Records

10.      The Article was largely based upon a review of Plaintiff's emails, which UF produced in response to multiple public records requests, including Mr. Lipton's. See ECF 19, ¶ 26; ECF 41, ¶ 26. Many of UF's records were embedded in the Article's online document viewers so readers could review the source documents. See ECF 64-9.

11.      In late January 2015, an organization known as U.S. Right to Know ("USRTK") made a public records request to UF related to Plaintiff's

---

[5] The online version of the Article, which was not attached to the Complaint, is located at: https://www.nytimes.com/2015/09/06/us/food-industry-enlisted-academics-in-gmo-lobbying-war-emails-show.html. A true and correct copy is attached at ECF 64-14. Further, true and correct copies of records provided by UF that were published within the online version of the story, followed by the related online annotations, are found within ECF 64-9. The annotated records can also be found at: https://www.nytimes.com/interactive/2015/09/06/us/document-folta.html.

communications with various agribusiness/biotechnology entities.  <u>See</u> ECF 64-10; ECF 64-11.  Responsive records were provided to USRTK by UF in four batches in the summer of 2015.  <u>See</u> ECF 64-12.

12.     Around August 19, 2015, Mr. Lipton made a public records request to UF, seeking copies of the records UF provided to USRTK.  <u>See</u> ECF 64-13.[6]

13.     On August 24, 2015, UF provided the requested records to Mr. Lipton.  <u>See</u> ECF 64-15.

14.     Those same records were requested by other members of the media, with Plaintiff at times directly providing copies.  <u>See</u> ECF 64-16.  Plaintiff stated that UF provided the records to "at least two dozen journalists."  <u>Id.</u>,p.6.

15.     On May 21, 2018, UF certified that the records it transmitted to Mr. Lipton on August 24, 2015 were provided in response to his August 19, 2015 public records request.[7]  <u>See</u> ECF 64-17,pp.2-3.

16.     On his website, kevinfolta.com, Plaintiff stated that he became aware of the USRTK public records request on February 1, 2015.  <u>See</u> ECF 64-18,p.1. He then remarked, "Turns out that Florida has one of the loosest public records laws, so all documents were provided in a timely manner without resistance" and

_____

[6] The Article notes that "the New York Times separately requested" some of the public records USRTK previously obtained.  <u>See</u> ECF 64-8,p.2.  These included the records USRTK received from UF.

[7] The records Mr. Lipton received from UF equaled 4,593 pages.

that "in full compliance I provided >5400 pages of email." <u>Id.</u>  He invited anyone

with questions about the public controversies surrounding him to email, and closed

by noting that "yes, your email will be discoverable by FOIA laws." <u>Id.</u>,p.2.

17.  In slide presentations, Plaintiff also acknowledged that in response to

public record requests, he "turned over 4600 pages in 2015, many more in 2016

[to] USRTK, Food Babe, many others." <u>See</u> ECF 64-19.

18.  Addressing the records again in February 2015, Plaintiff wrote, "The

bottom line is that my university operates under the Sunshine Law.  Emails are

public information" and faculty "know our emails are open property." <u>See</u> ECF

64-20,p.1.

19.  Among other things, his UF records documented: (1) Plaintiff's

actions in securing a $25,000 "unrestricted grant" from Monsanto—that Plaintiff

told Monsanto would not have to be publicly disclosed—to fund talks about GMO

science, including the discussion of industry products; (2) Plaintiff's testifying

before governmental bodies in favor of pro-GMO policies; (3) Plaintiff's

interactions with industry, including numerous email communications with

industry representatives providing his thoughts about lobbying strategy and

describing his efforts to communicate GMO science to the public; (4) his posts for

GMOAnswers, an industry-sponsored website; and (5) travel expenses paid by

industry, including expenses related to his trip to Monsanto headquarters.  <u>See</u> ECF

64-9,pp.7-22,23-34,36-37,50-51,64-65,70,80-86,95-105,109-112,117-118,121-147,153-169.

<u>Plaintiff's Monsanto Grant & the Pre-Article Controversy</u>

20.    In July 2014, Plaintiff submitted a proposal to Monsanto that resulted in the award of a $25,000 "unrestricted grant" in August 2014.  <u>See</u> ECF  64-9,pp. 96-104,110; ECF 64-21.   It was a three-pronged proposal that sought to teach others how to teach GMO science, engage directly with the public on those issues, and hold on-campus GMO communications training.   <u>See</u> ECF 64-9,pp.97-99; ECF 64-21,pp.2-4.   Plaintiff requested the $25,000 be funded as a "SHARE" contribution of "unrestricted funds" and told Monsanto "SHARE" contributions "are not publicly noted," so the funds would not have to be disclosed publicly. ECF  64-9,pp.104; ECF 64-21,p.9.

21.    Plaintiff's proposal specifically stated that his program would include discussion of industry products: "What are some of the products in industry pipelines and what problems could they solve?"  ECF  64-9,pp.97,100; ECF 64-21,pp.2,5.

22.    The proposal additionally provided that Plaintiff intended to "engage the public" through topics like: "What is regulation like and how do we know products are safe?" and "What are the next generation of plant products?"  ECF 64-9,pp.98; ECF 64-21,p.3.

23.     On August 8, 2014, Monsanto provided the funding, stating in a letter to Plaintiff: "Please accept this unrestricted grant in the amount of $25,000 which may be used at your discretion in support of your research and outreach projects." See ECF 64-9,p.110.  A few days later, Plaintiff visited Monsanto's Chesterfield, Missouri campus.  See ECF 64-9,pp.111-113.

24.     The next summer, about a month prior to publication of the Article, Plaintiff's $25,000 Monsanto grant was first publicized in other news media. For example, an August 13, 2015 article in *Nature* magazine stated "e-mails show that Folta did receive an unrestricted US$25,000 grant last year from Monsanto."  ECF 64-22.

25.     Writing in *The Gainesville Sun* days later, Plaintiff asserted that once the $25,000 grant was publicized the "Internet exploded, calling [me] a liar, a shill, a criminal." See ECF 64-6,p.2.

26.     That same month, UF responded by donating Monsanto's $25,000 to a campus food pantry.  See ECF 64-23; ECF 64-24; ECF 64-25,p.1.  In making that decision, Plaintiff wrote in a UF email that "[i]t does not matter where [the $25,000] goes" because the Monsanto money was a "problem" for him.  See ECF 64-25,p.1.

27.     On multiple occasions over a three-year period, Plaintiff addressed this "shill" perception.  As early as 2012, Plaintiff was denying claims he was a

Monsanto "shill," writing that "like clockwork" he is accused of being on Monsanto's payroll whenever he speaks about GMOs.  <u>See</u> ECF 64-26,p.1.

28.    In late 2013, Plaintiff again refuted the "Big Ag Shill" criticism, blogging, "If accusations could be believed I would be heading home from my Monsanto-funded weekend in Fiji, a little payback for my defense of biotechnology," and remarking that he had read that he was a "paid agent for Monsanto." <u>See</u> ECF 64-27,p.1.  That same post noted that "[f]rankly, I've had the crap kicked out of me by the anti-GM movement." <u>Id.</u>

29.    By spring/summer 2015, Plaintiff wrote that he heard the shill criticism "almost every single day," continued to contest that charge, and suggested those who base their claims on scientific evidence should "take [the] high road" and not engage with hostile voices.  <u>See</u> ECF 64-28,pp.1-3; ECF 64-29,p.4.  The Article was published a few months later.

The Article

30.    Based on the UF records, the Article recounted nearly two years of Plaintiff's communications and interactions with various representatives of the agribusiness/biotechnology industry, including Monsanto, a company Plaintiff labels "one of the largest and [most] controversial companies in America." <u>See</u> ECF 19, ¶ 5; ECF 64-8; ECF 64-9,pp.6-13,17-21,35-37,45-61,73-86,95-95,105,120-122,126,137-139,150,157,162,168-169.

31.     Largely relying on Plaintiff's own emails, NYT reported: (1) how Monsanto provided a $25,000 "unrestricted grant" so Plaintiff could give talks on GMOs; (2) Plaintiff's interactions with Ketchum, a major public relations firm working with the industry to promote GMOs; (3) Plaintiff's thoughts on lobbying strategy—e.g., supporting TV spots using "farming mothers"—shared with industry; (4) Plaintiff's writing for GMOAnswers; and (5) Plaintiff's trips to testify or speak before government in places such as Hawaii, Pennsylvania, and Washington, D.C., at the invitation of industry interest groups with Monsanto ties such as The Biotechnology Industry Organization and the Hawaii Crop Improvement Association ("HCIA").   See ECF  64-8; ECF 64-9,pp.10-20,45-49,52,56-66,70-76,78-80,84-86,95-105,109-110,121-138,139-147,153-161.

32.     The Article also chronicled, as revealed in source emails, industry efforts to revamp strategic communications campaigns to advance public understanding of GMOs and influence legislation/regulatory action affecting business interests, utilizing academics because of the "big white hat[s]" they wear in such debates.   See ECF 64-9,p.86.   Monsanto believed the "misinformation campaign in ag biotech area [wa]s more than overwhelming" and "really hurting the progress in translating science and knowledge into ag productivity." See ECF 64-9,p.8.

33.     Plaintiff became a central figure in that communications campaign by strategizing with industry on how to craft public messages, communicating with the public himself, testifying before governmental bodies, and being awarded $25,000 to travel around the country to speak about GMOs.[8]  See ECF  64-9,pp.23-34,110,121-147.

34.     The Article reported Plaintiff's position that he stands by his science and that his ethics were never compromised because of his interactions with companies like Monsanto.  See ECF 64-8.  It specifically stated that (1) "[t]here is no evidence that academic work was compromised," and (2) Plaintiff "was not personally compensated" for his activities.  Id.  The Article added a quote by Plaintiff, saying "[n]obody tells me what to say, and nobody tells me what to think…Every point I make is based on evidence."  Id.  The Article also included Plaintiff's response to the existing controversy about him being a shill or "tool" of industry.  See id.

Plaintiff's Public Statements About Industry Ties & Industry Products

35.     A couple of weeks later, on September 22, 2015, Plaintiff wrote a piece for the *Huffington Post* again addressing the controversy over his interactions

---

[8]  Combatting negative public perceptions fueled by anti-GMO "fear-based narratives and practices" was the purpose behind Plaintiff's grant proposal to Monsanto.  See ECF  64-9,p.96; ECF 64-21,p.1.  As Monsanto noted, it was a "great 3rd-party approach to developing the advocacy that we're looking to develop."  See ECF  64-9,p.105.

with industry and his responsibility to be more forthcoming about those ties.  See

ECF 64-30.  Plaintiff wrote: "At times I have made some critical mistakes that

have only made [getting the public to embrace GMO science] worse.  I realize that

there are many things I could have done differently."  Id.,p.1.  Plaintiff promised

heightened levels of transparency where all his funding sources would be updated

on his blog.  See id.,p.2.

36.    Prior to the Article's publication, Plaintiff had made numerous public

statements that certain biotech products were safe and that he was glad to speak for

companies.  For example:

- In March 2015, he tweeted and blogged about ingesting Monsanto's Roundup herbicide before an audience to demonstrate its safety.  See ECF 64-31,pp.1,3.

- In April 2015, he authored a blog post challenging other writings critical of Monsanto, Roundup, and glyphosate.[9]  See ECF 64-32,pp.1-2.

- During 2013-2014, Plaintiff utilized PowerPoint presentations incorporating slides about "Roundup-ready" seeds, and the safety of Monsanto's glyphosate products and its GMO (or Bt) cotton in India.  See ECF 64-33; ECF 64-34.

- In an August 2015 submission to *The Gainesville Sun*, Plaintiff stated that "[he is] glad to speak for any company, and do[es] frequently on

---

[9] There are references to "glyphosate" in the exhibits.  Glyphosate, developed by Monsanto decades ago, is the off-patent herbicide used in branded products like Roundup.

GMOs, communication and how we can grow crops using LED light."
See ECF 64-6,p.2.

## II.   **ARGUMENT**

Plaintiff urges this Court to ignore the actual records-based reporting derived
from a plain reading of his own emails and, instead, find unreasonable
constructions and tortured implications in the Article.  Plaintiff's central theory is
that, in line with NYT's general purported anti-GMO bias,[10] the Article implied
Plaintiff was a mere shill for "Big Ag."  In reality, the Article presented a balanced
account on how *both* pro-GMO and organics industry advocates had turned to
academia to advance their respective messaging.[11]  The Article shed light on how

---

[10] Such bias accusations are, unsurprisingly, negated by Plaintiff's own words.
Plaintiff previously praised NYT's "appropriately critical" March 2015 article
profiling anti-GMO advocate and frequent target of Plaintiff's criticism, Vani Hari
(a.k.a. the "Food Babe").  See ECF 64-35,pp.1.  Plaintiff is quoted in that story,
criticizing Hari's positions on science.  See id.,p.7.  Additionally, in his Monsanto
grant proposal, Plaintiff suggested inviting NYT journalist Amy Harmon—a
"journalist expert[] in science communication"—to participate in his  outreach
program.  See ECF 64-9,p.99; ECF 64-21,p.4.

[11] "Big Ag" agrees.  Syngenta emails commenting on the Article noted that
Council for Biotechnology Innovation members (industry funders of the
GMOAnswers website) found the piece "balanced" and that Lipton "was not
taken-in" by any purported activist group agendas.  See ECF 64-36,p.1.  It further
noted that "[Lipton] did his research" on organics industry funding too, and
appropriately reported information provided by Monsanto.  Id.  Council for
Biotechnology Innovation members include Monsanto, Dow AgroSciences, Bayer,
BASF, and Syngenta. Even UF's Assistant VP for Media Relations and Public
Affairs, Janine Sikes, approved, stating in a UF email to other UF personnel, "Just
so you know, Kevin Folta worked with the New York Times reporter and for the
*…footnote continued on next page*

each side enlisted and coordinated with public university scientists to advance their messaging in the public arena.

To aid this Court in sifting through the chaos of the Complaint and Joint Report, Defendants will discuss the statements raised by Plaintiff in both documents. Section A discusses the general legal standards applicable to First Amendment cases. Section B discusses the legal defenses that support summary judgment, many of which are common to multiple statements. Section C identifies each purported defamatory statement and the applicable defenses, citing supporting source records, when relevant.[12]  Finally, Section D confronts the extreme implications Plaintiff reads into the Article and why it is non-defamatory as a whole.

## A.    Standards Applicable to Cases Involving First Amendment Rights.

In addition to the traditional summary judgment standards, to safeguard freedom of the press, courts have long favored prompt resolution of legally untenable claims against the news media. Courts have a "prominent function" in deciding whether such cases should proceed. See Stewart v. Sun Sentinel Co., 695 So. 2d 360, 363 (Fla. 4th DCA 1997) ("pretrial dispositions are 'especially appropriate' because of the chilling effect these cases have on freedom of speech")

---

record I thought the story was fair." See ECF 64-37,p.1.

[12] An accompanying summary reference table is found at ECF 64-53.

(quotation omitted); Byrd v. Hustler Magazine, Inc., 433 So. 2d 593, 595 (Fla. 4th DCA 1983) (citation omitted); see also § 768.295, Fla. Stat. (2018) (Anti-SLAPP law, providing for accelerated dismissal of lawsuits challenging protected speech). Courts even grant motions to dismiss on the same grounds raised here on summary judgment.  See Stewart, 695 So. 2d at 363 (affirming dismissal for privileged report of official proceedings); Steven H. v. Duval Cty. Sch. Bd., No. 99-500-CIV-J-20C, 1999 WL 1427666, at *1 (M.D. Fla. Sept. 3, 1999) (same).  Earlier this year, applying Florida law, the Eleventh Circuit affirmed the dismissal of a defamation claim involving numerous statements on truth, opinion, and lack of actual malice grounds.  See Turner v. Wells, 879 F.3d 1254, 1262-74 (11th Cir. 2018).

**B.   Applicable Substantive Defamation Law/Defenses.**

   **1.   Elements of Defamation**

Florida's substantive defamation law guides this Court's analysis on the merits.  See Turner, 879 F.3d at 1262.  Under Florida law, defamation is generally defined as "'the unprivileged publication of false statements which naturally and proximately result in injury to another.'"  See Turner v. Wells, 198 F. Supp. 3d 1355, 1364 (S.D. Fla. 2016), aff'd, 879 F.3d 1254 (11th Cir. 2018) (quoting Wolfson v. Kirk, 273 So. 2d 774, 776 (Fla. 4th DCA 1973)).  To state a claim, plaintiffs must set forth facts that, if proven, would establish: (1) publication; (2)

falsity; (3) the requisite degree of fault; (4) actual damages; and (5) defamatory meaning.  Turner, 879 F.3d at 1262 (citing Jews for Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1106 (Fla. 2008)).

### 2.    Florida's Fair Report Privilege.

The statements at issue are accurate accounts of records provided by government sources, primarily UF.  Thus, Plaintiff's defamation claim fails as a matter of law because Defendants' journalism is protected by Florida's "fair report privilege." Its application is a question of law to be decided by the Court.  See Huszar v. Gross, 468 So. 2d 512, 515-16 (Fla. 1st DCA 1985).

Publishers have long enjoyed a qualified privilege when they report on events of public interest.  See Coogler v. Rhodes, 21 So. 109 (Fla. 1896); Abram v. Oldham, 89 So. 2d 334, 336 (Fla. 1956).  The fair report privilege thus permits the news media "to report accurately on the information received from government officials." Rasmussen v. Collier Cty. Publ'g Co., 946 So. 2d 567, 570 (Fla. 2d DCA 2006); Alan v. Palm Beach Newspapers, Inc., 973 So. 2d 1177, 1180 (Fla. 4th DCA 2008) (citing Rasmussen); Woodard v. Sunbeam Television Corp., 616 So. 2d 501, 502 (Fla. 3d DCA 1993) ("The news media has been given a qualified privilege to accurately report on information they receive from government officials."); Stewart, 695 So. 2d at 362 (quoting Woodard).  Courts recognize that the privilege, which "shields news organizations from defamation claims," is one

that "goes to the heart of news organizations' ability to report to citizens about their government [and carries] constitutional implications." Reuber v. Food Chemical News, Inc., 925 F.2d 703, 712 (4th Cir. 1991) (citations omitted).  It functions to "encourage[] the media to report regularly on government operations so that citizens can monitor them." Id.; Medico v. Time, Inc., 643 F.2d 134, 141 (3d Cir. 1981) ("theory of public supervision also informs the fair report privilege"), cert. denied, 454 U.S. 836 (1981).

A related policy underpinning this "important news-reporting privilege" that "insulates the media" from liability is that it "encourages the republication of information disseminated by government sources on the theory that the public should be informed about such statements and that the press is the logical vehicle to accomplish the task."  Clark v. Clark, No. 93-47-CA, 1993 WL 528464, at *3 (Fla. Cir. Ct. June 22, 1993), per curiam aff'd, 641 So. 2d 866 (Fla. 1st DCA 1994).  Indeed, "[i]f the privilege did not exist, journalists would not be able to rely on what they were told by government sources; they would have to conduct independent investigations, investing significant time and resources." Vaillancourt v. Media Gen. Operations, Inc., 36 Media L. Rep. 1543, 1544 (Fla. Cir. Ct. May 3, 2007) (attached at ECF 64-38).

The privilege encompasses a wide range of government sources, including oral statements and records, press releases, employment records, and complaint

letters.  See, e.g., Steven H. v. Duval Cty. Sch. Bd., No. 99-500-CIV-J-20C, 1999 WL 1427666, at *1 (M.D. Fla. Sept. 3, 1999) (statements provided by public school teacher/football coach); Carson v. News-Journal Corp., 790 So. 2d 1120 (Fla. 5th DCA 2001) (employment records); Stewart, 695 So. 2d at 362 (government press releases); Ortega v. Post-Newsweek Stations, Fla., Inc., 510 So. 2d 972, 976 (Fla. 3d DCA 1987) (oral statements describing testimony of another); Angelastro v. Novotny, No. 2012-CA-000998-NC, 2013 WL 12144969 (Fla. Cir. Ct. July 2, 2013), per curiam aff'd, 145 So. 3d 838 (Fla. 2d DCA 2014) (complaint letter and government reports); Dickey v. Gannett Co., Inc., No. 09-28344, 2010 WL 3581644 (Fla. Cir. Ct. Sept. 8, 2010) (video surveillance footage).

The privilege is broad and simply requires a publication be a substantially correct account of the information received.  See, e.g., Rasmussen, 946 So. 2d at 570 (privilege applied because the publications were "substantially truthful" accounts); Alan, 973 So. 2d at 1180 (privilege applied because reporting of official proceeding was correct).  "It is not necessary that [the publication] be exact in every immaterial detail or that it conform to the precision demanded in technical or scientific reporting.  It is enough that it conveys to the persons who read it a substantially correct account of the proceedings."  Woodard, 616 So. 2d at 502-03 (quoting Restatement (Second) of Torts § 611, cmt. f (1977)).

Additionally, the privilege does not dictate that news organizations report on

information received from government in sterile language.  Rather, news reporting

may be "phrased to catch the . . . readership's attention" without losing protection.

Alan, 973 So. 2d at 1180.  In other words, the legal test does not turn on editorial

style, but an evaluation of the publication's substantial accuracy in its reporting.

Id.; see also Jamason v. Palm Beach Newspapers, Inc., 450 So. 2d 1130, 1132 (Fla.

4th DCA 1984).  Even allegations that a journalist published with actual or

constitutional malice cannot overcome the privilege.  See Jamason, 450 So. 2d at

1133 ("we fail to see how actual malice is pertinent to an accurate report of a

judicial proceeding"); Fancher v. Lee Cty. Humane Soc'y, Inc., 25 Media L. Rep.

2565, 2566 (Fla. Cir. Ct. July 14, 1997) ("Dr. Fancher's allegations of actual

malice . . . will not save this action from dismissal under the fair report privilege . .

. [because] allegations of actual malice are irrelevant in actions concerning

substantially accurate press reports on the government."), rev. den., 717 So. 2d

1011 (Fla. 2d DCA 1998) (attached at ECF 64-39).[13]

    Further, a publisher has no duty to conduct further reporting that would

purportedly explain or refute the information government provides.  See Dickey,

2010 WL 3581644, at 2–3 (failure to interview certain witnesses or include

---

[13]   The terms "actual malice" or "constitutional malice" are derived from the U.S. Supreme Court's decision in New York Times Co. v. Sullivan, 376 U.S. 254 (1964).  They are shorthand for a high media fault standard requiring publishing known falsehoods or with reckless disregard for the truth.  Id. at 280.

witness comments in Article does not negate reliance on fair report privilege); Jamason, 450 So. 2d at 1133 ("The newspaper, had it wished, could have devoted the entire issue to the statement without any effort to neutralize the accusation by giving the accused the opportunity to deny.").

Finally, the privilege applies equally to any claims of defamation by implication, and no claim arises because the subject of a record disagrees with how he is portrayed.  See Jews for Jesus, Inc., 997 So. 2d at 1108 ("All of the protections of defamation law that are afforded to media and private defendants are therefore extended to the tort of defamation by implication."); Alan, 973 So. 2d at 1180 ("While some of the statements in the Post's articles may be viewed as painting Alan in a negative light, this alone does not rise to actionable defamation.").  See also Jeter v. McKeithen, No. 5:14-cv-00189-RS-EMT, 2014 WL 4996247, at *2 (N.D. Fla. Oct. 7, 2014) (dismissing case on fair report privilege grounds and noting that the privilege applies with full force in cases of claimed defamation by implication).

Once the privilege attaches, it can be defeated *only* where the challenged publication is not "reasonably accurate and fair" in describing the information provided.  Woodard, 616 So. 2d at 502 (citations omitted); see also Stewart, 695 So. 2d at 362 (news reports of beatings by corrections officers privileged because there were "no material differences" between reports and information contained in

official files); Ortega, 510 So. 2d at 977 (privilege applied to "substantially accurate" report of official proceeding).  To assess the privilege, this Court need only compare the complained of statements to the corresponding information. Therefore, regardless of Plaintiff's unending proffer of alternative explanations for his actions, the privilege concerns itself only with the plain text of the actual records.  Were this Court even to credit Plaintiff's histrionics, it would not alter what the records themselves say.

The undisputed facts establish that Mr. Lipton received the records he relied on about Plaintiff from a government agency—a state university[14]—and in response to a public records request.  See ECF 64-13; ECF 64-15.  UF has certified that fact, and the fair report privilege accordingly attaches to the information provided by this government institution.  See ECF 64-17.  While the records provided undoubtedly also constitute "public records" within the meaning of Florida's public records laws, this Court need not confront whether each meets that legal definition for the privilege to apply.  As discussed, it attaches to information provided by government, and government disclosure triggers fair report privilege protections.  Indeed, Florida courts acknowledge that application of the privilege does not turn on a record's "public" status.  See Ortega, 510 So. 2d at 976

---

[14] It cannot be disputed that UF is a government agency.  Florida's state university system was created by the Florida Constitution.  See Art. IX, § 7(b), Fla. Const.

(discussing <u>Medico</u>, in which the "court determined that even though the [FBI] materials were not public records, the report based on those materials" fell within the privilege).  Indeed, the privilege is no less applicable to reports on non-public information when doing so promotes government oversight.  <u>See, e.g.</u>, <u>Ingenere v. Am. Broad. Cos., Inc.</u>, No. 81-2894-Z, 1984 WL 14108, at *2 (D. Mass. Sept. 18, 1984).

Even so, Plaintiff's assertion that the source records are not public records is simply wrong.  The records provided to Mr. Lipton constitute records "made or received pursuant to law or ordinance or in connection with the transaction of official business by an agency."  Fla. Stat. § 119.011(12) (2018).[15]  Plaintiff's admitted land-grant university mandate to communicate science to the public and integrate with industry is directly reflected in his emails as they document official actions like securing grant funding to go on GMO speaking tours and numerous exchanges with industry designed to convince the public that GMO food products are safe.[16]  <u>See</u> ECF 64-9,pp.10-20,23-34,59,80-86,95-105,109-110,121-147,153-

---

[15] Plaintiff cites this very definition in his opposition to the motion to dismiss.  <u>See</u> ECF 32,p.24.

[16] Plaintiff's "direct supervisor," Dr. Jack Payne, has also stated that Plaintiff's university duties include interfacing with the public regarding science education and working with industry.  Specifically, one of Plaintiff's duties as a land-grant university scientist is to "engage in educational outreach," interacting with various public groups "about the science of food and farming."  ECF 64-40,p.2.  Dr. Payne
*...footnote continued on next page*

161. As previously noted, Plaintiff's own filings in this case confirm that such actions fulfill his land-grant university duties. See ECF 29-2,pp.9-11. Moreover, when Plaintiff traveled to Washington, D.C. to advise Congress on GMOs, UF did a press release. See ECF 64-9,p.161. This underscores the official business nature of his activities.

Understanding exactly how Plaintiff fulfilled his public university's mandates is of patent public interest and is a conclusive reason why his communications are public records.[17]   Naturally, neither Plaintiff nor UF ever resisted their public disclosure. Only now, to advance a strategic legal position, does Plaintiff claim these same records are *not* public records. The privilege covers the reporting here and this Court must reject Plaintiff's attempt to retroactively undermine it in such a capricious and self-serving fashion. See Carson, 790 So. 2d at 1121.

Daily, journalists report on information and documents provided by

---

further remarked that "an essential component of Dr. Folta's job as a land-grant university scientist is to integrate with industry and interact with the companies supplying seeds and support to farmers." Id.,p.1. Plaintiff referred Defendants to these statements in response to an interrogatory requesting Plaintiff detail his job duties. See ECF 64-41,p.2.

[17] In fact, UF's release of these records to USRTK (and dozens of others) is itself government action documenting its interface with the public and how it is complying with its public records obligations. That too is of public interest, and the privilege is designed to allow journalists to monitor those activities as well.

government agencies such as law enforcement, municipal and county departments, and state institutions, including flagship land-grant universities. Those journalists are entitled to rely on that information and inform the public via privileged reporting on the contents of whatever government provides. In Section II.C., below, Defendants demonstrate that the statements at issue regarding Plaintiff are, in fact, rooted in information provided by UF and, therefore, privileged as a matter of law.

### 3.   Truth/Substantial Truth.

A related way to reach the same conclusion commanded by application of the privilege is to look to the most fundamental of defenses to a defamation claim: truth. Plaintiff's own words, actions, and records firmly establish that the Article was true or substantially true. Summary judgment is, therefore, appropriate on this ground also.

"[T]he heart and soul of all defamation actions still rests at the core question: are the defamatory statements true or false?" Rodney A. Smolla, Law of Defamation, § 5.2, at 5-3 (2d ed.). Thus, under the First Amendment, truth undoubtedly defeats a defamation claim. See Garrison v. Louisiana, 379 U.S. 64, 74 (1964) ("Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned."); Turner, 879 F.3d at 1262 ("True statements . . . are protected from defamation actions by the First Amendment.").

Truth is so highly protected that if a statement is just "substantially" true, it is not actionable.   Under the substantial truth doctrine inaccuracies do not necessarily equate to falsity, and a statement is true if its "gist" or "sting" is correct.   See, e.g., Air Wis. Airlines Corp., v. Hoeper, 134 S.Ct. 852, 866 (2014) (finding that an airline's statements made to federal authorities about pilot's mental instability, terminated status, and fact that he was armed were substantially true and need not be further qualified or worded in the precise manner the pilot preferred); Nelson v. Associated Press, Inc., 667 F. Supp. 1468, 1477–80 (S.D. Fla. 1987) (finding statement that person "saw" two individuals having sex substantially true because person unquestionably knew it occurred, even though it was not witnessed firsthand); Woodard, 616 So. 2d at 502–03 (story was substantially true when it reported four-year prison sentence for homicide, rather than actual two-year served term for attempted murder); McCormick v. Miami Herald Publ'g Co., 139 So. 2d 197, 200 (Fla. 2d DCA 1962) ("newspapers are not to be held to the exact facts or to the most minute details of the transactions they publish, that what the law requires is that the publication shall be substantially true, and that mere inaccuracies, not affecting materially the purport of the article, are immaterial") (citation omitted); Smith v. Cuban Am. Nat'l Found., 731 So. 2d 702, 706 (Fla. 3d DCA 1999) (failing to disclose that grants received by organization were passed along to other entities did not render substantially untrue statement

that the original grant recipient's affiliated political action committee had donated to congressman who created grants). Finally, publishers enjoy editorial discretion in determining what to publish, and what not to publish. See Turner, 879 F.3d at 1270 ("[t]he law of defamation is concerned with whether a publisher reports a story truthfully, not generously") (citations omitted).

Attempts to cherry pick and contort statements so to cobble together a defamation claim were recently rejected by the Eleventh Circuit in Turner v. Wells. In that defamation case, James Turner, a former Miami Dolphins line coach, sued the authors of a report detailing their investigation into a bullying climate within the organization, which eventually led to offensive lineman Jonathan Martin's quitting the team. See Turner, 879 F.3d at 1259–60. Affirming the district court's dismissal, the Eleventh Circuit rejected Coach Turner's claims that the report defamed him when it concluded he knew about and did nothing to stop certain insulting comments directed at Martin. See id. at 1266–67. Instead, the court determined that Turner "cherry pick[ed]" quotations from the report and presented them out of context. But the report revealed the statements were true: "Indeed, Coach Turner does not argue that he was never present when Martin was subjected to the insulting comments nor does he identify any action he took to stop them. The challenged statements are true, and Turner's defamation claim falls short on this basis alone." Id. at 1267. The court additionally rejected Turner's

claim that he was defamed because the report did not mention whether these types of insults were common NFL locker room fodder, noting that, regardless of the broader NFL context, the statements remained true.  See id.

Federal precedent in cases such as Turner and Air Wisconsin provide apt guidance for this Court because they reject attempts to cherry pick statements, ignore context, disregard statements that directly rebut claims, and offer strained interpretations.  At bottom, as will be demonstrated below, Plaintiff cannot escape the reality that Defendants' reporting of his own email exchanges are true (or at the very least substantially true) and accurate accounts of those communications.

### 4.   Lack of Defamatory Meaning.

It is fundamental that to be actionable a statement must actually be defamatory.  And it is for this Court in the first instance to decide whether a publication is even capable of a defamatory meaning.  See Rubin v. U.S. News & World Rep., Inc., 271 F.3d 1305, 1306–08 (11th Cir. 2001) (affirming dismissal of defamation by implication claim because no reasonable reader would have concluded that plaintiff, who owned a gold refining business, was involved in the illegal gold trade simply because he was interviewed for a story discussing the small fraction of the trade that was illegitimate).  In making that determination, the law counsels that plaintiffs cannot simply cherry pick; the alleged defamatory statement(s) must be read in the context of the entire article.  See Turner, 879 F.3d

at 1270 ("Like the district court, we are 'hard-pressed to discern what arguably defamatory statement could reasonably flow from the facts about the [player] fine system or the Judas concept' when considering the Report's actual text."); Byrd, 433 So. 2d at 595 (allegedly defamatory publication must be considered in total and isolated statements must be evaluated within the context of entire piece). Where a plaintiff's reading is strained, a "court has a 'prominent function' in determining whether a statement is defamatory, and if a statement is not capable of a defamatory meaning, it should not be submitted to a jury." Smith, 731 So. 2d at 704 (citations omitted).

Further, to decide whether a statement is capable of a defamatory meaning, courts must take an objective approach and "evaluate the publication, not by extremes, but as the common mind would naturally understand it." Byrd, 433 So. 2d at 595 (finding that re-touched photograph resulting in subject giving obscene gesture could not, in light of caption making clear photograph was altered, be viewed as implying subject posed making the gesture) (citation omitted). See also Valentine v. C.B.S., Inc., 698 F.2d 430, 431–32 (11th Cir. 1983) (finding plaintiff's claim that Bob Dylan song lyrics implied she was part of conspiracy to convict Rubin "Hurricane" Carter was not reasonable because none of the lyrics mentioning her related to the conspiracy and noting "[a] review of the entire song makes it clear this interpretation is not reasonably possible . . . plaintiff's

29

interpretation does not construe the words as the common mind would understand them but is tortured and extreme.").

Sections II.C. and II.D. discuss the non-defamatory nature of the statements complained of, as well as Plaintiff's related alleged defamatory implications regarding the Article's layout and use of photographs.

### 5.    Statements of Opinion are Non-Actionable.

To the extent elements of the Article are read in any way to editorialize about certain facts, those would be protected opinion.  See Beck v. Lipkind, 681 So. 2d 794, 795 (Fla. 3d DCA 1996) ("[o]pinions cannot be defamatory. Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public.") (citations omitted).  Likewise, as this Court already observed, "an article's 'spin,' grounded in the author's opinion of the facts, is not actionable."  ECF 34,p.3 (citing From v. Tallahassee Democrat, Inc., 400 So. 2d 52, 56-57 (Fla. 1st DCA 1981)) (ECF 34).  See also, Turner, 879 F.3d at 1264–66 (report finding that Turner engaged in "homophobic taunting" and exercised "poor judgment" was protected opinion based on the known, disclosed facts, further noting that "it is well settled in Florida that commentary or opinion based on accurate facts set forth in an article are not the stuff of libel") (citations omitted).

Here, the Article painstakingly disclosed factual information—and then disclosed the source documents themselves.  As discussed more fully below, Plaintiff takes issue with specific words and phrases describing his disclosed actions—such as "*aggressive*," "*recruited*," "*ivory tower elites*," "*lobbying,*" "*powerful player*," "*supposedly unbiased research*," "*prolific*," "*relationship,*" and "*inner circle.*" (ECF 19, ¶¶ 35, 37, 46, 72-73, 74-76, 78-80, 88, 93, 102-103).  But these characterizations are reasonable opinions based on Plaintiff's disclosed activities, and Defendants enjoy editorial license to label those actions as such. Plaintiff could never prove, for example, that he is not an "aggressive" proponent of GMOs. Plaintiff routinely advocates for GMOs and mentions products by brand name in his public speaking presentations.  See, e.g., ECF 64-9,pp.20,32-33,82,125,161; ECF 64-32; ECF 64-33; ECF 64-34.  Courts agree such terms are non-actionable.  See, e.g., Price v. Viking Penguin, Inc., 881 F.2d 1426, 1445 (8th Cir. 1989) (statement that FBI agent engaged in "open and even aggressive surveillance" was "full of rhetorical hyperbole and would be understood as an opinion").[18]

---

[18] Numerous courts have held "aggressive" to be non-actionable opinion.  See Coles v. Dearborn Midwest Co., No. 13-14450, 2014 WL 7530433, at *6 (E.D. Mich. Sept. 17, 2014);  Honolulu Data Entry Project, Ltd. v. D. Bello Assocs., No. 12-00467 BMK, 2014 WL 4536266, at *15 (D. Hawaii Sept. 10, 2014); Hadlock v. Tex. Christian Univ., No. 2-07-290-CV, 2009 WL 485669, at *5 (Tex. Ct. App. Feb. 26, 2009); Taylor v. Town of Freetown, 479 F. Supp. 2d 227, 242 (D. Mass. *…footnote continued on next page*

Moreover, even if the Article contained accusations of bias, they would be non-actionable opinion.  See, e.g., Simmons v. Ware, 920 S.W.2d 438, 449 (Tex. Ct. App. 1996) ("Whether [Plaintiff's] reports were biased, considered in context and in the light of the entire controversy, was in the eye of the beholder and incapable of definitive proof one way or the other."); Parks v. Steinbrenner, 131 A.D.2d 60, 65–66 (N.Y. App. Div. 1987) (calling a baseball umpire incompetent and biased constitutes pure opinion); Treppel v. Biovail Corp., No. 03-Civ-3002(PKL), 2004 WL 2339759, at *15 (S.D.N.Y. Oct. 15, 2004) ("determining plaintiff's level of honesty or bias is a subjective inquiry, incapable of being proven true or false"); Rappaport v. VV Publ'g Corp., 618 N.Y.S.2d 746, 750 (N.Y. Sup. Ct. 1994) ("Courts have uniformly found that the question of bias or motivation is quintessentially subjective and therefore may not form the basis for an action for defamation."), affirmed, 223 A.D.2d 515 (N.Y. App. Div. 1996).

Nor can Plaintiff disprove that he "work[ed] closely" with industry, further illustrating the protected opinions in the Article.  Even Plaintiff's ultimate contention in this case—that the Article implies he "shills" for industry—would, if it were even present, be protected opinion.  See, e.g., Palermo v. Underground Solutions, Inc., No. 12-cv-01223-WQH-BLM, 2012 WL 3134255, at *6–*8 (S.D. 2007).

Cal. Aug. 1, 2012) (defamation claim based on accusations of shilling for PVC piping industry unlikely to succeed because they were protected opinion based on disclosed facts).[19]

Finally, some of the words Plaintiff complains of are so innocuous (e.g., tactics, strategy and recruited) courts find them to be protected opinion even when pejorative modifiers are added. See, e.g., Sands v. Living Word Fellowship, 34 P.3d 955, 960 (Alaska 2001) ("cult recruiter" was "not [a] factual statement[] capable of being proven true or false"); James v. San Jose Mercury News, Inc., 17 Cal. App. 4th 1, 14–15 (Cal. App. Ct. 1993) (alleging attorney used "sleazy tactics" was opinion).[20]

In short, Plaintiff cannot dissect editorial word choices in the Article. Such decisions are protected as opinion because they are based upon facts set forth in the Article—not only in the text but also in the embedded records readers were free to

---

[19] Plaintiff soon thereafter dismissed his defamation count.  See Palermo v. Underground Solutions, Inc., No. 12-cv-01223-WQH-BLM, 2013 WL 310556, at *1 (S.D. Cal. Jan. 25, 2013).

[20] Additional Florida state and federal courts have rejected similar purportedly negative descriptions in other contexts.  See, e.g., Santilli v. Van Erp, No. 8:17-cv-1797-T-33MAP, 2014 WL 2172554 (M.D. Fla. Apr. 20, 2018) (calling an academic a "fringe scientist," "mad professor," and questioning whether he was a "cunning scam artist" was opinion); Forston v. Colangelo, 434 F. Supp. 2d 1369 (S.D. Fla. 2006) (calling NBA player a "thug" is opinion); Pullum v. Johnson, 647 So. 2d 254 (Fla. 1st DCA 1994) (calling one who favors local alcohol sales a "drug pusher" was rhetorical hyperbole/opinion).

examine.  <u>See</u> <u>Turner</u>, 879 F.3d at 1262-63 (citing <u>From</u>); <u>see also</u> <u>Miami Herald</u> <u>Publ'g Co. v. Tornillo</u>, 418 U.S. 241, 258 (1974) (First Amendment guarantees free exercise of editorial discretion).[21]

### 6.    Statements Must Be "Of And Concerning" Plaintiff.

Establishing a prima facie case of defamation under Florida law also requires proof that an alleged statement was "of and concerning" the plaintiff.  <u>See</u> <u>Molenda v. Hoechst Celanese Corp.</u>, 60 F. Supp. 2d 1294, 1303 (S.D. Fla. 1999), <u>aff'd</u>, 212 F.3d 600 (11th Cir. 2000) (table); <u>see also, e.g.</u>, <u>Baker v. McDonald's</u> <u>Corp.</u>, 686 F. Supp. 1474, 1484 (S.D. Fla. 1987), <u>aff'd</u>, 865 F.2d 1272 (11th Cir. 1988) (table); <u>Mile Marker, Inc. v. Petersen Publ'g, L.L.C.</u>, 811 So. 2d 841, 845 (Fla. 4th DCA 2002).

That a statement be "of and concerning" is of constitutional magnitude.  <u>See</u> <u>Sullivan</u>, 376 U.S. at 288.  Consequently, a plaintiff is "required to show specific reference" to himself in an allegedly defamatory publication.  <u>Rosenblatt v. Baer</u>, 383 U.S. 75, 83 (1966).  Thus, to meet this burden, a plaintiff must demonstrate that a reader would understand that the passages in question actually refer to him.  <u>See, e.g.</u>, <u>Croixland Props. Ltd. P'ship v. Corcoran</u>, 174 F.3d 213, 216 (D.C. Cir. 1999).

---

[21] Defendants illustrate additional terms/phrases that would be protected opinion in addressing the specific statements from the Complaint and Joint Report in Section II.C.

As detailed in Section II.C., many of the statements Plaintiff attempts to shoehorn into this case are simply not about him; most notably, portions of the Article discussing *other* academics' actions.

### 7. Certain Statements are Time-Barred.

Florida defamation claims are subject to a two-year statute of limitations. See § 95.11(4)(g), Fla. Stat. (2018).  Additionally, before a Plaintiff can even bring a claim, he must comply with Florida's pre-suit notice statute.  See § 770.01, Fla. Stat. (2018).

Section 770.01 commands that "[b]efore any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, *specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory*."   Id. (emphasis added).  In cases of alleged written defamation such as in newspaper stories, Section 770.01 requires a party provide the best notice possible, which means quoting the allegedly offending language verbatim in the notice.   See Nelson v. Associated Press, Inc., 667 F. Supp. at 1474.

Compliance with this notice provision is a jurisdictional condition precedent to the very filing of a defamation action.  See Ross v. Gore, 48 So. 2d 412, 415–16 (Fla. 1950); Canonico v. Callaway, 26 So. 3d 53, 54 (Fla. 2d DCA 2010), review

denied, 36 So. 3d 83 (Fla. 2010); <u>Gifford v. Bruckner,</u> 565 So. 2d 887, 888 n.1

(Fla. 2d DCA 1990); <u>Davies v. Bossert,</u> 449 So. 2d 418, 419 (Fla. 3d DCA 1984).

If a plaintiff has not served notice in accordance with Section 770.01, no cause of

action even exists at the time of filing the complaint.  <u>Orlando Sports Stadium, Inc.</u>

<u>v. Sentinel Star Co.</u>, 316 So. 2d 607, 610 (Fla. 4th DCA 1975).

    As detailed in Section II.C., certain statements complained of were never

identified in Plaintiff's "770" letter and/or not plead in the Complaint.  They are,

therefore, now wholly beyond the statute of limitations, which expired in early

September of 2017, and time-barred as a matter of law.

### 8.    Florida Rejects False Light.

    Finally, Count I of the Complaint bears a combined title of

Defamation/False Light predicated on alleged "implications," "innuendos," and

"misrepresentations" in the Article.  (ECF 19, ¶ 138).  But as the Court previously

recognized, "the odds that Plaintiff's false light theory survives summary judgment

are not good."  ECF 34 at 3 (citing <u>Jews for Jesus, Inc. v. Rapp</u>, 997 So. 2d 1098

(Fla. 2008)).

    To the extent Count I is read to plead an independent claim for false light, it

is now proper for the Court to grant Defendants summary judgment.  The Florida

Supreme Court ruled almost a decade ago that the tort does not exist in Florida.

<u>See Jews for Jesus, Inc.</u>, 997 So. 2d at 1108 ("Because defamation by implication

applies in circumstances where literally true statements are conveyed in such a way as to create a false impression, we conclude that there is no meaningful distinction on that basis to justify recognition of false light as a separate tort."); Dowbenko v. Google Inc., 582 Fed. App'x 801, 804 (11th Cir. 2014) (applying Jews for Jesus, Inc. and affirming dismissal of false light claim).

## C.    The Complaint and Joint Report Statements.

Plaintiff identifies more than 30 statements in the Complaint and Joint Report as purportedly at issue. Defendants quote each statement below and detail why none is actionable.  The statements are organized first to address preliminary concerns the Court expressed in its Order on Motion to Dismiss.  There, the Court identified two statements that initially gave it "pause."  The first was the passage relating to Plaintiff's conceding that some could—"unfairly"—view him as a "tool of industry." See ECF 34,p.4.  The second related to whether Plaintiff "defended" or "promoted" biotechnology industry products.  See id.  To minimize redundancy, the statements related to Plaintiff's defending GMO technology, the industry, or GMO products are grouped and discussed together.  The remaining statements from the Complaint and Joint Report are then addressed in the order Plaintiff presented them in the Joint Report (with, when applicable, cross-citations to the Complaint), with the single statement mentioned only in the Complaint addressed

last.[22]

**Statement On Disputing "Industry Tool" Criticism As Unfair.**

**Statement 1:** "*But he also conceded in an interview that he could unfairly be seen as a tool of industry, and his university now intends to donate the Monsanto grant money.  'I can understand that perception 100 percent,' he said, 'and it bothers me a lot.'*" Joint Report ("J.R."), ¶ 10.

**Defenses:** Time-barred, truth/substantial truth, not capable of a defamatory meaning, and opinion.

This is the first of two statements the Court noted.[23]  Plaintiff, however, cannot sue on this statement because neither the Complaint nor the "770" pre-suit notice letter specifically included it as required by law.  See ECF 64-50 (Plaintiff's "770" letter).  The first time Plaintiff ever referenced this statement was in a footnote in his opposition to Defendants' motion to dismiss (see ECF 29-1,n.6).  Therefore, no cause of action ever accrued, and any claim based on this statement was time-barred months ago.  See § 95.11(4)(g), Fla. Stat. (2018); Canonico, 26 So. 3d at 54.  This alone requires summary judgment.

---

[22] Neither the Complaint nor the Joint Report catalogs allegations in the order presented in the Article.  To assist the Court, a copy of the Article highlighting passages Plaintiff identifies and cross-referencing them with the Complaint and Joint Report is attached as ECF 64-45.

[23] The alleged "loaded" question, "How does it feel to be a tool of the industry?" referenced in paragraph 83 of the Complaint does not appear in the Article.  The actual statement from the Article is quoted above.

Independently, the statement is a substantially true characterization of Plaintiff's oft-acknowledged position that criticism of him as a "shill" of industry is unfair.  Prior to the Article, the perception that Plaintiff was a "shill"—or more benignly a "tool"—of industry existed (and Plaintiff undeniably acknowledged the perception and disputed it).  See ECF 64-26; ECF 64-27; ECF 64-28; ECF 64-29. He confirmed this position not only to Mr. Lipton, but on other occasions, including in his *Huffington Post* piece where he wrote: "[My] central mistake was underestimating the importance of a [$25,000] donation from Monsanto to my science communication program, and its perception with the public" and that "something as simple as [a] single-reimbursed travel cost or a picked-up dinner tab is a red flag to many."  See ECF 64-30,p.2.  Failing to be fully transparent "stops them from assessing the situation on their terms" and when funds "are discovered through later means, they appear deceptive…."  Id.   Even immediately before the Article was published, Plaintiff was acknowledging criticism and defending his actions.  For example, in his August 30, 2015 *Gainesville Sun* submission, Plaintiff said he had "taken great heat in the press for being reimbursed for travel, but this is normal and customary" and that "nobody has ever questioned anything I've ever published or anything I've ever said."  See ECF 64-6,p.2.  For these same reasons, the statement also is not capable of a defamatory meaning because the Article

merely reiterates Plaintiff's long-standing position that the perception exists[24] and is "unfair."  Simply questioning Plaintiff about that criticism is not defamatory, it is good journalism.[25]

Finally, using the term "tool of industry" and "conceded" are protected opinions/editorial choices based on Plaintiff's own recognition that some unfairly viewed him as a shill for industry.  By the time the Article was published, the Monsanto grant had already come to light and engendered significant public outcry, to which Plaintiff had already responded.  Mr. Lipton appropriately included Plaintiff's position on the widespread "shill" accusations that Plaintiff had been refuting for years.  See ECF 64-8.

---

[24] UF President Fuchs has also acknowledged that Plaintiff's aggressive advocacy has garnered controversial public interest.  In addressing Plaintiff's situation, Fuchs stated that public criticism "may come with the territory of being out-front as an advocate" and that when professors leave the relative safety of academia to enter public debates "the rules change."  See ECF 64-46,pp.1-2.

[25] See, e.g., Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1094, 1096 (4th Cir. 1993) (finding that "[a] question can conceivably be defamatory, though it must be reasonably read as an *assertion* of a false *fact*; inquiry itself, however embarrassing or unpleasant to its subject, is not accusation" and rejecting the premise that "the question implies the answer: [Plaintiff] is a dishonest man who pockets the difference…[t]hat answer was certainly within the wide range of possibilities, which is precisely why we need and must permit a free press to ask the question.").

**Statements 2-7 On Defending/Promoting GMOs.**

**Statement 2:** Plaintiff was given a grant "*to help with 'biotechnology outreach' and to travel around the country to defend genetically modified foods.*" J.R., ¶ 9; Compl., ¶ 53.

**Statement 3:** "*Dr. Folta said that he joined the campaign to publicly defend genetically modified technologies because he believes they are safe and that it is his job to share his expertise.*" J.R., ¶ 10; Compl., ¶ 82.

**Statement 4:** "*In August 2014, Monsanto decided to approve Dr. Folta's grant for $25,000 to allow him to travel more extensively to give talks on the genetically modified food industry's products*." J.R., ¶ 15; Compl., ¶ 65.

**Statement 5:** "*Dr. Folta is one of many academics the biotech industry has approached to help it defend or promote its products, the emails show.*" J.R., ¶ 15; Compl., ¶ 100.

**Statement 6:** "*By the middle of 2014, Dr. Folta and Monsanto had taken steps to formalize their relationship, with Dr. Folta planning a trip, at the company's expense, to its headquarters and the company considering a grant to Dr. Folta for helping promote G.M.O. technologies.*" Compl., ¶ 78.

**Statement 7:** "*[Dr. Folta] has a doctorate in molecular biology and has been doing research on the genomics of small fruit crops for more than a decade. Monsanto executives approached Dr. Folta in the spring of 2013 after they read a blog post he had written defending industry technology.*" Compl., ¶ 97.

**Defenses:** Fair report privilege, truth/substantial truth, and opinion.

In its motion to dismiss order, this Court also noted statements related to whether Plaintiff "defended" or "promoted" biotechnology industry products. See ECF 34,p.4. The above-quoted statements are those in the Complaint and Joint Report potentially related, some only broadly, to this issue. Again, Plaintiff's own

words and actions, including those revealed in records provided by UF, show he has promoted and defended not only industry technologies, but, indisputably, also actual products and companies.

First, Plaintiff's $25,000 Monsanto proposal promised that part of the outreach program would be to inform science communicators about actual products: "What are some of the products in industry pipelines and what problems could they solve?"  ECF 64-9,pp.97,100; ECF 64-21,pp.2,5.  The proposal additionally noted that Plaintiff intended to "engage the public" through topics including: "What is regulation like and how do we know products are safe?" and "What [is] the next generation of plant products?"  Id.,p.98,p.3.  The Article's two specific references to "products"—as well as references to the underlying technologies—necessarily fall within the fair report privilege to report on Plaintiff's grant proposal promises.

Moreover, Plaintiff has specifically defended the safety of Monsanto's Roundup brand herbicide—and other Monsanto products.  His tweets and blog posts establish that he will drink Roundup before public audiences to advocate its safety.  See ECF 64-31.  In fact, he has an "official position on drinking Roundup": "Over the years I've done the demo, not hammering a glass of the stuff but mixing a tablespoon of the working solution into diet Mountain Dew."  Id.  He also blogs about Monsanto, Roundup, and glyphosate (developed by Monsanto).  See ECF

64-32.  His PowerPoint presentations repeatedly discuss (1) "Roundup-ready" seeds and (2) the safety of Monsanto's glyphosate products and its GMO (or "Bt") cotton in India.  See ECF 64-33; ECF 64-34.

Finally, at industry's behest, Plaintiff testified before Hawaiian government bodies stating that GMO crops developed by biotechnology firms are "safe" and that the bill under consideration, if passed, "would make it almost impossible for any of these [biotechnology] companies to do business here."  ECF 64-9,p.33.  He has also appeared before government officials in Pennsylvania and Washington, D.C. to argue against GMO labeling initiatives. See ECF 64-9,pp.125,161.

While Plaintiff pitches these actions as simply discussing "the science," he cannot divorce himself from the fact that in doing so he defends and promotes industry products utilizing that very science, often by brand name.  Thus, statements 2-7 are non-actionable as both privileged and substantially true.

Finally, using words such as "defended" and "promoted" constitute protected opinion based on the disclosed facts in the Article and disclosed supporting records.  For example, Plaintiff has routinely spoken in favor of glyphosate products and has urged government to take (or forbear from) regulatory/legislative action that would impact industry and its products.  Further, the specific pledge in his grant proposal to discuss industry products and his advocacy against GMO food regulation can reasonably be viewed as

43

defending/promoting industry and its products.  See <u>Turner</u>, 879 F.3d at 1262-64.

Those terms constitute protected opinion based on disclosed facts.

**Remaining Statements In Joint Report And Complaint.**

**Statement 8:** "*Industry Swaps Grants for Lobbying Clout*" J.R., ¶ 1; Compl., ¶ 29, 32, 35.

**Defenses**: Fair report privilege, truth/substantial truth, and opinion.

The above sub-headline appeared in the print version of the Article only and refers generally to the documented practice of both the biotechnology and organics industries' funding the various professional pursuits of academics who advocated positions that advance industry interests.  Indeed, their strategic communications campaigns were multi-pronged and involved not only lobbying government but also the public at large through, for example, the GMOAnswers website, newspaper editorials, and funding Plaintiff's travel costs to educate others about GMOs.

No less than 75 pages of public university source records reveal Plaintiff and other academics received funds from companies that benefitted from their public advocacy, advocacy that often occurred before government bodies considering legislation or regulation.  See, e.g., ECF 64-9,pp.95-105,110,121-138,153-161; ECF 64-47,pp.2,4-13; ECF 64-48,pp.2-16,19-22,28-31; ECF 64-49,pp.2,4-13,21-26,37,41; ECF 64-52,pp.1-2,22.  As to Plaintiff, it is clear that in the months immediately preceding and following his receipt of the $25,000 grant, industry

groups supported by Monsanto asked him to weigh in on federal anti-labeling legislation and paid for his travel costs to testify in Pennsylvania.  See ECF 64-9,pp.121,137,153,157.  In the wake of the $25,000 grant award he was also strategizing with Monsanto about how to defeat state-level labeling legislation through television ads designed to sway public opinion, while continuing to consult with industry about how to support the federal anti-labeling legislation.  See ECF 64-9,pp.139-147,156-157,159.

The $25,000 grant itself was part of a strategic public lobbying campaign designed to "influence the vast general public that is still clearly forming an opinion" on GMOs, done in part because activist narratives had led to a "strong push for clunky and unnecessary food labeling efforts…."  See ECF 64-9,p.96; ECF 64-21,p.1.   As Monsanto noted, Plaintiff's talks embodied the public "advocacy" campaign they wanted to develop.   See ECF 64-9,p.105.   That initiative—for which Plaintiff "promise[d] a solid return on the investment"—was also designed to educate the public about how the regulatory process impacted GMOs.  See ECF 64-9,pp.98,109; ECF 64-21,p.3.

The statement is thus protected as privileged reporting on information from government, as well as being true.

Finally, terms/phrases such as "swap" and "lobbying clout" are protected opinion based on the disclosed facts in the Article and supporting, published source

records detailing correspondence between industry and academia, including monetary information. Such phrases are a subjective characterization of the manner in which industry and academia mutually supported each other, with academics' "white hats" providing desired independent credibility to the public-facing communications campaigns designed to sway opinion about GMOs.

> **Statement 9:** "*So Monsanto, the world's largest seed company, and its industry partners retooled their lobbying and public relations strategy to spotlight a rarefied group of advocates: academics**, brought in for the gloss of impartiality and weight of authority that come with a professor's pedigree.*" J.R., ¶ 2.

> **Defenses**: Time-barred, fair report privilege, truth/substantial truth, not capable of a defamatory meaning, and opinion.

This statement is undeniably time-barred because it was not alleged in the Complaint nor addressed in the "770" pre-suit notice letter. See Canonico, 26 So. 3d at 54; ECF 64-50.

It is also privileged and substantially true because it is clear from at least 40 pages of source records, including Plaintiff's, that Monsanto and its industry partners interacted with multiple academics—whom industry viewed as independent, corroborating sources—to advance their strategic communication goals of persuading both the public and lawmakers/regulators that GMOs are safe. See ECF 64-8; ECF 64-9,pp.7,17,21-22,36,86,120,128; ECF 64-48,pp.2-16,19-21,31; ECF 64-49,pp.4-13,21-26,37,41. The source emails reveal the extent of the

advocacy and PR collaboration among academics (including Plaintiff) and industry (including Monsanto).  For example, as previously mentioned, Plaintiff, Monsanto executives, and others debated the most effective television advertising campaign strategies—mainly whether to feature scientists or "farming mothers"—to combat GMO labeling initiatives in Oregon and Colorado.  See ECF 64-9,pp.139-147. Additionally, Monsanto also provided Plaintiff the $25,000 grant to be used to combat negative public perceptions of GMOs, and was part of industry coalition funding of Plaintiff's travels to promote GMOs and testify against GMO-labeling. See ECF 64-9,pp.56,110,117-118,121.

Moreover, the Article quotes Monsanto's Charla Lord and Keith Reding as respectively saying, "[i]t is in the public interest for academics to weigh in credibly not only to consumers but to stakeholders like lawmakers and regulators as well" and "[w]e really appreciate independent scientists working to educate the public." See ECF 64-8; ECF 64-9,p.7.  Clearly, lobbying both government and the public was part of Monsanto's plan, and Plaintiff had a key role in that plan.

Further, the statement cannot reasonably be construed as defamatory; there's nothing unlawful about lobbying and advocacy, and Plaintiff assuredly stands by his record of advocacy in such arenas.[26]  Finally, the phrasing—including "gloss of

---

[26] Courts agree, emphasizing that "lobbying," a First Amendment-based right to petition, is not actionable, even if it alleges disreputable motives. See, e.g., *…footnote continued on next page*

impartiality" and "weight of authority"—constitute protected opinion/editorial discretion based on disclosed facts, including published source records detailing *industry's* desire to utilize academia because of their perceived impartiality. Indeed, this statement is an opinion about *industry* motivations, rather than Plaintiff, in that it sought to refine, or "gloss," its messaging with the neutral viewpoint it believed academics provided.  See ECF 64-8; ECF 64-9,pp.7,17,21-22,36,86,120,128; ECF 64-47,pp.2,4-13; ECF 64-48,pp.2-16,19-22,28-31; ECF 64-49,pp.2,4-13,21-26,37,41.   See supra, cases holding allegations of bias non-actionable opinion.

> **Statement 10:** "*Companies like Monsanto are squaring off against major organic firms like Stonyfield Farm, the yogurt company, and both sides have aggressively recruited academic researchers, emails obtained through open records laws show.*"  J.R., ¶ 3; Compl., ¶ 72.

**Defenses**: Fair report privilege, truth/substantial truth, not capable of a defamatory meaning, and opinion.

This statement about *industry* motivations (exemplifying the absurdity of Plaintiff's claims) is privileged and substantially true because at least 50 pages of source records demonstrate that both sides of industry sought to utilize academics. See ECF 64-8; ECF 64-9,pp.7,17,21-22,36,86,120,128; ECF 64-47,pp.2,4-13; ECF

---

Bigelow v. Brumley, 37 N.E.2d 584, 592–94 (Ohio 1941) (rejecting defamation claim when plaintiff "alleged by way of innuendo . . . that the 'term lobbyist, in common parlance and as used by the defendants herein, indicates a person of ill repute.'").

64-48,pp.2-16,19-22,28-31;  ECF  64-49,pp.2,4-13,21-26,37,41.   It is also not capable of a defamatory meaning because it simply reflects the reality that industry looked to academics.

Additionally, the phrase "aggressively recruited" constitutes protected opinion/editorial discretion because the text of the Article and published source records show that, over a period of years, both sides continually turned to numerous academics when they needed help advancing or refuting positions about food products.  See Price, 881 F.2d at 1445. The UF emails from Plaintiff's experience alone reveal how the biotech industry courted Plaintiff for public support and advocacy for the cause, emailing with him more than 50 times over two years, funding his advocacy travel, giving him grant money for outreach, discussing strategy, and recruiting him for GMOAnswers.  See generally ECF 64-9.

> **Statement 11:** "*The emails provide a rare view into the strategy and tactics of a lobbying campaign that has transformed ivory tower elites into powerful players.*"  J.R., ¶ 3; Compl., ¶ 74.

**Defenses**: Time-barred, fair report privilege, truth/substantial truth, not capable of a defamatory meaning, and opinion.

Suing on this statement is almost wholly time-barred because, aside from references to "ivory tower elites," it was not specifically addressed in the "770" pre-suit notice letter.  See ECF 64-50.

This statement is also privileged and substantially true.  Published source emails previously cited demonstrate that various academics on both sides of the GMO debate from top research universities actively strategized with industry representatives to advance or defeat legislative and regulatory initiatives, and speak out in high-profile forums in support of industry interests.  <u>See generally</u> ECF 64-9; ECF 64-47; ECF 64-48; ECF 64-49.  As to Plaintiff, this specifically included, for example, UF emails about his testimony/presentations in Hawaii, Pennsylvania, and Washington, D.C. advocating in support of GMOs (and his coordination with industry representatives for those trips), Plaintiff's strategizing with industry on how to combat anti-GMO labeling campaigns, and his $25,000 industry grant to speak in support of GMO science.  <u>See</u> ECF 64-9,pp.23-34,56-59,110,121-147, 153-161.

Further, it cannot reasonably be construed as defamatory as there is nothing defamatory about being a "powerful player" in developing messaging based on academic knowledge that is designed to educate the public.  Finally, as disclosed in the text and document viewer, there is no doubt that academics became central figures in this space, for example, internally consulting with industry (and providing public testimony) on how to defeat or advance legislative/regulatory initiatives and engaging in industry-coordinated public communications strategies designed to influence public opinion on GMOs.  Therefore, phrases like "strategy

and tactics," "lobbying campaign," "transformed," "ivory tower elites," and "powerful players," again, constitute protected opinion/editorial discretion.

> **Statement 12:** *The use by both sides of third-party scientists, and their supposedly unbiased research, helps explain why the American public is often confused as it processes the conflicting information.*"   J.R., ¶ 4; Compl., ¶ 74.
> **Defenses**:   Fair report privilege, truth/substantial truth, not capable of a

defamatory meaning, and opinion.

This statement also is a privileged and true aggregate view of the story told through records provided by government of how industry utilized various academic voices in its public education campaigns—while also offering financial support to those same voices.   See ECF 64-9,pp.23-34,56-59,110,121-147,153-161; ECF 64-47,pp.2,4-13; ECF 64-48,pp.2-16,19-22,28-31; ECF 64-49,pp.2,4-13,21-26,37,41; ECF 64-52,pp.1-2,22.   Industry strategists, in fact, told Plaintiff of the importance of academics over emotional appeals in the public perception battle over GMOs.   See ECF 64-9, p.86.

Further, the Article makes clear that both the organic and biotechnology industries viewed academics as impartial and sought to leverage that perception with the public, which cannot be read to impugn academics' reputations.   See ECF 64-8.   As previously mentioned, the Article quotes Monsanto representatives acknowledging the role independent academics can play, and the organics side clearly agreed.   The Article quotes Stonyfield Farm's Gary Hirshberg saying, "of

course it helps to have an academic scientist explain it." Id.  Parroting that sentiment, Dr. Benbrook was quoted as saying, industry could "conduct [] studies on their own…but nobody would believe them." Id.

Moreover, the documented financial ties to the biotechnology and organics industries raises an issue about whether the public would perhaps question whether the differing attendant academic messages were biased.  Therefore, the phrase "supposedly unbiased research" is an opinion, reflecting an overall view on how the two battling industries interacted with a number of academics, academics the public perceived as unbiased and free of financial support that could affect that perception.  The cautionary qualifier "supposedly" is additionally appropriate within the context of this general opinion.  The basis for the statement is fully disclosed, and it constitutes protected opinion/editorial discretion.

Additionally, were this Court to even credit any implication in the Article that Plaintiff's public statements supportive of GMOs were suspect because of his documented industry relationships, such conclusions would be non-actionable opinion as well.  See, e.g., Coghlan v. Beck, 984 N.E.2d 132, 148 (Ill. App. Ct. 2013) ("[W]e agree with other jurisdictions that have held that, under factual circumstances similar to those in the case at bar, [an] allegation that [someone] engaged in a classic conflict of interest is nonactionable opinion"); Schmidt, Long & Assocs. v. Aetna U.S. Healthcare, Inc., No. 00-CV-3683, 2001 WL 856946, at

*6 (E.D. Pa. July 26, 2001) (statements that plaintiffs operated under a conflict of interest "cannot be construed to have a defamatory meaning because they are opinion"); Savage v. Pac. Gas & Elec. Co., 21 Cal. App. 4th 434, 444–45 (Cal. App. Ct. 1993) (same).

> **Statement 13:** "*The push has intensified as the Senate prepares to take up industry-backed legislation this fall, already passed by the House, that would ban states from adopting laws that require the disclosure of food produced with genetically modified ingredients. The efforts have helped produce important payoffs, including the approval by federal regulators of new genetically modified seeds after academic experts intervened with the United States Department of Agriculture on the industry's behalf, the emails show.*" J.R., ¶ 5; Compl., ¶ 51.

**Defenses**: Time-barred, fair report privilege, truth/substantial truth, not capable of a defamatory meaning, not "of and concerning" Plaintiff, and opinion.

This statement is time-barred because it was never raised in Plaintiff's "770" pre-suit letter, and, therefore, improperly included in the Complaint. See ECF 64-50. This failure cannot be corrected as the statute of limitations has run.

This statement is also privileged and, again, a substantially true aggregate view of how, as evidenced in the published source records, industry employed academics in support of federal legislation to pre-empt state GMO labeling laws and for USDA approval of Dow's "Enlist" herbicide technology.[27]   Source

---

[27] Amid controversy, Enlist seeds won approval.  See Andrew Pollack, Altered to Withstand Herbicide, Corn and Soybeans Gain Approval, N.Y. Times, Sept. 17, 2014, *available at*: https://www.nytimes.com/2014/09/18/business/altered-to- ...*footnote continued on next page*

documents support this statement.   See ECF 64-9,pp.153-161; ECF 64-49,pp.4-12;18-21.

Further, it does not reference Plaintiff and, because it simply reports on industry legislative/regulatory efforts and academics' documented roles in the same, it cannot reasonably be construed as defamatory.  Finally, descriptive terms and phrases like "push," "important payoffs" ("payoffs" obviously meaning "results") and "intervened" constitute protected opinion/editorial discretion as they merely characterize the legislative/regulatory actions documented in the above-referenced disclosed facts/published source records.

> **Statement 14:** "*Kevin Folta, the chairman of the horticultural sciences department at the University of Florida, is among the scientists who have been recruited in the debate over bioengineered foods.*"  J.R., ¶ 5; Compl., ¶ 43.

**Defenses**: time-barred, fair report privilege, truth/substantial truth, not capable of a defamatory meaning, and opinion.

This statement appears only in the online version of the Article under a UF-supplied photograph of Plaintiff.  It is time-barred because it was never raised in Plaintiff's pre-suit letter, and, therefore, improperly included (in part) in the Complaint.  See ECF 64-50.  This statement is also privileged and substantially true because a wealth of published, source documents demonstrate that industry frequently solicited Plaintiff's help to speak out in favor of GMOs in a variety of

---

withstand-herbicide-corn-and-soybeans-gain-approval.html.

contexts, helping him with related costs.  See, e.g., ECF 64-9,pp.10-20,23-34,64-65,117-118,121-147,162-169.

Further, the statement cannot reasonably be construed as defamatory because it simply states a fact: industry sought out Plaintiff for his expertise to help influence the public debate. Finally, the term "recruited," as previously discussed, constitutes protected opinion/editorial discretion based on the same disclosed facts/published source records referenced here.

**Statement 15:** "*Emails Reveal Financial Ties Between Food Industry and Academics*"  J.R., ¶ 6.

**Defenses**: time-barred, fair report privilege, truth/substantial truth, and not capable of a defamatory meaning.

This statement, which appears at the top of the "jump page" of the print version of the Article (ECF 64-8), is time-barred because it was not addressed in Plaintiff's pre-suit notice letter and is not even in the Complaint.  See ECF 64-50 It is also privileged and substantially true because, as previously explained, numerous published source records make clear that the food industry funded the professional pursuits of the academics profiled in the Article, including Plaintiff's $25,000 Monsanto grant and various travel-related payments so Plaintiff could defend GMOs and visit Monsanto's headquarters.

Finally, it cannot reasonably be construed as defamatory because Plaintiff himself admits he is supposed to "integrate with industry" and that such financial

ties (e.g., industry reimbursements for travel costs) are "normal and customary." ECF 64-6,p.2.

> **Statement 16:** "'*Nobody tells me what to say, and nobody tells me what to think.' Kevin Folta An aggressive biotech proponent with financial ties to Monsanto*" J.R., ¶ 7; Compl., ¶¶ 37, 39.

> **Defenses**: fair report privilege, truth/substantial truth, not capable of a

defamatory meaning, and opinion.

This quotation from Plaintiff and description appear in a caption under a photograph of Plaintiff in the print version of the Article, and partially appears in the text.  <u>See</u> ECF 64-8.  It is a privileged, substantially true statement because Plaintiff does have financial ties to Monsanto, as obviously documented by the source records regarding the $25,000 grant and travel-related payments/accommodations.  <u>See</u> ECF 64-9,pp.110-112,117-118.  Finally, calling Plaintiff an "aggressive" biotech proponent is not reasonably capable of a defamatory meaning and constitutes a protected opinion (<u>see</u> <u>Price</u>) based on the disclosed facts because the published source records document his enthusiastic and prominent role publicly defending GMOs and interacting with industry.  <u>See</u> ECF 64-9,pp.12,46,61,77,140,160.

> **Statement 17:** "'*If you spend enough time with skunks, you start to smell like one.' Charles M. Benbrook A proponent of labels on G.M.O. foods, backed by the organic industry*" J.R., ¶¶ 7, 8; Compl., ¶ 40.

> **Defenses**: fair report privilege, truth/substantial truth, not capable of a

defamatory meaning, not "of and concerning" Plaintiff, and opinion.

This statement about *Dr. Benbrook* appears in a caption under his photograph in the print version of the Article (and in the Article text), and quotes Dr. Benbrook on *his* regrets over aligning with the organics industry. It is a non-defamatory, privileged, and substantially true statement of Dr. Benbrook's personal experiences.[28] See ECF 64-8.

**Statement 18:** "*But even some of the academics who have accepted special "unrestricted grants" or taken industry-funded trips to help push corporate agendas on Capitol Hill say they regret being caught up in this nasty food fight.*" J.R., ¶ 8; Compl., ¶ 44.

**Defenses**: fair report privilege, truth/substantial truth, not capable of a defamatory meaning, not "of and concerning" Plaintiff, and opinion.

This statement, again, is about *Dr. Benbrook*, and precedes his expressions of regret about aligning with the organics industry. It is also a non-defamatory, privileged, and substantially true statement about Dr. Benbrook because, again, the published source records show he was funded by the organics industry and made

---

[28] Moreover, even if this statement were about Plaintiff, courts have routinely found that defamation claims based on being cast as a "skunk" are rejected as non-actionable opinion. See, e.g., Wilson v. Grant, 687 A.2d 1009, 1013 (N.J. App. Div. 1996) (ruling that the phrase "sick, no good, pot smoking, wife beating skunk" was a non-defamatory opinion amounting to name-calling); Sall v. Barber, 782 P.2d 1216, 1217–18 (Colo. App. 1989) (determining that referring to someone as a "skunk" or "coyote" is non-actionable opinion); Ferguson v. Dayton Newspapers, Inc., No. 7304, 1981 WL 5379, at *6 (Ohio Ct. App. Dec. 17, 1981) (editorial cartoon depicting plaintiff as a skunk is non-actionable opinion).

industry-organized trips to Washington, D.C. to support organics industry initiatives.  See ECF 64-8; 64-47,pp.2,7-9,14.

> **Statement 19:** "*Monsanto and its industry partners have also passed out an undisclosed amount in special grants to scientists like Kevin Folta….*"  J.R., ¶ 9. Plaintiff received an "*undisclosed amount in special grants.*" Compl., ¶ 52.

> **Defenses**:  fair report privilege, truth/substantial truth, and not capable of a

defamatory meaning.

This privileged, substantially true, and  non-defamatory statement recounts in a straightforward manner Plaintiff's acceptance of the $25,000 "unrestricted grant" from Monsanto as described repeatedly in records provided by UF, his effort to shield those funds from public disclosure as set out in his grant proposal, and his denial of any formal relationship with the company after accepting those funds.  All of this is amply documented in Plaintiff's published source records.  Specifically, the $25,000 is called an "unrestricted grant" at least three times in emails provided by UF, and Plaintiff explains to Monsanto that the $25,000 can be classified as a type of contribution that "is not publicly noted." See ECF 64-9, pp.104-105,110.  In other words, the grant amount could remain undisclosed.

> **Statement 20:** "'*This is a great 3rd party approach to developing the advocacy that we've been looking to develop.' Michael Lohius, the director of crop biometrics at Monsanto, wrote last year in an email as the company considered giving Dr. Folta an unrestricted grant.*"  J.R., ¶ 9; Compl., ¶ 55.

**Defenses**:  fair report privilege, truth/substantial truth, and not capable of a defamatory meaning.

This statement quotes directly from a UF-provided source email from a Monsanto employee reacting to Plaintiff's grant proposal, which is referred to multiple times—including in Monsanto's award letter addressed to Plaintiff—as an "unrestricted grant."   <u>See</u> ECF 64-9,pp.105,110.   It is a privileged and substantially true statement that repeats Monsanto's reaction to Plaintiff's proposal.   For this same reason, it also cannot be reasonably construed as defamatory.

> **Statement 21:** "'*Misinformation campaign in ag biotech area is more than overwhelming,' Yong Gao, then Monsanto's global regulatory policy director, explained in an April 2013 email to Dr. Folta as the company started to work closely with him. 'It is really hurting the progress in translating science and knowledge into ag productivity.'*"   J.R., ¶ 11; Compl., ¶ 88.

**Defenses**: fair report privilege, truth/substantial truth, not capable of a defamatory meaning, and opinion.

This statement accurately quotes a source email communication between Gao and Plaintiff, provided by UF, and traces Plaintiff's growing relationship with Monsanto.  <u>See</u> ECF 64-9,p.8.  It is a privileged, non-defamatory, and substantially true statement documenting Monsanto's views about GMO misinformation and how to remedy the perceived problem.  Further, soon after that correspondence, Plaintiff began working with Monsanto-backed GMOAnswers and was also

coordinating with Monsanto to respond to anti-GMO statements in *Elle* magazine. See ECF 64-9,pp.10-22. Finally, the phrase "work closely" is protected opinion/editorial discretion characterizing the blossoming relationship between Plaintiff and Monsanto evident in the disclosed emails and the Article's text.

> **Statement 22:** "*Dr. Folta is among the most aggressive and prolific biotech proponents, although until his emails were released last month, he had not publicly acknowledged the extent of his ties to Monsanto.*" J.R., ¶ 11; Compl., ¶ 93.

**Defenses**: fair report privilege, truth/substantial truth, not capable of a defamatory meaning, and opinion.

This statement reflects the fact, as documented in numerous published source email communications provided by UF and his own blog posts/activities, that Plaintiff was an outspoken and frequent advocate for GMOs, and sought to shield public disclosure of the Monsanto grant by classifying it as a "SHARE" contribution that would not be publicly disclosed. See ECF 64-9,pp.21,46,61,77,84-85,104,125,140,160; ECF 64-32. Even after receiving the grant, Plaintiff continued to state he had no "formal connection" to Monsanto, until a year later—and about one month prior to the Article's publication—when third parties publicized its existence. See ECF 64-9,pp.114; ECF 64-22. It is, therefore, a privileged and substantially true statement. It is also non-defamatory because it is a straightforward timeline account of Plaintiff's frequent defense of GMOs and his position on his relationship with Monsanto. Further, terms like "aggressive"

60

and "prolific" are protected opinion/editorial discretion based on the same disclosed facts/source documents identified here.  See Price, 881 F.2d at 1445.

> **Statement 23:** "*A few weeks later, the Council for Biotechnology Information—controlled by BASF, Bayer, Dow Chemical, DuPont and Monsanto—asked Dr. Folta and other prominent academics if they would participate in a new website, GMOAnswers, which was established to combat perceived misinformation about their products. The plan was to provide the academics with questions from the public, such as, 'Do GMOs cause cancer?' 'This is a new way to build trust, dialogue and support for biotech in agriculture that will help explain in an independent voice what GMOs are,' an executive at Ketchum wrote to Dr. Folta. But Ketchum did more than provide questions. On several occasions, it also gave Dr. Folta draft answers, which he then used nearly verbatim, a step that he now says was a mistake. 'It was absolutely not the right thing,' he said, adding that he now insists that he write his own responses.*" J.R., ¶ 12.

**Defenses**: time-barred, fair report privilege, truth/substantial truth, and not capable of a defamatory meaning.

This statement is time-barred because it was not alleged in the Complaint nor addressed in the "770" pre-suit notice letter.  See ECF 64-50.  Additionally, it is a privileged, substantially true statement because it is clear from the email source records quoted that industry asked Plaintiff to take part in GMOAnswers and at least twice provided him pre-drafted responses for which he assumed authorship, with relatively minor modification to pre-drafted portions.  See ECF 64-9,pp.13-20.  It also accurately quotes Plaintiff's acknowledgment that he should not have simply adopted the pre-drafted answers as his own work product.  See ECF 64-8.  Finally, as the statement simply recounts how industry provided pre-

drafted answers that Plaintiff later adopted, there is no defamatory implication.

**Statement 24:** *"Dr. Folta, the emails show, soon became part of an inner circle of industry consultants, lobbyists and executives who devised strategy on how to block state efforts to mandate G.M.O. labeling and, most recently, on how to get Congress to pass legislation that would pre-empt any state from taking such a step."* J.R., ¶ 13; Compl., ¶ 102.

**Defenses**: fair report privilege, truth/substantial truth, not capable of a defamatory meaning, and opinion.

This is a privileged and substantially true statement because the published source records document Plaintiff's email communications with industry on how best to block various state GMO labeling campaigns through targeted television ads and how to advance anti-labeling federal legislation that would pre-empt state-level action, with Plaintiff eventually briefing Congressional staff. See ECF 64-9,pp.121-147,153-161. Additionally, there is no defamatory implication in this statement, as Plaintiff concedes his professional duties include interfacing with and educating the public. Further, phrases like "inner circle" and "devised strategy" and "consultant" reflect that Plaintiff was working with industry insiders on these initiatives in a non-employee fashion and, therefore, constitute protected opinion/editorial discretion based on the same disclosed facts/source documents identified here.

**Statement 25:** *"While Dr. Folta was not personally compensated, biotech companies paid for his trips to testify in Pennsylvania and Hawaii. 'I should state upfront that I have not been compensated for any testimony,' he said at a public hearing in Hawaii, before adding, 'The technology is safe and is*

*used because it helps farmers compete.' Dr. Folta routinely gave updates on his travels—and his face-to-face encounters with opponents of genetically modified crops—to the industry executives who were funding his efforts.*"
J.R., ¶ 14.

"'*Your email made my day!' wrote Cathleen Enright, an executive vice president of the Biotechnology Industry Organization, after Dr. Folta gave her a written update on the October 2014 legislative hearing in Pennsylvania. 'Please send all receipts to us whenever you get around to it. No rush.'*" J.R., ¶ 14.

**Defenses**: time-barred, fair report privilege, truth/substantial truth, and not capable of a defamatory meaning.

First, these statements are time-barred because they were not alleged in the Complaint nor addressed in the "770" pre-suit notice letter.  <u>See</u> ECF 64-50. Additionally, these statements accurately quote from Plaintiff's source emails provided by UF and Plaintiff's testimony in Hawaii.  <u>See</u> ECF 64-9,pp.6-7,137. They also relay the fact that he provided industry representatives updates and thoughts on given testimony, for which his travel costs were paid by industry—all supported in his email exchanges.  <u>See</u> ECF 64-9,pp.137-138.  They are, thus, privileged and substantially true.

Moreover, they are non-defamatory because, they simply chronicle (and quote) Plaintiff's own testimony, and Ms. Enright's positive response to it.  Any alleged defamatory implication is also negated by the fact that the statement emphasizes Plaintiff was not personally compensated.  Plaintiff cannot at once claim his mandate is to educate the public and policymakers, while also claiming

factually reporting on those same activities impugns his reputation.

> **Statement 26:** "'*I am grateful for this opportunity and promise a solid return on the investment,' Dr. Folta wrote in an email to one Monsanto executive.*"  J.R., ¶ 15.

**Defenses**:  time-barred, fair report privilege, truth/substantial truth, and not capable of a defamatory meaning.

This statement is time-barred because it was not alleged in the Complaint nor addressed in the "770" pre-suit notice letter.  See ECF 64-50.  Moreover, it literally quotes Plaintiff's email response after being awarded the $25,000 grant. See ECF 64-9,p.109.   It is also, therefore, privileged and substantially true.  It cannot reasonably be construed as defamatory as it merely relays Plaintiff's own expressed sentiments.

> **Statement 27:** "*In 2013, Monsanto also asked David R. Shaw, the vice president for research and economic development at Mississippi State University, to intervene with the Department of Agriculture to help persuade the agency to approve a new type of genetically modified soybean and cottonseed designed by Monsanto. Organic farmers argued against this move, convinced that approval of the new seeds would lead to an increase in potentially harmful herbicide use. Monsanto wanted Dr. Shaw, whom the company has supported over the last decade with at least $880,000 in research grants for projects he helped oversee, to refute these arguments, the emails show.*"  J.R., ¶ 16.

**Defenses**:  time-barred, not "of and concerning" Plaintiff, fair report privilege, truth/substantial truth, and not capable of a defamatory meaning.

This statement about *Dr. Shaw*, recounts his interactions with industry, as reflected in published source email records from a public university.   Aside from

not being about Plaintiff, it is time-barred because it was not alleged in the Complaint nor addressed in the "770" pre-suit notice letter.   See ECF 64-50. Finally, it is a non-defamatory, privileged, and substantially true statement because the published source records show Monsanto did request his assistance in obtaining regulatory approval for its products and Dr. Shaw's curriculum vitae shows he received $880,000 in Monsanto funding.   See ECF 64-49,pp.21-27; ECF 64-52,pp.1-2, 22.

> **Statement 28:** "*Dow Chemical made a similar pitch this year, with one company executive first reminding Dr. Shaw in an email about the industry's financial support for the university. Then the executive asked Dr. Shaw to intervene with the Agriculture Department to urge it to approve Dow's new genetically modified cottonseed, which was designed to be treated with a Dow-produced herbicide. Dow's and Monsanto's requests to the Agriculture Department have since been approved.*"  J.R., ¶ 17.

**Defenses**: time-barred, not "of and concerning" Plaintiff, fair report privilege, truth/substantial truth, and not capable of a defamatory meaning.

This statement, also about *Dr. Shaw,* recounts his interactions with industry, as reflected in published source email records of a public university.   Aside from again not being about Plaintiff, it is time-barred because it was not alleged in the Complaint nor addressed in the "770" pre-suit notice letter.   See ECF 64-50. Finally, it too is a privileged, substantially true, and non-defamatory statement because the published source records document Dr. Shaw's interactions with Dow, including the funding his university received from Dow and its requests for his

assistance in obtaining regulatory approval for its cotton products.  See ECF 64-49,p.37.

> **Statement 29:** "*'What the situation requires is a suite of TV spots featuring attractive young women, preferably mommy farmers, explaining why biotech derived foods are the safest & greenest in the history of ag and worthy of support,' wrote L. Val Giddings, a senior fellow at Information Technology & Innovation Foundation, a nonprofit food policy research group in Washington, in an October 2014 email to a Monsanto lobbyist. The company was debating how to defeat labeling campaigns last year in Colorado and Oregon. Dr. Folta, included in the email chain, agreed. 'We can't fight emotion with lists of scientists,' Dr. Folta wrote to Lisa Drake, the Monsanto lobbyist. 'It needs a connection to farming mothers.'*"  J.R., ¶ 18; Compl., ¶ 107.

**Defenses**: fair report privilege, truth/substantial truth, and not capable of a defamatory meaning.

This statement accurately quotes source email records UF provided documenting Plaintiff's interactions with industry representatives on how to combat GMO labeling initiatives in Colorado and Oregon, including Plaintiff's input.  See ECF 64-9,pp.139-142.   It is thus privileged, substantially true, and non-defamatory.

> **Statement 30:** "*At least twice, Mr. Hirshberg's group also paid for Dr. Benbrook to go to Washington so he could help lobby against a federal ban on G.M.O. labels. And his research suggesting that herbicide use in G.M.O. crops has surged has been a central part of the organic industry's argument for mandatory labels.*"  J.R., ¶ 19; Compl., ¶ 111.

**Defenses**: not "of and concerning" Plaintiff, fair report privilege, truth/substantial truth, and not capable of a defamatory meaning.

This statement is obviously about *Dr. Benbrook*—not Plaintiff.  It recounts, as discussed in public university records, Dr. Benbrook's interactions with the organics industry and his industry-coordinated trips to Washington, D.C. to promote GMO labeling.   See ECF 64-47,pp.3-9,14-17.   It is, thus, not of and concerning Plaintiff, privileged, substantially true, and not defamatory.

> **Statement 31:** *"That is why Dr. Benbrook, who had served as chief scientist at the Organic Center, a group funded by the organic foods industry, resigned his job and sought a university appointment, he said. 'I was working for an organization affiliated and funded by the industry, and people were just not listening,' he said. At Washington State, Dr. Benbrook was supported by many of the same financial backers, including Organic Valley, Whole Foods, Stonyfield and United Natural Foods Inc. The companies stayed closely involved in his research and advocacy, helping him push reporters to write about his studies, including one concluding that organic milk, produced without any G.M.O.-produced feed for the cows, had greater nutritional value…*
>
> *Dr. Benbrook, whose research post at Washington State was not renewed this year, said the organic companies had turned to him for the same reasons Monsanto and others support the University of Florida or Dr. Folta directly. 'They want to influence the public,' he said. 'They could conduct those studies on their own and put this information on their website. But nobody would believe them. There is a friggin' war going on around this stuff. And everyone is looking to gain as much leverage as they can.'"*  J.R., ¶ 19.

**Defenses**: time-barred, not "of and concerning" Plaintiff,[29] privileged, truth/substantial truth, not capable of a defamatory meaning, and opinion.

---

[29] Plaintiff is mentioned in this statement in the context of explaining that he and Dr. Benbrook were sought by opposite sides of the debate for the same reason: academic clout and independence.  To the extent this statement is construed to be *…footnote continued on next page*

These additional statements, primarily about *Dr. Benbrook*, again recount his views on his associations with the organics industry and what companies, on both sides of the debate, seek to achieve through such relationships. These statements are also time-barred because they were not alleged in the Complaint nor addressed in the "770" pre-suit notice letter. <u>See</u> ECF 64-50. In addition to detailing Dr. Benbrook's personal views, the Article again draws from source public records documenting his industry funding ties and efforts to support organics industry interests. <u>See</u> ECF 64-8; ECF 64-47,pp.2,7-13,26-50. Once again, it is a non-defamatory, privileged, and substantially true statement. Finally, the statement that "the organic companies had turned to him for the same reasons Monsanto and others support the University of Florida or Dr. Folta directly" constitutes Dr. Benbrook's protected opinion about Monsanto's motives, an opinion Defendants were free to report.

**Statement 32:** "*Keep it up!*" Compl., ¶ 71.

**Defenses**: fair report privilege, truth/substantial truth, and not capable of a defamatory meaning.

This is simply a verbatim quotation from a Ketchum public relations representative in published source email correspondence to Plaintiff (provided by

---

about Plaintiff, it has previously been shown how the biotech industry sought Plaintiff's assistance on multiple occasions to help advance messaging/goals. Thus, it would be a privileged and true/substantially true statement.

UF) expressing appreciation for Plaintiff's efforts to write in defense of GMOs. See ECF 64-9,p.86. Another privileged, substantially true, and non-defamatory statement.

## D.    Strained Implications.

An additional problematic aspect of this matter is one the Court has already identified: Plaintiff's pleadings are laden with "hyperbole and editorializing of the facts," thus rendering it difficult to determine where factual allegations actually begin. ECF 35,p.1. In this final section, Defendants address these concerns and demonstrate the various ways Plaintiff's urged interpretation of the text of the Article, as well as its layout and use of photographs, is simply unreasonable and must be rejected.

Because he is unable to genuinely attack the facts, Plaintiff urges this Court to read extreme and twisted implications into the Article. However, much of the defamatory meaning Plaintiff ascribes to the Article has little to do with what it actually says. Instead, Plaintiff envisions a host of defamatory implications. The supposed defamatory implications distill to the following themes:[30] (1) that

---

[30] To further the false narrative that Defendants were targeting Plaintiff, the Complaint contains purported quotations from the Article that simply are not there. For example, the "quotations" found in paragraphs 49 and 83 of the Complaint, "enlist[ing] scientists – the soldiers doing the work for their industry" and "how does it feel to be a tool of the industry?" do not appear in the Article. He also claims that Defendants stated that he had taken industry money to fund his research *…footnote continued on next page*

Plaintiff was "nothing more than a paid industry salesman" (ECF 19, ¶ 68); (2) that Plaintiff was a "puppet" of industry who mislead the public and compromised his own scientific integrity (Id. ¶¶ 69-74); (3) that he was a "client" or "employee" of Monsanto (Id. ¶¶ 78-80); and (4) that he was a lobbyist who would "lie for money" (Id. ¶¶ 86-87, 90, 93, 95, 99-100).   The Article neither says nor implies any of those things, and to credit such strained interpretations as meeting a necessary element of Plaintiff's claim raises constitutional concerns.  See Sullivan, 376 U.S. at 288-89 (finding evidence presented was incapable of any interpretation that could lead a jury to conclude that the alleged defamatory statements at issue generally referring to the police and "They" were about Sullivan).

When the Article is considered as a whole and the statements complained of put in proper context, it becomes clear that it was not a personal attack on Plaintiff but a balanced, behind-the-scenes look at how the food industry—both pro and anti-GMO—recruited academics to further their messaging.  Plaintiff clearly had a relationship with Monsanto and the industry generally, confirmed in the email trail, but the Article does not suggest that he was a secret employee of Monsanto, a mere puppet, or a liar for money.  Like the plaintiffs in Turner, Air Wisconsin, Rubin, Byrd, and Valentine, Plaintiff seeks to stack and contort sourced facts to contrive a

and salary.  See ECF 19, ¶ 21.  The Article does not say that and, in contrast, states "Dr. Folta was not personally compensated." ECF 64-8.

litany of extreme and sinister implications, all the while ignoring statements that flatly refute his reading.

For example, accurately quoting an industry representative's email urging Plaintiff to "*Keep it Up!*" does not imply anything defamatory. Likewise, truthfully describing Plaintiff as having a "*relationship*" with Monsanto or as an "*aggressive*" proponent of GMO science cannot be reasonably read to imply that the Monsanto relationship was unethical or that he was a Monsanto stooge. These examples typify Plaintiff's approach to the entire Article. As Plaintiff himself steadfastly claims, it is his job as a land-grant professor to integrate with industry and educate the public. Reporting on those very actions cannot be reasonably viewed as defamatory.

The same is true of Plaintiff's claims that the photographs and headlines accompanying the Article, along with the photo layout itself, result in further sinister implications. (Id. ¶¶ 31-47). The similar online and print headlines for the Article: "*Food Industry Enlisted Academics in G.M.O. Lobbying War, Emails Show*" and "*Emails Reveal Academic Ties In a Food War*," with the subheading "*Industry Swaps Grants for Lobbying Clout*" cannot reasonably be read to imply Plaintiff had a nefarious relationship with industry where his scientific research results were influenced by industry money. Instead, the Article truthfully reports facts about both the biotechnology and organics industries' use of academics,

grants, and various communications campaigns to further their respective messaging to lobby the public and government bodies.  With respect to Plaintiff, the Article, which must be considered in full, explicitly makes clear: (1) "there is no evidence that academic work was compromised;" and (2) that "Dr. Folta was not personally compensated."  ECF 64-8.  It further quotes Plaintiff's refutations, "[n]obody tells me what to say, and nobody tells me what to think" and "every point I make is based on evidence."  Id.

Plaintiff's next strained implication, that Defendants' use of his photograph in his lab was insidiously juxtaposed with that of Dr. Charles Benbrook in a natural setting (ECF 19, ¶¶ 41-42), provides further apt illustration of the exaggerated claims that flow throughout the Complaint.[31]  He claims the picture purposefully portrayed him as an evil, corporate scientist, "seen in a laboratory with petri dishes, metal racks, and indoor plants under fluorescent lamps."  (Id. at ¶¶ 41-42.)  But that public record photograph is noted as a UF-credited picture and was provided to NYT by UF in direct response to a photo use request.  See ECF 64-42. Plaintiff/UF routinely use such photographs, including ones in his lab, and supply them to third parties.  See ECF 64-43.  NYT merely used the publicity photograph Plaintiff's employer provided.

---

[31] It is but one of many official UF photographs provided by Plaintiff in discovery that show Plaintiff in a laboratory setting (two-thirds of those 33 photographs show him in labs).  See ECF 64-44.

All told, Plaintiff's true grievance is the one he admits was regrettable, one he understands "*100 percent*," and one which he wrote about in the *Huffington Post*: that after reading a factual account of his activities some members of the public may independently form the opinion that he became too close to industry. Plaintiff cannot ignore the statements in the Article that contradict his urged implications, mainly that: (1) the organics industry and its academic partners are also profiled, "[l]ike the biotech companies, organic industry executives believed they could have more influence if they pushed their message through academics;" (2) Plaintiff's academic integrity was not questioned; and (3) NYT included an additional quote Plaintiff wanted to add in the Article that "every point [he] make[s] is based on evidence."  See ECF 64-8.

Plaintiff's extreme implications are simply not reasonable and, as a matter of law, not defamatory.  This case presents a prime occasion for exercising the pre-trial disposition standards applicable to cases involving First Amendment interests.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request the Court grant final summary judgment in this matter as to the remaining Count I, including all statements raised in the Complaint, the Joint Report, and any other papers.

## REQUEST FOR ORAL ARGUMENT

Defendants request oral argument on this motion and estimate that sixty (60) minutes will be required.

Dated: July 25, 2018.

Respectfully submitted,

THOMAS & LOCICERO PL

/s/ *Gregg D. Thomas*
Gregg D. Thomas
  Florida Bar No. 223913
Carol Jean LoCicero
  Florida Bar No. 603030
Mark R. Caramanica
  Florida Bar No. 110581
601 South Boulevard
Tampa, FL 33606
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
gthomas@tlolawfirm.com
clocicero@tlolawfirm.com
mcaramanica@tlolawfirm.com
secondary email addresses:
dlake@tlolawfirm.com
tgilley@tlolawfirm.com

*Attorneys for The New York Times*
*Company and Eric Lipton*

## LOCAL RULE 7.1(F) CERTIFICATION

I HEREBY CERTIFY that the foregoing memorandum of law contains 16,521 words (see ECF 63), with such word count incorporating all portions of this

document subject to the limitations imposed under Local Rule 7.1(F).

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing

document is being electronically filed and will be furnished via CM/ECF and via

electronic mail on July 25, 2018, to:

James J. Evangelista             James E. Beasley, Jr.
Bryan D. Hull                    Lane R. Jubb, Jr.
Bush Ross, P.A.                  The Beasley Law Firm, LLC
1801 North Highland Avenue       1125 Walnut Street
Tampa, FL 33602                  Philadelphia, PA 19107
P.O. Box 3913                    Jim.Beasley@BeasleyFirm.com
Tampa, FL 33601-3913             Lane.Jubb@BeasleyFirm.com
jevangelista@bushross.com        Roseann.Diorka@BeasleyFirm.com
bhull@bushross.com               Janet.Volpe@BeasleyFirm.com
osmith@bushross.com
jlantz@bushross.com



                                 /s/ *Gregg D. Thomas*
                                 Attorney