# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

KEVIN FOLTA, Ph.D.,

      *Plaintiff*,

v.                         **Case No. 1:17cv246-MW/GRJ**

THE NEW YORK TIMES
COMPANY and ERIC LIPTON,

      *Defendants.*

_____/

## ORDER GRANTING DEFENDANTS' MOTION
## FOR FINAL SUMMARY JUDGMENT

This is a defamation case. In September 2015, Defendant The New York Times Company ("NYT") published an article written by Defendant Lipton ("the Article"). It appeared both online and on the Sunday edition's front page. The Article purported to document relationships cultivated by both biotechnology and organics companies with public university academics. It focused especially on the effects of these relationships in debates about the safety and regulation of genetically modified organism ("GMO") food products. Defendants discussed and quoted Plaintiff Kevin Folta, Ph.D., professor and former chairman of the Horticultural Sciences Department at the University

of Florida ("UF"), in the Article. Plaintiff now brings a claim of defamation against the Defendants for numerous statements made therein.[1]

Defendant moves for summary judgment by asserting a range of affirmative defenses. Among them are that the statements complained of are true or substantially true; are not susceptible to a defamatory meaning; are not "of and concerning" Plaintiff; are protected speech, either under the fair report privilege or as pure opinion; and/or are barred by the applicable statute of limitations.[2]

This Court has considered, without hearing, Defendants' Motion for Final Summary Judgment, ECF No. 65. For the reasons set forth below, the motion is **GRANTED**.

## I

Summary judgment is appropriately granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Facts are "material" with respect to the substantive law if they

---

[1] Plaintiff's Amended Complaint also included an intentional infliction of emotional distress claim, ECF No. 19, at 25–26, but this Court dismissed it on a prior motion. ECF No. 34, at 6.
[2] Defendants also assert that Florida has rejected the false light tort. ECF No. 65, at 3. As Plaintiff does not advance a separate false light cause of action, ECF No. 74, at 45, this Court does not address that argument.

form disputes that are not "irrelevant or unnecessary" and have the potential to "affect the outcome of the suit." *Id.* A nonmoving party's failure to provide sufficient evidence of an element for which it bears the burden of proof at trial mandates the entry of summary judgment for the moving party, "since a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

As it must, this Court accepts the facts in the light most favorable to Plaintiff. *See Galvez v. Bruce*, 552 F.3d 1238, 1241 (11th Cir. 2008). All reasonable doubts and inferences about the facts are resolved in favor of Plaintiff as the nonmoving party.

## II

This Court first addresses Florida's "fair report" privilege. Defendants argue that all but one[3] of the thirty-two statements at issue are protected by Florida's fair report privilege. ECF No. 65, at 17. The privilege's application is a question of law. *See Huszar v. Gross*, 468 So. 2d 512, 515–16 (Fla. 1st DCA 1985) ("[W]hen the facts and circumstances of a communication are revealed,

---

[3] The only statement excluded is Statement 1, which is based on Defendant Lipton's interview of Plaintiff, rather than the UF-produced emails. However, this Court has determined that the operative portions of two other statements (Statements 17 & 31) are also likely quotes from interviews and so not subject to the fair report privilege.

the issue of whether a privilege has been established is a question of law for the court to decide.").

The fair report privilege is news media's qualified privilege "to report accurately on information received from government officials." *Rasmussen v. Collier Cty. Publ'g Co.*, 946 So. 2d 567, 570–71 (Fla. 2d DCA 2006). Florida courts have borrowed from the Restatement (Second) of Torts § 611 in describing the privilege. *See, e.g.*, *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502 (Fla. 3d DCA 1993) (quoting Restatement (Second) of Torts § 611 cmt. b (Am. Law Inst. 1977)) ("If the report of a public official proceeding is accurate or a fair abridgement, an action cannot constitutionally be maintained, either for defamation or for invasion of the right of privacy."). Although its first uses were related to official proceedings—like court proceedings—the privilege has since been expanded to cover a wide range of government-derived sources.

Courts have offered three different policy rationales to support the privilege. *Medico v. Time, Inc.*, 643 F.2d 134, 140 (3d Cir. 1981). The first, the agency rationale, casts the reporter as an agent for the public; the reporter stands in "for persons who had a right to attend, and informs them of what they might have seen for themselves." *Id.* at 141. The second rationale is a theory of public supervision—meaning that publicity provides security for and promotes the "proper administration of justice." *Id.* (quoting *Cowley v. Pulsifer*,

137 Mass. 392, 394 (1884)). Finally, the third rationale concerns the legitimate interest of the public in important matters. *Id.* at 142.

A

The threshold question presented by Defendants' argument for application of the fair report privilege is whether Plaintiff's emails—as produced by UF—trigger the privilege. Defendants argue that they do trigger the privilege, in either of two ways. ECF No. 65, at 22. First, Defendants assert that "government disclosure triggers fair report privilege protections"—if the government produced it, then it can support the fair report privilege. *Id.* Alternatively, Defendants argue that the emails at issue are "public records" under Florida law because Plaintiff is a public employee and the emails were created as a part of his official business. *Id.* at 23–24. Defendants stress that Plaintiff's job description as a land-grant scientist includes engagement with industry and the public. *Id.*

Plaintiff opposes Defendants' assessment of the trigger standard and focuses on the definition of "public records" in Florida's Public Records Law. ECF No. 74, at 20–21. Public records are defined as essentially all "material . . . made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency." § 119.011(12), Fla. Stat. (2018). Plaintiff further indicates that to be "public records," documents must be both related to "official agency business" and "intended as final evidence of the

5

knowledge to be recorded." ECF No. 74, at 20 (quoting *Shevin v. Byron, Harless, Schaffer, Reid & Assocs.*, 379 So. 2d 633, 640 (Fla. 1980)). Plaintiff argues that Defendants allege that he had a "sort of *side-relationship*" with industry and thus that the related emails are not official business. ECF No. 74, at 22–23 (emphasis in original).

Because most documents produced by government entities also fall within the definition of public records, the case law does not clearly address the actual hook or trigger for the fair report privilege in Florida. *See, e.g.*, *Rasmussen*, 946 So. 2d at 570–71 (basing privilege on "information received from government officials," like the "contents of official documents" and "matters of public record, including criminal informations, the Governor's executive orders appointing a special prosecutor, Mr. Rasmussen's plea agreement, and reports by government officials that Mr. Rasmussen pleaded to 'related charges'"). Here, coming to an ultimate decision on the proper hook is unnecessary; both of Defendants' theories lead to the same answer. First, although Plaintiff opposes Defendants' government production trigger theory, all parties would concede that the source documents related to Plaintiff were produced by UF, a state agency of Florida.[4] *See, e.g.*, ECF No. 65, at 22 n.14.

---

[4] They would also likely concede that the documents relating to the other noted academics—Drs. Benbrook, Chassy, and Shaw—were also produced by public universities, each agencies of their resident state.

And second, this Court cannot avoid the conclusion that the Plaintiff's UF emails are public records. The Florida Constitution identifies access to public records as a fundamental constitutional right for Florida citizens. The Sunshine Amendment (Article I, Section 24(a)) provides that "[e]very person has the right to inspect or copy any public record made or received in connection with the official business of any public body, officer, or employee of the state, or persons acting on their behalf." Fla. Const. art. I, §24(a).

The Florida legislature has effectuated this commitment. *See* § 119.01, Fla. Stat. (2018) ("It is the policy of this state that all state, county, and municipal records are open for personal inspection and copying by any person."). And Florida courts have repeatedly recognized it. *See, e.g.*, *City of Riviera Beach v. Barfield*, 642 So. 2d 1135, 1136 (Fla. 4th DCA 1994) (noting that "[t]he general purpose of the Florida Public Records Act is to open public records so that Florida's citizens can discover the actions of their government"). In keeping with this intention, the Public Records Act "is to be construed liberally in favor of openness, and all exemptions from disclosure are to be construed narrowly and limited in their designated purpose." *Bd. of Trustees, Jacksonville Police & Fire Pension Fund v. Lee*, 189 So. 3d 120, 125 (Fla. 2016) (quoting *Lightbourne v. McCollum,* 969 So.2d 326, 332–33 (Fla. 2007)). Exceptions are made only for "public records provided by statute to be confidential or which are expressly exempted by general or special law from

7

disclosure." *Miami Herald Publ'g Co. v. City of N. Miami*, 452 So. 2d 572, 573 (Fla. 3d DCA 1984), *approved sub nom. City of N. Miami v. Miami Herald Publ'g Co.*, 468 So. 2d 218 (Fla. 1985).

Electronic records are decisively included in the public records definition. *See* § 119.01, Fla. Stat. ("Automation of public records must not erode the right of access to those records."). Emails sent to or from a public university email address—and related to the official business of that university—are public records. *Rhea v. Dist. Bd. of Trustees of Santa Fe Coll.*, 109 So. 3d 851, 855–56 (Fla. 1st DCA 2013). Personal emails present on a government agency server are not public records, as "[t]he determining factor is the nature of the record, not its physical location." *State v. City of Clearwater*, 863 So. 2d 149, 154 (Fla. 2003). Plaintiff's emails are related to official agency business. Although Plaintiff opposes Defendants' characterization of his emails, ECF No. 74, at 22–23, this argument is undercut by his own assertions of the centrality of public and industry engagement to his position at UF. *See, e.g.*, ECF No. 64-41, at 2 (detailing duties and referring to letter from Plaintiff's "direct supervisor"); ECF No. 64-40, at 1–2 (letter from Plaintiff's supervisor indicating that his position requires interpreting and delivering scientific results to the public as well as "integrat[ing] with industry and interact[ing] with companies").

Plaintiff's argument that his emails are not public records because they are not "intended to perpetuate, communicate, or formalize knowledge of some type" is also unpersuasive. ECF No. 74, at 21 (quoting *Shevin*, 379 So. 2d at 640). The court in *Shevin* recognized that inter- and intra-office memoranda could constitute public records, even when only in draft form or when directed to file. *Shevin*, 379 So. 2d at 640. Only "rough drafts, notes to be used in preparing some other documentary material, and tapes or notes taken by a secretary as dictation" were provided as examples of items falling outside the public records label. *Id.*

Plaintiff's attempt to force his emails to fit the "precursor" records framework is a paradigmatic example of trying to put a square peg in a round hole. Plaintiff's emails are communications and transmissions of knowledge to industry players and other academics, not the occasional Post-it note reminder to himself. Plaintiff could mount a formidable argument that draft calendar invites or draft emails are not public records—just as only the final, mailed version of a hard copy letter would be a public record, and not the earlier crumpled, handwritten drafts tossed haphazardly towards the office waste bin. Plaintiff's assertion that his emails are not public records borders on the nonsensical; taken to the extreme, Plaintiff's theory of public records would exclude the vast majority of emails between public employees and outside

individuals. In today's virtual world, where almost all business is conducted electronically, this conclusion is absurd.

In summary, this Court has determined that Plaintiff's emails, as produced by UF, have both been disclosed by a government agency and constitute public records. As a result, they can form the basis of the fair report privilege.

B

This Court now turns to the application of the privilege. Having concluded that the source documents can trigger the privilege, the question becomes whether the Article statements are a "fair and accurate" report of them. Determining whether a report is fair and accurate requires a close comparison of the report and the documents and information from which it is drawn.[5] *See Heekin v. CBS Broad., Inc.*, 789 So. 2d 355, 360 (Fla. 2d DCA 2001), *disapproved of on other grounds by Anderson v. Gannett Co.*, 994 So. 2d 1048 (Fla. 2008) (reversing application of the fair report privilege where there was "nothing in the record to indicate that the trial court compared the broadcast at issue with the public records").

---

[5] Plaintiff also proffers an argument that Defendants were required to review and analyze *all* the produced documents to properly invoke the fair report privilege. ECF No. 74, at 23–24. Section 611 indicates that the report must be "accurate and complete or a fair abridgement of the occurrence reported." Restatement (Second) of Torts § 611 (Am. Law. Inst. 1975). Despite the apparent risk of "cherry-picking," Plaintiff's argument is not reasonable or commonsensical, and his selective reading of § 611 seems to elide the "fair abridgement" portion—just as he claims Defendants have done with "complete."

10

The fair report privilege is broad. It requires only that the publication be "substantially" correct in its representation of the information received. *See, e.g.*, *Ortega v. Post-Newsweek Stations, Fla., Inc.*, 510 So. 2d 972, 977 (Fla. 3d DCA 1987) (privilege held to operate because the reports were "fair and substantially accurate"). "It is not necessary that [the publication] be exact in every immaterial detail or that it conform to the precision demanded in technical or scientific reporting. It is enough that it conveys to the persons who read it a substantially correct account of the proceedings." *Woodard*, 616 So. 2d at 502–03 (quoting Restatement (Second) of Torts § 611 cmt. f (Am. Law Inst. 1977)).

Protection of the privilege is not lost, for example, by colorful language or a failure to look beyond the government documents for verification. Editorial style is expected, and news media can phrase their coverage to "catch . . . the readership's attention." *Alan v. Palm Beach Newspapers, Inc.*, 973 So. 2d 1177, 1180 (Fla. 4th DCA 2008). They can also select the focus of a piece and have no duty to further investigate or verify government-produced information. *See Jamason v. Palm Beach Newspapers, Inc.*, 450 So. 2d 1130, 1133 (Fla. 4th DCA 1984) ("The newspaper, had it wished, could have devoted the entire issue to the statement without any effort to neutralize the accusation by giving the accused the opportunity to deny."); *Woodard*, 616 So. 2d at 503 (holding reporter did not need to "determine the accuracy of the information" in

11

government records). In addition, a publication's language does not have to be "technically precise" in discussing legal proceedings. *Rasmussen*, 946 So. 2d at 570.

## C

This Court has conducted a thorough review of the thirty-one statements and the documents Defendants cite in support. For ease of analysis and explanation, this Court has categorized the statements into five groups and discusses in detail only one statement from each of the first four groups. The fifth and final group, consisting of Statements 1, 17, and 31, is not discussed with reference to the fair report privilege because the relevant statement part appears to be a quote taken from an interview, rather than from a publicly produced source document.[6]

### 1

The first group includes Statements 2, 3, 4, 5, 6, and 7—the statements Plaintiff has highlighted as "related to defending and promoting GMOs." ECF No. 74, at 65–66. As explained above, the privilege is broad and requires only that the resulting report be fair and "substantially accurate." In *Woodard*, a news report met this standard by reporting that a school bus driver had served four years in prison for homicide, though she had in fact only served two.

---

[6] This group includes two statements from the thirty-one to which Defendants allege the fair report privilege applies, as well as the one remaining statement.

*Woodard*, 616 So. 2d at 502–03. Similarly, a report describing inmate beatings met the standard when there were "no material differences" between the reported information and the official documents upon which it was based. *Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 362 (Fla. 4th DCA 1997). Discrepancies that would not have "a different effect on the mind of the [reader]" and that do not "affect the gist of the story" do not prevent the fair report privilege from operating. *Woodard*, 616 So. 2d at 503.

This Court has determined that it would be fair and accurate to interpret the source documents Defendants cite in support of Statements 2–7 to mean that Plaintiff has written and spoken about the safety of GMO technologies. *See, e.g.*, ECF No. 64-21, at 1 (grant proposal including the statement that "[s]afe food products with no plausible means of harm become stigmatized" because of "fear and undue cynicism about transgenic crop technology"); ECF No. 64-9, at 33 (testimony before the Council of the County of Kaui'a describing GMO technology as "safe and used because it helps farmers compete"). Plaintiff would prefer this idea to be communicated more neutrally—perhaps as a statement that he often explains the science of GMO technologies. But this preference is not the yardstick by which statements in a news report are measured. Defendants' statements must be only "substantially accurate," and Defendants have a right to focus and color their report to capture and hold readers' attention. Look at Statement 3.

13

**Statement 3:** *"Dr. Folta said that he joined the campaign to publicly defend genetically modified technologies because he believes they are safe and that it is his job to share his expertise."*

It appears undisputed that Plaintiff thinks GMO technologies are safe and that he believes it is his role as a land-grant scientist to engage with and explain complex scientific concepts to the public. Plaintiff bristles at the idea that he "joined the campaign" to defend GMOs, but this is a reasonable description of his correspondence with industry around labeling laws and his advocacy activities before government bodies. *See, e.g.*, ECF No. 64-9, at 139–147 (email chain discussing possible public education responses to proposed state labeling laws); *Id.* at 137 (email from Plaintiff to an industry organization executive evaluating a meeting held by the Pennsylvania House Agriculture and Rural Affair Committee). Therefore, Statement 3 is a fair and accurate report of the cited source documents.

In response to several of these statements, Plaintiff highlights the difference between GMO "products" and "technologies." Though this Court appreciates the distinction and its relevance, in the context of the fair report privilege, this is too exacting. The court in *Woodard* specified that the standard in the news media context is not that of "technical or scientific reporting." *Woodard*, 616 So. 2d at 502–03. The typical reader is not likely to consider Dr. Folta in a different light after hearing that he is supportive of GMO products,

14

as opposed to GMO technologies. This is precisely the type of error that still falls within the definition of "substantially accurate."

As a result, the fair report privilege applies to Statements 2, 3, 4, 5, 6, and 7. Summary judgment as it pertains to these statements is **GRANTED**.

2

The second group—made up of Statements 11, 24, 29, and 32—relates to Plaintiff's motivation for participation with industry and in advocacy activities. The fair report privilege allows the news media flexibility for editorial style and places no duty on it to further investigate or verify the information contained in government-produced records. *See Alan*, 973 So. 2d at 1180; *see also Woodard*, 616 So. 2d at 502–03. From this, an article's negative portrayal of an individual is not grounds for a defamation action. *Alan*, 973 So. 2d at 1180 ("While some of the statements in the Post's articles may be viewed as painting Alan in a negative light, this alone does not rise to actionable defamation.").

Consider Statement 24.

**Statement 24:** *"Dr. Folta, the emails show, soon became part of an inner circle of industry consultants, lobbyists and executives who devised strategy on how to block state efforts to mandate G.M.O. labeling and, most recently, on how to get Congress to pass legislation that would pre-empt any state from taking such a step."*

15

The cited documents make clear that Plaintiff communicated with industry-associated individuals and other academics about GMO labeling legislation at both the state and federal levels. *See, e.g.*, ECF No. 64-9, at 139–147; *id.* at 156–57 (email discussion about a proposed federal bill). Plaintiff takes offense at the concept of belonging to an "inner circle" and at the perceived implication that he would participate in such discussions as part of a *quid pro quo* exchange of strategic cooperation for grant money. This Court appreciates Plaintiff's frustration and believes that his true incentive for taking action was—as he stresses—about the science. Plaintiff and biotechnology companies often have, possibly to Plaintiff's detriment in some instances, aligned interests. Plaintiff seeks to educate the public about GMO technology for the sake of sharing knowledge and fighting misinformation. The biotech industry encourages such education efforts, maybe altruistically to a degree, but also because it helps their bottom line. A public with a deeper understanding of GMO food products is more likely to accept and purchase them.

The mischaracterization of motivation that Plaintiff observes in this group of statements does not provide him with a legal remedy. The news media Defendants' qualified privilege reaches these statements. Defendants have presented a fair and accurate report of the source documents, so Plaintiff cannot complain of the "negative light" in which he feels he has been cast.

16

Accordingly, the fair report privilege applies to Statements 11, 24, 29, and 32, and summary judgment is **GRANTED** as to them.

3

The third group, which includes Statements 8, 9, 10, 12, 13, 14, 15, 18, 19, 20, 27, 28, and 30, covers the statements most closely tied to the Article's overarching theme, as well as those describing other academics' interactions with various industry players. This group also includes several of the statements that Plaintiff contends are "the most independently defamatory and damaging." ECF No. 74, at 47–53, 57–61. These statements pertain to industry's alleged practice of swapping grants for advocacy and how industry considers and seeks out academic support.

At the risk of sounding like a broken record, the fair report privilege is broad and its "fair and accurate" bar is a low standard, especially considering the importance placed on news media's responsibility to report on government action. Media defendants can add color. And they are not required to regurgitate the exact, precise language of their government sources. They can also summarize and focus publications as they choose. *See, e.g.*, *Jamason*, 450 So. 2d at 1133. In *Rasmussen*, for example, the plaintiff objected to an article stating that he had pleaded to "reduced or related charges" in a particular suit, when in reality those charges had been dropped after he had pleaded to lesser charges in a related case. *Rasmussen*, 946 So. 2d at 569. The court there

17

determined that the summary language, which covered charges against numerous defendants, was not false as it related to the plaintiff and that the media's reporting was protected by the fair report privilege. *Id.* at 569–70.

Plaintiff's main contention with the Article is the implication that he is not the independent scientist he has spent the last thirty years becoming, but rather that he shills for industry, promoting biotech company products and technologies in a *quid pro quo* arrangement for grant money. While this Court acknowledges the reputational impact of such a perception, and is sympathetic to Plaintiff's situation, the Article statements to which Plaintiff objects are nonactionable. Take Statement 9, for example.

> **Statement 9:** *"So Monsanto, the world's largest seed company, and its industry partners retooled their lobbying and public relations strategy to spotlight a rarefied group of advocates: academics, brought in for the gloss of impartiality and weight of authority that come with a professor's pedigree."*

The cited sources offer evidence of industry support for academics, as well as of academics advocating for outcomes that align with company interests. *See, e.g.*, ECF No. 64-48, at 2–16, 19–22, 28–31 (detailing Professor Chassy's communication with a Monsanto executive about a letter to the EPA and a donation to his university); ECF No. 64-49, at 2, 4–13, 21–26, 37, 41 (including Professor Shaw's communications with Dow and Monsanto

executives about letters to the USDA and support for university faculty). It is clear from the communications that biotech companies, like Monsanto, had the goal and the plan of harnessing academic voices to advance their objectives. It is not obvious to this Court that a natural reading of the statement would necessarily impute any sort of strategizing or "shilling" on the part of the targeted professors. To the extent that it does, it is likely still a fair and substantially accurate report of sources documenting industry funding for educational pursuits. The Article's reference to a "gloss of impartiality" appears to be in the eye of the industry beholder and therefore not most easily interpreted as a questioning of academic or professional integrity.

Plaintiff argues in response to at least one of these statements that the fair report privilege cannot apply with respect to *him*, based on its fairness and accuracy with regard to sources about other academics. ECF No. 74, at 48. Plaintiff does not provide any authority to support this assertion, and though not precisely on point, *Rasmussen*, discussed *supra*, weighs against such an application. There, the court determined that a summary statement that more precisely described the situation of others similarly situated was acceptable, even despite it being technically inaccurate as to the plaintiff. *Rasmussen*, 946 So. 2d at 569–70. Here, the UF-produced source documents do show industry collaborating with Plaintiff and expelling the virtues of his participation in

their activities. *See, e.g.*, ECF No. 64-9, at 7, 36, 86, 120, 128 (mentioning, for example, the "big white hat" worn by land grant scientists in the GMO debate).

After reviewing the cited source documents, this Court appreciates the ranging levels of collaborative intensity between various companies and academics. Plaintiff's involvement with industry and industry groups was different in kind from that of some other professors. This Court understands Plaintiff's frustration with being "lumped in" with others and arguably being touted as the poster child for such *quid pro quo* transactions when others had notably deeper and more involved relationships. Unfortunately, even if this perception can be gleaned from the Article, Defendants did not step outside the privilege's protection in reporting on the source documents. The fair report privilege applies to Statements 8, 9, 10, 12, 13, 14, 15, 18, 19, 20, 27, 28, and 30. Defendants' motion for summary judgment as to these statements is **GRANTED**.

4

The fourth group—consisting of Statements 16, 21, 22, 23, 25, and 26— is concerned with the omission of favorable or explanatory information. Florida's fair report privilege requires that a report be "accurate and complete or a fair abridgment" of the underlying information. *See, e.g.*, *Huszar*, 468 So. 2d at 516 (quoting Restatement (Second) of Torts § 611). Fair abridgment can occur when media defendants accurately summarize separable portions of

government records. *See Carson v. News-Journal Corp.*, 790 So. 2d 1120, 1122 (Fla. 5th DCA 2001), *dismissed*, 805 So. 2d 805 (Fla. 2002). The court in *Carson* did not find problematic that the newspaper had reported on plaintiff's dismissal without also noting that he was discharged for "reasons other than 'misconduct connected with his work' and that he was awarded unemployment compensation benefits." *Id.* Turn to Statement 21.

> **Statement 21:** *"'Misinformation campaign in ag biotech area is more than overwhelming,' Yong Gao, then Monsanto's global regulatory policy director, explained in an April 2013 email to Dr. Folta as the company started to work closely with him. 'It is really hurting the progress in translating science and knowledge into ag productivity.'"*

The quoted portions come directly from a UF-produced email. Plaintiff objects to Defendants' omission of several sentences, arguing that the abbreviated version presents the conversation in a completely different light. ECF No. 74, at 84. The omitted sentences essentially state that the author is "grateful that academics like [Plaintiff] are willing to speak out on the science in this area to the public" and thank Plaintiff for "supporting science and for educating those who are open to science." *Id.* It is not apparent that the inclusion of these sentences would at all change the effect of the statement in an average reader's mind. If anything, their inclusion would likely strengthen

21

the theme of industry executives seeing value in professorial allies. As a result, Defendants provided a fair and accurate abbreviation of the email in question, so the statement is covered by the fair report privilege.

More generally, Defendants are under no obligation to include additional information that would portray the Plaintiff in a more favorable light. The press can select the focus of their own publications, without regard to presenting both sides of every issue. *See, e.g.*, *Jamason*, 450 So. 2d at 1133. For this reason, Statements 16, 21, 22, 23, 25, and 26 are protected by the fair report privilege. Summary judgment as it pertains to these statements is **GRANTED**.

## D

As explained, Statements 2–16, 18–30, and 32 all clearly fall within the ambit of the fair report privilege. Given the current climate, it is important to recognize the critical nature of the privilege and the necessity of its expansive application. Today's environment has created a unique prism for defamation actions and the protections intended to ensure a free press. When politicians plan to "open up our libel laws," and then after winning elections, continue to pummel the press and decry anything unflattering as "fake news," it is clear that the Fourth Estate is under attack. When those in power describe lawful investigations as witch hunts and "[c]arefully sourced journalism" as "fake news from the enemies of the people," it is especially important for the

22

judiciary to consider carefully its role in providing the media ample space to exercise their First Amendment rights. Michael Miller, *Enemy of the People?*, N.Y. St. B.J., September 2018, at 5.

Beyond these verbal and 140-character attacks, there is also evidence to suggest that the media is losing in libel and privacy suits much more often and at a greater cost than in the past. RonNell Andersen Jones & Sonja R. West, *The Fragility of the Free American Press*, 112 Nw. U.L. Rev. Online 47, 58 (2017). The press has won only 39% of the privacy and libel cases at trial since 2010. Emily Bazelon, *Billionaires vs. the Press in the Era of Trump, N.Y. Times* (Nov. 22, 2016), https://www.nytimes.com/2016/11/22/magazine/billionaires-vs-the-press-in-the-era-of-trump.html. The average award granted against media defendants in the 1980s was $200,000; the median damage award has now grown to $1.1 million. *Id.* Today, it seems that super-wealthy individuals—undeterred by the negative outcomes and market forces that used to prevent many defamation suits—can treat "suing the press as an investment" and can pursue their objectives by funding cases and waiting for the right combination of issue, judge, and jury. *Id.*

Against this backdrop, the importance of the press's common law privileges becomes even more obvious. The fair report privilege exists largely enshrined in state and federal court jurisprudence alone. It is only as strong as the courts that enforce it. In applying the privilege, this Court is mindful of

the instructive nature of the Florida Constitution and the legislature's direction in Florida's Public Records Law. Both these sources indicate a weighty significance placed on citizen oversight of their government—oversight that is assisted and largely effectuated by reliance on a free press to investigate and report on government action.

This case is not one cooked up by billionaire opponents of a free media. Plaintiff seeks only a remedy for the reputational damage he alleges he suffered because of Defendants' publication. Plaintiff would have this Court apply a narrow understanding of the fair report privilege—either through exempting his emails from the definition of public records or by applying a considerably harsher "fair and accurate" reporting standard. Despite this Court's sympathy for and understanding of Plaintiff's case, it cannot act as Plaintiff suggests. A cramped reading of the privilege would undercut its very purpose. It would open the door to far less meritorious suits by far less scrupulous plaintiffs, and it would contribute to the ongoing chipping-away of the rights and privileges necessary to the press's ability to play its intended role as government watchdog. This Court will not do so.

### III

This Court now turns to the fifth and final group of statements—Statements 1, 17, and 31. Although Defendants claim four or five defenses for each statement, this Court will focus primarily on two: that the statements are

not susceptible to a defamatory meaning and that they are protected as pure opinion.

A

Whether a statement is capable of defamatory meaning is a question of law for the court. *Turner v. Wells*, 879 F.3d 1254, 1263 (11th Cir. 2018). Only when a statement is susceptible to two reasonable meanings—one of which is defamatory—does it become a question of fact for the jury. *Id.* at 1269.

A statement is defamatory when its "gist" or "sting" is defamatory. *Greene v. Times Publ'g Co.*, 130 So. 3d 724, 729–30 (Fla. 3d DCA 2014). A defamatory statement is a statement that "tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, one that exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1108–09 (Fla. 2008). A statement that does such "on its face" can be referred to as defamatory *per se*, and extrinsic proof is not required to establish the statement's defamatory meaning. *See Carroll v. TheStreet.com, Inc.*, No. 11-CV-81173, 2014 WL 5474061, at *16 (S.D. Fla. July 10, 2014) ("The statements labeling Carroll a "convicted felon," "con artist," and "troubling character," remain the same—they are injurious on their face and require no extrinsic evidence to establish their defamatory meaning."). Defamation can also occur by implication under Florida law. Defamation by implication arises

25

when "literally true statements are conveyed in such a way as to create a false impression." *Rapp*, 997 So. 2d at 1108. This can occur in two ways: (1) through juxtaposing facts to imply a defamatory connection or (2) creating a defamatory implication by omitting facts. *Id.* at 1106.

In determining the availability of a defamatory meaning for a given statement, a court considers the statement in the context of the publication as a whole and evaluates it as it would be understood by the common mind. A court must consider a publication in its totality, looking at "all the words used, not merely a particular phrase or sentence." *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983) (quoting *Info. Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980)). "Articles are to be considered with their illustrations; pictures are to be viewed with their captions; stories are to be read with their headlines." *Byrd*, 433 So. 2d at 595. In addition, publications should be evaluated "not by 'extremes, but as the common mind would naturally understand it.'" *Id.* (quoting *McCormick v. Miami Herald Publ'g Co.*, 139 So. 2d 197, 200 (Fla. 2d DCA 1962)). The *Byrd* court clarified further, indicating that statements "should be considered in [their] natural sense without a forced or strained construction." *Byrd*, 433 So. 2d at 595.

This Court first considers Statement 1.

**Statement 1:** *"But he also conceded in an interview that he could unfairly be seen as a tool of industry, and his university now intends to donate the Monsanto grant money. 'I can understand that perception 100 percent' he said, 'and it bothers me a lot."*

Plaintiff includes Statement 1—the "tool of industry" statement—as one of the Article's most damaging statements. ECF No. 74, at 53. Plaintiff argues that the statement as written insinuates that Plaintiff himself offered the term "tool of industry," when the words were really those of Defendant Lipton.[7] This Court's reading of the sentence is that the phrase did come from Defendant Lipton; the use of the verb "conceded," when discussing an interview, would suggest that the statement was the response to a question, and likely a question that included the pertinent phrase. Regardless, the identity of the party to introduce the phrase is not truly relevant to the question of the common mind's perception of the statement. This Court cannot conceive of this statement as capable of a defamatory meaning when the "tool of industry" label is so closely coupled with "could unfairly be seen." Plaintiff's singular focus on

---

[7] Plaintiff also spends time and space arguing that Defendant Lipton's question itself was defamatory. ECF No. 74, at 53–54. As Defendants note in their Supplemental Reply Memorandum—however Defendant Lipton's question was phrased—it was not published to any third party (as it does not appear in the Article) and is thus not actionable. *See, e.g.*, *Valencia v. Citibank Int'l*, 728 So.2d 330, 330–31 (Fla. 3d DCA 1999) (recognizing publication to a third party as two elements of defamation under Florida law).

the phrase "tool of industry" and its potential defamatory effects is misplaced. The label needs to be considered in context—beginning with the sentence in which it appeared. Reading the entire sentence, the import is not that Plaintiff *is* a "tool of industry" but rather that the *unfair perception of him as one* exists. Even considering this statement in the Article's larger context—with all the other privileged, but arguably defamatory statements—Statement 1 is not susceptible of a defamatory meaning. As a result, summary judgment is **GRANTED** as to this statement.

### B

Whether a statement is one of fact or opinion is a question of law for the court. *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981). While the Supreme Court in *Milkovich* refused to create additional protections for all statements "categorized as 'opinion,'" it also reiterated existing constitutional protections already in effect. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20 (1990). The Court discussed these protections in three groupings: (1) *Hepps*, (2) *Bresler-Letter Carriers-Falwell*, and (3) *New York Times-Butts-Gertz. Id.* at 20. *Hepps* means that "a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least . . . where a media defendant is involved." *Id.* In other words, "a statement of opinion relating to matters of public concern

which does not contain a provably false factual connotation will receive full constitutional protection." *Id.*

Florida, like other states, has relied on the Restatement (Second) of Torts § 566, to more clearly delineate protected from nonprotected opinion. This distinction is made between pure and mixed expressions of opinion. Pure opinion must be "based upon facts that the communicator sets forth in a publication, or that are otherwise known or available to the reader or the listener as a member of the public," while mixed opinion is "based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication." *Fla. Med. Ctr., Inc. v. New York Post Co.*, 568 So. 2d 454, 457 (Fla. 4th DCA 1990) (quoting *Hay v. Indep. Newspapers Inc.,* 450 So. 2d 293 (Fla. 2d DCA 1984)). Only pure opinion is protected under the First Amendment. *Hay*, 450 So. 2d at 293. It is worth noting, however, that if the stated facts upon which the speaker has based his opinion are "either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact" and therefore lose its protection. *Milkovich*, 497 U.S. at 18–19; *see also Fla. Med. Ctr.*, 568 So. 2d at 458 ("Thus, in the instant case assuming . . .  a subject of public concern, . . . if the statements are capable of being proved false, they are not protected."). In assessing the status of potentially defamatory statements, a court "must construe the statement in its totality, examining not merely a

29

particular phrase or sentence, but all of the words used in the publication."
*Fla. Med. Ctr., Inc.*, 568 So. 2d at 457 (quoting *Hay*, 450 So. 2d at 295).

1

This Court now turns to Statement 17.

**Statement 17:** *"'If you spend enough time with skunks, you start to smell like one.' Charles M. Benbrook A proponent of labels on G.M.O. foods, backed by the organic industry"*

Statement 17—the so-called "skunk smear"—appears both in the text of the Article and directly beneath a photograph of Dr. Benbrook in the print version. Viewing Dr. Benbrook's quote in the broader context of the entire Article—as this Court must do—it is apparent that the statement is Dr. Benbrook's pure opinion, based on his own experiences. Dr. Benbrook, who had been the chief scientist at an organics-funded organization, resigned for the chance at a university appointment. While at Washington State, Dr. Benbrook continued to advocate on behalf of the organics industry, just as the industry continued to fund his research and to promote coverage of his study findings. Dr. Benbrook no longer works at Washington State, as his research post was not renewed. Dr. Benbrook's recent career trajectory provides the facts upon which his protected, pure opinion is based; Dr. Benbrook's "skunk smear" appears to be his own expression of regret over the organics industry's use of his academic

30

pedigree. Statement 17 is privileged as pure opinion and, therefore, is nonactionable. Summary judgment as to this statement is **GRANTED**.

2

Finally, this Court looks to Statement 31.[8]

**Statement 31:** *"Dr. Benbrook, whose research post at Washington State was not renewed this year, said the organic companies had turned to him for the same reasons Monsanto and others support the University of Florida or Dr. Folta directly. 'They want to influence the public,' he said. 'They could conduct those studies on their own and put this information on their website. But nobody would believe them. There is a friggin' war going on around this stuff. And everyone is looking to gain as much leverage as they can.'"*

Statement 31 appears toward the end of the Article and immediately after a description of Dr. Benbrook's recent employment history and involvement with the organics industry. Plaintiff takes offense at the Article's assertion that Monsanto approached him for the same reasons that organics companies supported Dr. Benbrook. He does concede, though, that the statement is not actionable alone but instead argues that it supports other more defamatory

---

[8] This Court has reproduced only the second half of Statement 31 above both because it summarized the first half in its discussion of Statement 17 and because Plaintiff seems most concerned with the portion that refers to him by name.

31

statements. ECF No. 74, at 95–96. Dr. Benbrook's mention of the "same reasons" is further explained by the direct quote that follows. It is his opinion that both biotech and organics companies want to influence the public's perception of GMO products and that they perceive academic voices as particularly valuable in doing so. The direct quote that follows and the previous portion about Dr. Benbrook's employment trajectory provide the stated facts upon which his opinion is based. Plaintiff argues that this cannot be Dr. Benbrook's true opinion because he knew that Plaintiff had received no research funding from biotech companies. This information is inapposite. Dr. Benbrook's statement is most easily understood simply as opining on the strategies of Monsanto (and other companies) and does not imply that Plaintiff's research is in any way biased or disingenuous. As a result, Statement 31 is privileged as pure opinion, and as Plaintiff partially admitted, is nonactionable. Therefore, summary judgment on this statement is **GRANTED**.

## IV

In today's world of "fake news" and near-constant attacks on the traditional media, this Court is especially sensitive to upholding the legal protections that enable the press to act effectively in its essential task of policing the government. In summary, Statements 2–16, 18–30, and 32 are privileged under Florida's fair report privilege. Statement 1 is not capable of a

defamatory meaning, and Statements 17 and 31 are privileged as pure opinion. Summary judgment as to all the statements—Statements 1–32—is **GRANTED**.

Accordingly,

**IT IS ORDERED:**

1. Defendant's Motion for Final Summary Judgment, ECF No. 65, is **GRANTED**.

2. The Clerk is directed to enter judgment in this matter, stating "Plaintiff's claims are dismissed with prejudice."

3. The Clerk shall close the file.

**SO ORDERED on February 27, 2019.**

**s/Mark E. Walker              ____**
**Chief United States District Judge**